**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (No. II) | MDL Docket No. 1:20-mc-00008-BAH |
| | Civil Action No.: 1:20-cv-00489-BAH |
| This document relates to: | |
| TOYOTA MOTOR SALES, U.S.A., INC. 6565 Headquarters Dr., Plano, TX 75024; | **AMENDED COMPLAINT** |
| TOYOTA CANADA INC. 1 Toyota Pl., Toronto, ON M1H 1H9, Canada, | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| BNSF RAILWAY COMPANY 2650 Lou Menk Drive, Fort Worth, TX 76131; | |
| UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street, Omaha, NE 68179; | |
| CSX TRANSPORTATION, INC. 500 Water Street, Jacksonville, FL 32202; | |
| NORFOLK SOUTHERN RAILWAY COMPANY Three Commercial Place, Norfolk, VA 23510, | |
| Defendants. | |

**<u>AMENDED COMPLAINT</u>**

Plaintiffs Toyota Motor Sales, U.S.A., Inc. ("TMS") and Toyota Canada Inc. ("TCI") (collectively, "Toyota" or the "Toyota Companies") allege against Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (collectively, the "Defendants"), based on personal knowledge as to their own acts and practices and otherwise based on information and belief, the following claims for violations of Section 1 of the Sherman Act, 15 U.S.C. §1.  Other persons injured by Defendants' price-fixing conspiracy have filed Sherman Act Section 1 claims and those lawsuits have been consolidated for pretrial proceedings in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 1:07-mc-00489 (PLF), in the U.S. District Court for the District of Columbia and in *In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, 1:20-mc-00008 (BAH), in the U.S. District Court for the District of Columbia.

## INTRODUCTION

1.      This lawsuit challenges violations of Section 1 of the Sherman Act by Defendants, the four largest United States-based Class I railroads,[1] from as early as July 1, 2003 through at least December 31, 2008 (the "Relevant Period").  Defendants have damaged Toyota by jointly dramatically increasing the prices Toyota paid Defendants to ship products by rail.

2.      As alleged in detail herein, Defendants jointly fixed, raised, maintained, and/or stabilized the price of rail freight transportation services sold in the United States to their direct customers (shippers), such as the Toyota Companies.  Defendants artificially increased prices and their resulting revenues by jointly adopting and in a coordinated manner imposing on

---

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars; $447.6 million in 2017 dollars).  There are currently seven Class I railroads operating in the United States:  (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Southern Railway Company; (6) Soo Line Railroad Company; and (7) Grand Trunk Corporation The Soo Line Railroad Company is owned by Canadian Pacific Railway.  The Grand Trunk Corporation is owned by the Canadian National Railway.

shippers a charge, calculated as a percentage of the base rail freight rate (the "base rate" method), that Defendants called a "rail fuel surcharge" or "FSC."  Because Defendants price their services based on the different shippers' individual elasticities of demand for rail transportation, such a rail fuel surcharge was unrelated to and exceeded Defendants' actual fuel costs.

3.    The collusively set rail fuel surcharges significantly exceeded Defendants' actual fuel costs, increased Defendants' revenues by billions of dollars, and wrongfully increased Defendants' profits.  An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 exceeded $6 billion.  UP boasted to its shareholders in its 2005 Annual Report that its rail fuel surcharge revenues in 2005 alone were over $1 billion.

4.    In a proceeding denominated Rail Fuel Surcharges, *Ex Parte* No. 661 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency charged with regulating aspects of the railroad industry, addressed Defendants' practice of computing rail fuel surcharges as a percentage of their base rail freight rate.  The STB found Defendants' actions "unreasonable." Defendants' practices, invoices, and documents describing the rail fuel surcharges were, according to the STB, "misleading."

5.    Through their collective action during the Relevant Period, Defendants conspired to impose upon shippers coordinated rail fuel surcharges that far exceeded any increases in Defendants' fuel costs, and thereby collected billions of dollars in additional profits, including hundreds of millions of dollars from Toyota.

6.     Defendants' rail fuel surcharge conspiracy constitutes a *per se* violation of the Sherman Act Section 1 and is, in any event, an unreasonable and unlawful restraint of trade.

7.     Defendants' illegal conduct has injured each of the Toyota Companies that is a plaintiff in this action.  Each directly paid illegal rail fuel surcharges that it would not have paid but for the rail fuel surcharge conspiracy.  Each of the Toyota Companies is entitled under Section 4 of the Clayton Act, 15 U.S.C. § 15, to damages for violations of Section 1 of the Sherman Act.

8.     Toyota seeks damages for the rail fuel surcharges that Defendants imposed on rail freight shipments made under private transportation contracts or other arrangements with Toyota entered during the Relevant Period and through other means exempt from rate regulation under federal law.  Toyota does not seek damages arising from rail fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

9.     Plaintiff Toyota Motor Sales, U.S.A., Inc. is a corporation organized under the laws of the State of California, with its principal place of business in Plano, Texas.  During the Relevant Period, TMS's principal place of business was in Torrance, California.

10.     TMS and its subsidiaries and affiliates (including but not limited to Toyota Logistics Services, Inc.) oversee the sales, marketing, and distribution of Toyota, Lexus, and (during the Relevant Period) Scion products in the 48 contiguous states and Alaska.  TMS and its subsidiaries and affiliates manage U.S. distribution through its twelve parts centers and twelve vehicle processing centers located across the United States.

11.     During the Relevant Period, TMS entered into contractual arrangements with Defendants for rate-unregulated rail freight transportation services.

12.     TMS purchased rate-unregulated rail freight transportation directly from Defendants, or their subsidiaries and affiliates, or agents controlled by Defendants or their subsidiaries and affiliates, during the Relevant Period and pursuant to agreements and other arrangements entered into during the Relevant Period.  Defendants assessed rail fuel surcharges on TMS in connection with those purchases.  TMS paid Defendants more for rate-unregulated rail freight transportation services on which rail fuel surcharges were imposed than TMS would have paid absent the conspiracy alleged herein.  As a direct result of Defendants' unlawful conduct, TMS suffered injury to its business or property.

13.     Plaintiff Toyota Canada Inc. is a corporation organized under the laws of Canada, with its principal place of business in Toronto, Canada.

14.     TCI oversees the distribution of Toyota, Lexus, and (during the Relevant Period) Scion products in Canada.  A substantial portion of the automobiles TCI distributed during the Relevant Period were transported from plants in the United States, including in Texas and California, to Canada on BSNF's and UP's rail lines.

15.     During the Relevant Period, TCI entered into contractual arrangements with BNSF and UP for rate-unregulated rail freight transportation services.

16.     TCI purchased rate-unregulated rail freight transportation directly from BNSF and UP, or their subsidiaries and affiliates, or agents controlled by BSNF and UP or their subsidiaries and affiliates, during the Relevant Period and pursuant to agreements and other arrangements entered into during the Relevant Period.  BNSF and UP assessed rail fuel surcharges on TCI in connection with those purchases.  TCI paid more to BNSF and UP for rate-unregulated rail freight transportation services on which rail fuel surcharges were imposed than TCI would have

paid absent the conspiracy alleged herein.  As a direct result of BNSF's and UP's unlawful conduct, TCI suffered injury to its business or property.

17.    Defendant CSX Transportation, Inc. is a corporation organized under the laws of Virginia, with its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has railway lines throughout the eastern United States.  CSX interchanges traffic with BNSF, UP, and NS and some of that traffic originates and terminates within this District.  During the Relevant Period, CSX, or its subsidiaries and affiliates, or agents controlled by CSX or its subsidiaries and affiliates, entered into agreements and other arrangements with TMS that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to TMS, and assessed TMS rail fuel surcharges for the agreed-upon transportation.

18.    Defendant Norfolk Southern Railway Company is a corporation organized under the laws of Virginia, with its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.  During the Relevant Period, NS, or its subsidiaries and affiliates, or agents controlled by NS or its subsidiaries and affiliates, entered into agreements and other arrangements with TMS that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to TMS, and assessed TMS rail fuel surcharges for the agreed-upon transportation.

19.    Defendant BNSF Railway Company is a corporation organized under the laws of Delaware, with its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.

BNSF is a wholly owned subsidiary of Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates approximately 32,000 route miles of railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states, including rail lines within this District.  BNSF connects with rail partners in the East, linking customers to markets around the world.  During the Relevant Period, BNSF, or its subsidiaries and affiliates, or agents controlled by BNSF or its subsidiaries and affiliates, entered into agreements and other arrangements with Toyota that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Toyota, and assessed Toyota rail fuel surcharges for the agreed-upon transportation.

20.     Defendant Union Pacific Railroad Company is a corporation organized under the laws of Delaware, with its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States, including rail lines within this District.  UP connects with rail partners in the East, linking customers to markets around the world.  During the Relevant Period, UP, or its subsidiaries and affiliates, or agents controlled by UP or its subsidiaries and affiliates, entered into agreements and other arrangements with Toyota that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Toyota, and assessed Toyota rail fuel surcharges for the agreed-upon transportation.

21.     Each Defendant acted as the agent of or co-conspirator with the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

22.     Whenever this Complaint refers to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its

officers, directors, employees, agents or representatives while they were actively engaged in the usual management, direction, control or transaction of the corporations business or affairs.

## JURISDICTION AND VENUE

23.     Toyota brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages, treble damages, injunctive relief, costs, and reasonable attorneys' fees for the injuries sustained by Toyota by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24.     This Court has subject matter jurisdiction over Toyota's federal antitrust claims pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

25.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of Defendants transacted business, maintained offices, were found, or had agents in this District, the wrongful conduct alleged in this Complaint was carried out in part within this District, and the interstate commerce described below was carried on in part within this District.

26.     This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

27.     During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States.  Defendants collect tens of billions of dollars in revenue each

year.  For example, the Association of American Railroads ("AAR") reported that railroad total operating revenue in the United States exceeded $52 billion in 2006.

28.     Defendants' activities were within the flow of, and substantially affected, interstate commerce.  During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers, including Toyota, throughout the United States, including through and into this District.  Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

29.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

## I.    CONGRESS DEREGULATED THE RAILROAD INDUSTRY, AND CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION.

30.     The U.S. freight railroad industry has played a central role in the country's economic growth and in the laws designed to foster that growth and protect consumers through competition.  As the Supreme Court said nearly 125 years ago in *United States v. Trans-Missouri Freight Ass'n*, "there is no other line of business carried out in our midst which is so intimately connected with the public as that conducted by the railways of this country."  166 U.S. 290, 336 (1897).  Indeed, the Sherman Act's legislative history reflects lawmakers' concerns with the railroads' anticompetitive practices.[2]  The first two antitrust cases the U.S. Supreme Court decided on the merits—*Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897) and *United States v.*

---

[2] *See, e.g.*, Cong. Rec. 5959 (1890) (statement of Congressman J. Anderson) (in arguing that railroad rate cartels should be outlawed, asking "whether the people shall be protected by the safeguard of competition between carriers, as they are by competition between merchants, or whether we shall legalize combinations so that the railroads may hereafter charge whatever they see fit in defiance of common law and justice").

*Joint Traffic Ass'n*, 171 U.S. 505 (1898)—involved allegations of price fixing by the railroads' joint operating arrangements.

31.     For 93 years—between 1887, when Congress passed the Interstate Commerce Act, and 1980—U.S. railroad operations were conducted by a large number of federally regulated railroads with rates for freight shipment required to be published in documents filed with the Interstate Commerce Commission (the "ICC").  During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis if approved by the ICC.

32.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 (the "Staggers Act").  This landmark legislation marked a dramatic change in the regulation of U.S. railroads.  After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set their own rates for rail transportation.  Among other things, instead of having all rates set in accordance with mandatory tariffs, rail shippers and rail carriers were generally allowed to enter into transportation contracts whose terms were not subject to ICC review and approval.  The Staggers Act also phased out the across-the-board, industry-wide rate increases.

33.     The Staggers Act relies on competitive forces, rather than government regulation, to improve railroad operations' efficiency.  The Staggers Act's objectives included creating a modern, competitive, and healthy railroad industry to service the American business community, with competitive rates and concern for serving the customer base, particularly those that depend on rail freight services for the movement of products.  As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709: "If anticompetitive behavior is alleged,

under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, 96th Cong. 2d Sess. 1, (1980) *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

34.    In 1995, Congress replaced the ICC with a new agency—the STB—that assumed some of the ICC's former functions.

35.    However, more than 80% of all U.S. rail freight shipments now move under terms that are not regulated by the STB or any other government agency.  For all of this rate-unregulated traffic, the railroads cannot turn to an agency—like the STB or its predecessor—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.  This Complaint involves such rate-unregulated rail traffic.

36.    Since 1980, the number of Class I railroads has declined dramatically, from thirty-five at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).  The railroad industry is (and during the Relevant Period was) highly concentrated:  four of these seven railroads—Defendants BNSF, UP, CSX and NS—collect approximately 90% of all freight revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

37.    Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered to Defendants by these small carriers is negligible.

38.    Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred—Defendants colluded to charge shippers, including Toyota, supra-competitive rates.

## II.   DEFENDANTS AGREED TO PRICE-FIX RAIL FUEL SURCHARGES.

### A.   The Pre-Conspiracy Age.

39.   By the early 2000s, the railroad industry had consolidated to the point where further mergers were unlikely, if not impermissible.  In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB introduced a moratorium on new mergers and promulgated more stringent standards for merger review.

40.   For many years before the Relevant Period, Defendants experienced decreasing prices.  The average U.S. rail freight rate decreased steadily after the 1980 passage of the Staggers Act until the early 2000s.  A January 2009 STB study, titled "Study of Railroad Rates: 1985-2007," concluded that "inflation-adjusted rail rates declined in every year but one from 1985 through 2004."  Figure 1 from "Study of Railroad Rates" evidences that trend:



41.   The decline in rail freight rates, reflected in the STB data above, was brought about by various factors, including by what CSX characterized in an internal analysis as

"destructive pricing for rail share" and "some very vicious historical price wars." A 2002 BNSF

"risk assessment" described this problem, while also foreshadowing the coordination Defendants

would later agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry,
> not being able to improve revenue through adequate rate increases.  We need to be able to
> achieve price rate improvement.  ***How can we do this if the other competing railroads do
> not do this at the same time? We are still not together as an industry.  We are fighting
> for revenue share as opposed to rate adequacy.***  (Emphasis added.)

42.    After 1980, railroads typically entered into private freight transportation contracts

that included cost escalation provisions to give railroads a reasonable cost-recovery mechanism.

These provisions typically relied on a price index called the All-Inclusive Index (the "AII") or a

price index called the Rail Cost Adjustment Factor (the "RCAF").  The AAR publishes the AII

and calculates and submits the RCAF to the STB for approval and publication.  The RCAF is

based on the AII.  As the name "***All-Inclusive*** Index" suggests, the AII and by extension the

RCAF weigh a number of price inputs, including labor, fuel, materials and supplies, equipment

rents, depreciation, interest, and other expenses, so that the indexes reflect the actual impact of

various price changes on overall rail transportation costs.  This means that no matter the size of

the actual increase in fuel prices, the AII and RCAF would reflect it.  James R. Young, the then-

CEO of UP, acknowledged publicly in an October 2004 earnings conference call that the RCAF

"looks at actual costs through the industry."

43.    During this pre-2003 era of competition, at least some Defendants unilaterally

inserted separate rail fuel surcharges into contracts for private rail freight transportation. But

these pre-conspiracy rail fuel surcharges were applied at very low levels in isolated instances that

were neither uniform nor consistent, and each Defendant had different rail fuel surcharge rates,

reflecting the differing fuel costs of each railroad.  These rail fuel surcharges "were subject to

competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 48 (D.D.C. 2012) ("*Rail Freight I*"). In short, these rail fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the [Relevant Period]." *Id.* Prior to 2003, rail fuel surcharges were the exception and often only theoretically billable, with the AII and RCAF indexes instead widely used to capture fuel and other costs.

44.     As an example, at least one contract between Toyota and Defendants—the 2001 Memorandum of Understanding between TMS and UP—contained a provision for a separate rail fuel surcharge. But to the extent this contractual provision either was triggered or, if triggered, was enforced by UP, it would have closely tracked UP's actual fuel costs—taking into account fuel weight, defined as "a ratio of locomotive fuel costs divided by the total railway operative expenses," and including adjustments to account for both increases and decreases in fuel price.

45.     Defendants have acknowledged their individual inabilities to contract for and/or collect rail fuel surcharges prior to the Relevant Period. For example, NS executive Pat Glennon, a manager of pricing systems, acknowledged that in 2001 and 2002 rail fuel surcharges were only "theoretically billable." In September 2002, Glennon reported to then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

46.     UP's former CEO James Young admitted that before the Relevant Period, UP's rail fuel surcharge contractual provisions "were never implemented" and he agreed that those surcharges "never reached significant percentage levels."

47.     UP's Current EVP and CFO Robert Knight testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position."

48.     In a May 2002 "Enterprise Wide Risk Assessment," BNSF explained, "[w]e are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it.  We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

49.     BNSF's EVP and Chief Marketing Officer John Lanigan admitted that BNSF's rail fuel surcharge participation rates in the early 2000s were "low."

50.     CSX's EVP of Sales and Marketing Clarence Gooden testified that CSX's rail fuel surcharge coverage was "very low" and that it "embarrassed" him.  He further testified that the rail freight surcharge revenue prior to 2003 was "relatively low to where it needed to be."

51.     CSX's Director of Marketing described rail fuel surcharges as "fairly minimal" prior to the Relevant Period.

52.     Prior to the Relevant Period, Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2017) ("*Rail Freight II*").  Defendants could not maintain rail fuel surcharges as a revenue generator because of competition.  As UP Director Bob Torey reported in April 2003, "[f]uel surcharge $ are melting away at the competition.  In a downward-pressure environment, what's on paper must not work in the real world."  In January 2003, NS reported that CSX "appear[s] to be more lax in applying the surcharge to private authorities," which "does have competitive implications for NS."  And as BNSF EVP and Chief Marketing Officer Charles Schultz told BNSF executives, including Chairman, President, and CEO Matthew Rose, in

-14-

January 2003, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."

53.    Defendants' individual difficulties applying and enforcing fuel surcharges in contracts caused Defendants to stop acting independently.  In 2003 they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of new rail fuel surcharges to enhance their revenues.  Defendants claimed that the new rail fuel surcharges were to combat rising fuel prices, but in reality, Defendants colluded to establish pretextual rail fuel surcharges that were not related to actual fuel costs and effectively served as across-the-board rate increases that would not have been achievable absent conspiracy.

**B.    The Conspiracy's Inception and the Imposition of New Rail Fuel Surcharges.**

54.    Beginning in 2003, Defendants conspired to use rail fuel surcharges as the means to create the type of across-the-board rate increase for which Defendants, in the era of deregulation, could no longer ask the ICC or its successor, the STB.  Defendants embarked on and implemented an agreed-to scheme to (a) remove the fuel component from the AII (and thus from the RCAF based on the AII) to create a new fuel-less index that would allow them to impose a separate fuel surcharge, (b) cease using the RCAF in contract rate adjustment formulas, and (c) instead apply that new fuel-less index, combined with a separate and agreed-upon "rail fuel surcharge," to increase rail rates.  Defendants' scheme allowed them pretextually to label the across-the-board price increase as a "rail fuel surcharge" that purportedly recovered increased fuel costs, when the rail fuel surcharge actually raised total freight prices by a standardized (and agreed-upon) percentage that was the product of conspiracy and not based on actual fuel costs or competition among Defendants.

55.     This conspiracy was possible, in part, because the freight railroad industry's structure is conducive to collusion.  It is heavily concentrated, there are significant entry barriers, services are interchangeable across railroads, shippers are price sensitive, and the demand for rail freight services is generally inelastic.

56.     From at least the spring of 2003 and continuing until at least 2008, Defendants' top executives met regularly at restaurants and recreational and conference facilities to discuss their industry.  For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), Defendants' executives met to consider and discuss developments in the railroad industry.  Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings.  The AAR was a particularly potent tool to coordinate and monitor a conspiracy because: (a) during the Relevant Period, Defendants' CEOs were AAR board members; (b) the AAR Board met regularly and board members (and their staff) regularly communicated between meetings; (c) Defendants employed many former AAR employees and staff members; and (d) the AAR published the AII and calculated and submitted the RCAF to the STB for approval.  AAR describes itself as "the central coordinating and research agency of the North American rail industry."

57.     On March 11, 2003, CSX internally recommended changing its rail fuel surcharge program to reduce the surcharges.  Simultaneously, UP's Chief Marketing Officer Jack Koraleski recommended that UP escalate its rail fuel surcharge program to be substantially more aggressive.  On March 12, 2003, Koraleski traveled to CSX to discuss "fuel surcharge methodology."  Shortly thereafter, CSX's leadership abruptly reversed course, abandoning its recommended rail fuel surcharge reduction and adopting a program that matched UP's escalation.

58.     On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" rail fuel surcharges.

59.     On March 20, 2003, CSX publicly announced a new, more aggressive rail fuel surcharge program with a lower trigger and higher base-rate multiplier.  On March 31, 2003, UP decided to adopt "the same approach as the CSXT."  On April 4, 2003, UP sent a "concurrence" to competitors that its new rail fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements."  Upon receipt, BNSF marketing officer Paul Anderson reacted enthusiastically: "This is sweet!!! Just like the CSXT."

60.     On April 1, 2003, BNSF and CSX senior executives, including John Lanigan and CSX Chief Marketing Officer Mike Giftos, met to discuss fuel surcharges as well.

61.     Between April 2-6, 2003, at the Spring 2003 NFTA meeting at the Wigwam resort in Litchfield Park, Arizona, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue."

62.     Similar to CSX's abandonment of a less aggressive rail fuel surcharge regime following CSX's meeting with UP in March 2003, BNSF also changed course following conversations with the Defendants.  Between February and April 2003, BNSF had been considering a mileage-based rail fuel surcharge, which could have better correlated the resulting rail fuel surcharges to actual fuel costs than the base rate method that Defendants broadly implemented during the conspiracy.  But BNSF abandoned that approach.

63.     By July 2003, Defendants agreed to coordinate their rate-based rail fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed.

64.     Under this agreement, BNSF and UP (collectively, the "Western Railroads") agreed to coordinate their rail fuel surcharges and based them on the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index").  Previously, the Western Railroads used fuel surcharges for a minimal portion of their contracts and calculated their respective fuel surcharges using different indexes.  Generally, BNSF had based its surcharge on the HDF Index and UP on the WTI Index.  The HDF Index reflects the average monthly price of Retail On-Highly Diesel Fuel based on prices reported on the U.S. Department of Energy's website.  The WTI Index reflects the West Texas Intermediate crude oil price.  In or about July 2003, however, UP suddenly switched to the HDF Index pursuant to an agreement with BNSF.  BNSF and UP began to charge the exact same rail fuel surcharges pursuant to this agreement, using the HDF Index.  From that point on, the Western Railroads moved in lockstep and charged the same rail fuel surcharge percentage for each month of the Relevant Period.

65.     The Western Railroads also conspired to apply the HDF Index in the same way. They selected "trigger points"—a price for the U.S. monthly average per gallon diesel fuel price as measured by the HDF Index—and implemented a scheme that operated to impose nearly identical rail fuel surcharges.  While BNSF and UP had slightly different trigger points, with BNSF at $1.25 (beginning with a surcharge of 0.5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for the Western Railroads.  Indeed, an internal NS analysis stated that "[o]nce [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including the lag times and effective dates."   And when the HDF Index exceeded $1.35, the Western Railroads both applied a rail fuel surcharge of 0.5% for every five cent increase above $1.35.  For example, if the HDF Index rose to $1.55 per gallon, BNSF and UP both would apply a surcharge of 2%.

Thus, the Western Railroads' surcharges were virtually identical once the HDF was higher than $1.35, which it was for the entire Relevant Period.

66.     The Western Railroads also coordinated when they would change their rail fuel surcharges.  They agreed that the rail fuel surcharge would be applied to shipments beginning the second month after the month in which the HDF Index average price changed.  So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new rail fuel surcharge percentage on February 1 and apply that surcharge to shipments in March.

67.     The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

68.     The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their rail fuel surcharges.  They used the same index, set functionally identical trigger points, and applied the surcharge at the identical interval after the HDF Index price changed.  The Western Railroads adopted this common pricing despite the fact that their rate and cost structures, customer bases, fuel sources, and fuel costs differed.  The Western Railroads' adoption of these new surcharges was not a coincidence.  The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

69.     UP's move to the same fuel price index as BNSF in or about July 2003 is striking evidence of concerted conduct as just a few months before, UP had announced a different modification to its existing rail fuel surcharge program.  In April 2003, UP made modifications to the trigger points it used for adjusting its program's rail fuel surcharge, but did not change using the WTI Index.  The fact that just a few months later, UP switched indexes and began

charging the same surcharge as BNSF is further evidence that this switch was the result of concerted conduct.

70.     CSX and NS (collectively, the "Eastern Railroads") soon aligned themselves with the Western Railroads.  During the spring of 2003, CSX modified its rail fuel surcharge formula so that when the U.S. monthly per barrel crude oil price as measured by the WTI Index exceeded $23 per barrel (rather than the old CSX formula's $28 per barrel), CSX's rail fuel surcharge increased 0.4% for every dollar the WTI exceeded $23.  By June 2003, CSX had implemented this new rail fuel surcharge formula.

71.     NS announced in January 2004 that it had adopted a formula that was aligned with CSX's.  Effective March 1, 2004, when the U.S. monthly average price of diesel fuel per gallon as measured by the WTI Index exceeded $23 per barrel, NS's rail fuel surcharge rates also increased 0.4% for every dollar the WTI exceeded $23.

72.     The Eastern Railroads also coordinated when they would change their rail fuel surcharges.  Matching the Western Railroads' timing, the Eastern Railroads applied the rail fuel surcharges to shipments beginning the second month after the month in which there was a change in the WTI Index average price.  And like the Western Railroads, they published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

73.     The Eastern Railroads thus adopted the same novel, arbitrary, and complex combination of features for their new rail fuel surcharges, in this case using the same WTI Index, setting the same trigger points, and applying the surcharge at the identical interval after the WTI Index price had changed.  This too was no coincidence.  The similarities, and the coordination

with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that impacted Defendants.

74.     Although the details differed slightly, the actual rail fuel surcharges imposed by the Western and Eastern Railroads were virtually identical.  During the Relevant Period, the prices of diesel fuel and crude oil were high enough that Defendants' trigger points—CSX and NS's $23 trigger point on the WTI Index, BNSF's $1.25 trigger point on the HDF Index, and UP's $1.35 trigger point on the HDF—were always met.  The increments—every dollar on the WTI Index and every 5 cents on the HDF Index—both reflected approximately 4% of the respective trigger point.  And the timing—applying a rail fuel surcharge two months after the change in the respective index—was identical.

75.     Figure A reflects the Western Railroads' lockstep standard rail fuel surcharges.

**Figure A**



76.     Figure B reflects the Eastern Railroads' lockstep standard rail fuel surcharges.

**Figure B**



C.      **Defendants Drove the Creation of a New Index:  The "All-Inclusive Index Less Fuel."**

77.     Even after conspiring to coordinate their new rail fuel surcharges, Defendants still faced a significant barrier to those surcharges' widespread use.  Most contracts, including at least one with Toyota, contained rate adjustment provisions that utilized periodic changes in the AII or the RCAF when adjusting rates over the contract term.  Because Defendants' contracts incorporated indexes that already accounted for changes in actual fuel costs, they had no basis to impose their new, separate, and additional rail fuel surcharges on shippers.

78.     In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to cease using the RCAF in contract rate adjustment formulas and remove fuel as a cost component from the AII.  By excising the fuel cost component of the AII, Defendants paved the way for widespread imposition of their new artificially high rail fuel surcharge program in which all Defendants could participate, and from which all could earn excessive profits.

79.     Through meetings and discussions within the AAR board on October 2-3,
December 11-12 and otherwise in 2003, Defendants agreed to create and implement coordinated
rail fuel surcharge programs and to enforce their program through a variety of means discussed
herein.

80.     Pursuant to their conspiracy, Defendants, with their large presence within the
AAR during the Relevant Period, caused the AAR to develop and announce in December 2003 a
new index without fuel costs.  That index, paradoxically called the *All*-Inclusive Index *Less Fuel*
("AII-LF"), was similar to the AII and RCAF indexes, but excluded the fuel cost component.
The December 2003 AAR announcement stated:  "This issue of AAR Railroad Cost Indexes
inaugurates a new index:  the All-Inclusive Index Less Fuel.  This index is calculated using the
same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment
Factor, with the exception of the exclusion of the fuel component."  The announcement of the
AII-LF, and the underlying decision to create it, was the product of Defendants' collective action
and could not have been accomplished without the conspiracy.

81.     Defendants conspired to cause the AAR to inaugurate the AII-LF so that they
could begin assessing separate, stand-alone rail fuel surcharges, applied against the total cost of
rail freight transportation, and coordinate that practice.  The creation of the AII-LF was an
important, carefully planned step taken collectively by Defendants to allow implementation and
coordination of their price-fixing conspiracy.

82.     This December 2003 announcement reflected the first time in its nearly 60-year
history that the AAR removed fuel costs from the AII index.  The AII included fuel costs in 1979,
when the law still permitted common rate-setting based upon costs and the Arab Oil embargo
pushed domestic crude oil prices to an inflation-adjusted high, more than $100 per barrel in 2019

dollars.  The index included fuel costs in 1998, when domestic crude oil prices dropped to an inflation-adjusted low of $18 per barrel in 2019 dollars.  And the index included fuel costs in 2000, when prices more than doubled to approximately $40 per barrel in 2019 dollars.

83.    Defendants induced the AAR to create the AII-LF.  Defendants planned to use this new index in combination with their pretextual rail fuel surcharges to conceal their conspiracy to impose price increases across the board without regard to actual fuel costs.  The AII and the RCAF had been "weighted" to reflect the actual and relative impact of fuel costs as compared to the other cost factors.  Defendants instead replaced those indexes with a method for calculating rail fuel surcharges that did not correspond with actual or anticipated fuel cost increases.

84.    BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003.  When asked in a July 2004 earnings call how BNSF would be able to apply the new revenue-based rail fuel surcharges to shipper contracts, John Lanigan responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR.  Lanigan stated:  "What happened last year, and Matt [Rose, BNSF's then-Chairman, President, and CEO] led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

85.    Following publication of the AII-LF in December 2003 and pursuant to the conspiracy, Defendants applied their rail fuel surcharges using the base rate method as separate items on shipping bills, including Toyota's.  This new, and less accurate, method of fuel cost recovery calculated rail fuel surcharges as a percentage of the total rate charged for the freight shipment, regardless of how much fuel contributed to costs or whether the particular trip used more or less fuel.

86.     Defendants not only conspired to charge illegal fuel surcharges, they also conspired to use the same cover story.  Defendants all falsely represented that the rail fuel surcharges were intended only to recoup fuel cost increases.  CSX, for example, described its new program as a "fuel cost recovery program."  That was false.  These charges did not merely recover fuel cost increases; they were a rate increase above and beyond any actual increases in fuel costs.

87.     "Defendants' own executives admitted that the new fuel surcharge programs . . . were more aggressive and yielded more revenue than earlier programs."  *Rail Freight I* at 48. For example, NS executive Pat Glennon described NS's new rail fuel surcharge program as follows: "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase."  Similarly, CSX internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%."

88.     The "convergence" in Defendants' rail fuel surcharge methodologies and prices raised industry experts' concerns.  One analyst contemporaneously concluded that the fuel surcharges were "not supported" by fuel cost increases and was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives" as a "way to gain significant market share."  ("Following the Competition" *Traffic World*, July 14, 2003).  A 2010 joint report by the United States Departments of Agriculture and Transportation, titled "Study of Rural Transportation Issues," found: "There is considerable evidence that railroad fuel surcharges recovered more than the additional costs of fuel, artificially boosting railroad profits.  From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

**D.      Defendants Acted Contrary to Their Independent Self-Interest.**

89.      No legitimate business or other procompetitive explanations justify Defendants'

collective efforts to cause the AAR to adopt the AII-LF.  Defendants had used the AII and the

RCAF for decades.  Those indexes had been appropriately "weighted" to reflect fuel costs as

compared to other cost factors.  Using the AII and the RCAF would have permitted Defendants

to recover all of their actual fuel costs throughout the Relevant Period.  Defendants' reworking

the index to operate "less fuel (LF)" and substituting a pretextual "rail fuel surcharge" formula

that applied to the entire base rail freight rate ensured that the formula would drive coordinated

rate increases far out of proportion to the actual fuel cost increases for the relevant rail

transportation.

90.      The creation and publication of a cost escalation index without a fuel component,

such as the AII-LF, was not necessary for any Defendant to independently institute its own

individual rail fuel surcharge program, nor required by any statute or regulatory body.

91.      In a competitive environment free of unlawful collusion, railroads with lower

costs would negotiate fuel cost adjustment provisions that more closely tracked their actual costs

in an effort to obtain additional business, revenue, and increased shares of business.

92.      But starting as early as 2003, Defendants acted against their independent self-

interest.  They refused to negotiate any changes to their rail fuel surcharge formulas even when

doing so would have allowed them to capture additional business, revenue, and market share.

Each Defendant instead restricted its own freedom to price competitively and adhered to an

industry-wide pattern of coordinated rail fuel surcharge pricing based on a percentage of the base

rail freight rate.  Defendants did not compete with one another, but instead collectively

maintained artificially high rail fuel surcharges.

93.     Actual fuel cost as a percentage of operating cost and fuel efficiency differs among Defendants and individual rail movements.  And even within a particular railroad, actual fuel costs vary across different routes and trains.

94.     A rail fuel surcharge applied as a percentage of the base freight rate is inefficient and an inaccurate measure of fuel cost because it taxes a route based upon the rates that a railroad is able to charge, not the amount of fuel that such route requires.  Defendants also engaged in differential pricing.  As the AAR explains, railroads "charg[e] relatively higher rates to customers who have fewer competitive options than to customers with more competitive options."[3]  Thus a percentage surcharge based on the base rail freight rate forces a shipper to pay more simply because it was already paying more, regardless of how much fuel that trip required.

95.     Defendants' rail fuel surcharges did not take into account the "hedging" activities of some railroads, which affected the actual fuel costs Defendants incurred.  Nor did Defendants' rail fuel surcharges account for the phase-out in the railroad diesel tax that occurred between 2004 and 2007.

96.     Defendants' rail fuel surcharges also disregarded fuel efficiency gains during the Relevant Period.  BNSF, for example, disclosed in its 2005 Annual Report that "[i]n the past decade, BNSF has improved its fuel efficiency another 9 percent" and reported in its 2008 Annual Report that it was "able to achieve record fuel efficiency with a nearly 2 percent improvement over 2007."  And UP in its 2007 Annual Report explained that in 2007 its "fuel conservation efforts allowed us to improve our consumption rate by 2%," which reflected a savings of 21 million gallons of fuel.  Defendants' collusive behavior allowed them to avoid

---

[3] *See* AAR, *Differential Pricing in the Rail Industry*, https://www.aar.org/data/differential-pricing-rail-industry (last visited February 25, 2019).

using fuel efficiency gains as a competitive advantage, and instead allowed them to keep the savings and the excess surcharges.

97.     If Defendants' cover stories for the new rail fuel surcharges were true and Defendants in fact merely wanted to recover their actual fuel costs efficiently and accurately, they would not have adopted approaches that applied a set percentage to the base rail freight rate. Absent conspiracy, it is inconceivable that Defendants would independently design their rail fuel surcharge formulas to move in lockstep for years on end.  The only way to achieve this coordinated pricing of fuel surcharges (and especially to achieve a pricing formula that exceeded actual and anticipated rises in fuel costs) was by a conspiracy to decouple fuel costs from the historical cost indexes and to create a new index and new formulas to compute the resulting standalone fuel surcharge percentages.

98.     Defendants' actions thus were not independent responses to a common problem of increasing fuel costs.  Rather, Defendants' purposes in taking these collective actions were to assess a standardized approach to stand-alone rail fuel surcharges designed to substantially increase revenue rather than to compete with respect to the recovery of fuel cost increases, to act illicitly in concert with each other to set the surcharge, and to ensure collective enforcement of the conspiracy.  The rail fuel surcharges were intended to achieve—and did achieve—across-the-board supra-competitive profits through coordinated increased prices.

**E.     Defendants Changed Other Practices to Facilitate the Conspiracy.**

99.     Defendants also collectively changed aspects of their pricing and other behavior to advance the conspiracy.

100.    Defendants enforced strict policies to ensure that that their standardized rail fuel surcharge programs were applied across-the-board to all their shippers, including to Toyota.

BNSF's CEO, for instance, issued a "[m]andate" that "[e]very price authority should have a fuel surcharge applied" and conveyed that "contracts requiring his signature but excluding full fuel surcharge provisions will not be signed."

101.   Defendants made no exceptions to the strict and non-negotiable mandate regarding rail fuel surcharges.  For example, CSX's policy was that "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge." Shippers from many different industries, including some like Toyota that make significant purchases, were told that the rail fuel surcharge provision was "not negotiable."

102.   Defendants also had strict mandates "not to discount base rates" to offset the rail fuel surcharge's effect on the total price.  For example, one NS senior executive wrote "we should *absolutely not* be deferring any rate increases because we are applying the [rail fuel surcharge]."  Defendants viewed the prohibition on base-rate discounting as an "inseparable" companion to their policies mandating the rail fuel surcharge.

103.   This widespread application of rail fuel surcharges differed substantively from Defendants' practices before the Relevant Period, when Defendants were actively competing for customers and could not maintain or collect rail fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare."  *Rail Freight I* at 50.  In this way, Defendants avoided undercutting one another and ensured that each could continue to apply rail fuel surcharges and reap their supra-competitive profits.

104.   Defendants realized that implementation of the rail fuel surcharges only worked because all Defendants participated.  As noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause

this to fail."  Defendants policed the conspiracy by exchanging rail fuel surcharge data among themselves, resulting in stable market shares.

105.    Defendants also enforced each other's adherence to their misleading rate-based fuel surcharges.  For instance, in November 2004, a BNSF executive "shopped the concept" of a mileage-based fuel surcharge to his counterparts at the other railroads, and they "pushed back, as expected."

106.    Defendants also limited the previously prevailing practice of sending a shipper one invoice for the entire transport where more than one railroad (usually an Eastern and Western) carried the shipment.  Instead and pursuant to the conspiracy, Defendants increasingly switched to having each Defendant on a multi-railroad trip send a separate invoice.  This permitted each Defendant to separately impose its own fuel surcharge.  This practice also made it easier for each Defendant to recoup its share of the supra-competitive profits.

**F.    The STB Declared Defendants' Actions an "Unreasonable Practice" and "Mislabeling."**

107.    In 2006, the STB launched regulatory proceedings to evaluate Defendants' use of rail fuel surcharges with respect to rate-regulated rail traffic.  In response to complaints from shippers, the STB held a hearing on Defendants' rail fuel surcharges on May 11, 2006.  In August 2006, the STB issued a notice of proposed rulemaking for rate-regulated rail traffic seeking comments on its proposed measures, including requiring Defendants to "develop a means of computing the surcharge that is more closely linked to the increases in the portion of its fuel costs that is attributable to the movement to which the fuel surcharge is applied," and ultimately received seventy-three comments.

108.    On January 25, 2007, the STB concluded its investigation and public proceeding concerning Defendants' rail fuel surcharge practices.  The STB found that Defendants' practice

of computing rail fuel surcharges as a percentage of the base rail freight rate was an "unreasonable practice" because that method "stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied."  Rail Fuel Surcharges, STB *Ex Parte* No. 661 (Jan. 25, 2007).  Thus, the STB concluded: "imposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for the particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice."  *Id.* at 7.

109.    The STB also determined that the term "fuel surcharge" used by Defendants was itself deliberately misleading:

> The term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied.  ***If it is used instead as a broader revenue enhancement measure, it is mislabeled***.  This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased cost of fuel serving that shipped, but also the increased cost of fuel for another shipper's traffic—which is what would often occur under rate-based fuel surcharges.

*Id.* at 6-7 (emphasis added).

110.    In announcing its decision, STB Chairman Charles D. Nottingham said: "Our decision today brings common sense and fairness to the railroads' implementation of fuel surcharges.  This new rule will preclude them from selectively imposing surcharges in a manner that bears little relationship to actual fuel use.  It will also remove the possibility that railroads will view fuel surcharges as a profit center."[4]

---

[4] Press Release, Surface Transportation Board, Surface Transportation Board Prohibits Misleading Rail Fuel Surcharge Practices (Jan. 26, 2007), *available at* https://www.stb.gov/newsrels.nsf/13c1d2f25165911f8525687a00678fa7/606420c7f5806645852 5726f0059a591?OpenDocument (last visited Feb. 25, 2020).

111.   As the STB explicitly noted in its decision, its jurisdiction does not reach the rate-unregulated traffic addressed in this Complaint.  Nevertheless, the STB's conclusions about the rail fuel surcharges logically apply to all of Defendants' rail fuel surcharges.

112.   Pursuant to the conspiracy, Defendants applied the same unreasonable rail fuel surcharge practices that the STB addressed by insisting, on a coordinated "take it or leave it" basis, that these formulas be included in the private rail freight transportation contracts, and other rate-unregulated freight transport, at issue here.  These coordinated, misleading, and unreasonable practices removed competitive constraints and raised shipping costs for shippers such as Toyota.

**G.     The Result:  Defendants' Supra-Competitive Profits.**

113.   Defendants reaped huge, supra-competitive profits as a result of their conspiracy's success.  Through their rail fuel surcharge conspiracy, Defendants realized billions of dollars in revenues in excess of their actual increase in fuel costs from the shippers on whom they imposed the surcharges, including hundreds of millions of dollars from Toyota.  The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006.  These dramatic increases are at least partially attributable to rail fuel surcharge revenue realized by Defendants through their price-fixing conspiracy.  As James R. Young, the then-President, CEO, and Chairman of UP, admitted in an interview in 2007, "three, four years ago [the rail fuel surcharges] were really non-existent," and "it's only been the last couple of years" that "the financial returns in the business has [sic] started to move in the right direction."

114.   Defendants "acknowledged that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers."  *Rail Freight II* at 104.  One NS

internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."  That same year UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

115.    A BNSF internal memorandum stated that CSX and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate."  Another BNSF document described its own rail fuel surcharge program as "a revenue maximization program, not a protection against fuel prices."  For BNSF, "[g]rowth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006."

116.    CSX's 2006 revenue increased by $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

117.    A 2007 independent study commissioned by the American Chemistry Council and CURE found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 was over $6 billion.

118.    A 2010 Senate Commerce Committee Report on "The Current Financial State of the Class I Freight Rail Industry" concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profit margins during the Relevant Period:

-33-



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

## III.   DEFENDANTS' ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL.

119.   Defendants' anticompetitive conduct caused shippers to pay dramatically higher prices for rail freight transportation services and significantly increased Defendants' profits. Their conspiracy—not a reduction in their costs, more efficient operations, or competition—was the source of their increased profitability.  Shippers, end users, and the public were damaged as a result.

120.   The rail fuel surcharge, by itself, enabled Defendants to reap extraordinary profits. Defendants over-recovered billions of dollars for their rail fuel surcharges during the Relevant Period.

121.   Defendants' anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce.  Defendants sold and carried out rail shipments

in a continuous flow of interstate and foreign commerce to shippers throughout the United States. Each Defendant used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.  Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce and have denied those who ship freight of the benefits of free, open, and unrestricted competition.

## IV. EACH OF THE TOYOTA COMPANIES SUFFERED INJURY BY VIRTUE OF SOME OR ALL OF DEFENDANTS' ANTICOMPETITIVE CONDUCT.

122.    During the Relevant Period, TMS entered into and/or paid Defendants pursuant to private contracts or other arrangements with Defendants that contained rail fuel surcharges that were the subject of Defendants' anticompetitive conduct.

123.    During the Relevant Period, TCI entered into and/or paid BNSF and UP pursuant to private contracts or other arrangements with BNSF and UP that contained rail fuel surcharges that were the subject of Defendants' anticompetitive conduct.

124.    As a proximate result of Defendants' unlawful conduct, combination, or conspiracy, Toyota has paid supra-competitive rates to ship freight, received reduced profits from sales of its products, experienced increased costs of doing business, and lost the benefits of competition.  These are the type of injuries that the antitrust laws are designed to prevent, and Toyota incurred these injuries as direct purchasers of Defendants' rate-unregulated but price-fixed rail shipping services.

125.    As a proximate result of Defendants' unlawful conduct, combination, or conspiracy, Toyota paid rail fuel surcharges for rate-unregulated rail freight transportation at prices above the price that Toyota would have paid in the absence of the conspiracy.

126.     As direct purchasers of rail freight services, the Toyota Companies collectively have paid hundreds of millions of dollars in collusively imposed fuel surcharges since the initiation of the conspiracy and have thereby been damaged in their business and property.

## COUNT I

### (Price Fixing in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

127.     Toyota incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

128.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, raised, maintained, and/or stabilized prices for rail fuel surcharges for rate-unregulated rail freight transportation.  Such contract, combination, or conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade.

130.     Defendants' contract, combination, conspiracy, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

131.     Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

132.     The contract, combination, or conspiracy has had the following effects:

a.   Defendants fixed prices charged to Toyota and other shippers for fuel surcharges applied to rate-unregulated rail freight transportation, and maintained those prices at supra-competitive levels.

-36-

b.  Toyota and other shippers have been deprived of the benefits of free, open, and unrestricted competition in the market for rate-unregulated rail freight transportation services; and

c.  Competition in establishing the prices paid for rate-unregulated rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

133.  As a proximate result of Defendants' unlawful conduct during the Relevant Period, Toyota has suffered injury in that it has paid supra-competitive prices for rail fuel surcharges applied to rate-unregulated rail freight transportation services pursuant to contracts or other arrangements entered during the Relevant Period, and has otherwise been damaged as above.

## PRAYER FOR RELIEF

134.  WHEREFORE, Toyota prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a.  Defendants engaged in a contract, combination, or conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Toyota was injured in its business and property as a result of Defendants' violations;

b.  Toyota shall recover the damages it sustained, as provided by the federal antitrust laws, and a joint and several judgment in favor of Toyota shall be entered against Defendants in an amount to be trebled in accordance with such laws;

c.  Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons

acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from continuing and maintaining the contract, combination, or conspiracy alleged herein;

d.  Toyota shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

e.  Toyota shall recover its costs of this suit, including reasonable attorneys' fees as provided by the law; and

f.  Toyota shall receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

135.    Pursuant to Federal Rule of Civil Procedure 38(b), Toyota demands a trial by jury

of its claims asserted in this Complaint so triable.


Date:   February 26, 2020

                                        Respectfully submitted,

                                        By:

                                            */s/ Edward D. Hassi*
                                            Edward D. Hassi, Esq. (D.C. Bar No. 1026776)
                                            Leah S. Martin, Esq. (D.C. Bar No. 1029757)
                                            DEBEVOISE & PLIMPTON LLP
                                            801 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20004
                                            Telephone: 202 383 8000
                                            Facsimile: 202 383 8118
                                            thassi@debevoise.com
                                            lmartin@debevoise.com

                                            Michael Schaper, Esq.
                                            Brooke J. Willig, Esq.
                                            DEBEVOISE & PLIMPTON LLP
                                            919 Third Avenue
                                            New York, NY 10022
                                            Telephone: 212 909 6000
                                            Facsimile: 212 909 6836
                                            mschaper@debevoise.com
                                            bwillig@debevoise.com

                                            Clyde M. Siebman
                                            SIEBMAN, FORREST, BURG, & SMITH,
                                            L.L.P.
                                            300 North Travis Street
                                            Sherman, TX 75090
                                            Telephone:  903-870-0070
                                            Facsimile:  903-870-0066
                                            clydesiebman@siebman.com

                                            *Attorneys for Plaintiffs Toyota Motor Sales,*
                                            *U.S.A., Inc. and Toyota Canada Inc.*

-39-