# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION (NO. II)

This document relates to:

*Anheuser-Busch, LLC, et al. v.*
*BNSF Railway Company, et al.*
(Case number 1:20-cv-00523-BAH)

MDL Docket No. 2925
Misc. No. 20-0008 (BAH)

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Plaintiffs Anheuser-Busch, LLC and Anheuser-Busch Companies, LLC (together, "Anheuser-Busch") bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

## NATURE OF THE ACTION

1. This antitrust action is brought under Section 4 of the Clayton Act in order to recover treble damages and attorneys' fees from the four largest United States freight railroads for price fixing—a *per se* violation of Section 1 of the Sherman Act. Anheuser-Busch purchased unregulated rail freight transportation services directly from Defendants during the period between July 1, 2003 and December 31, 2008 (the "Time Period") and was charged excessive rail fuel surcharges for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS")

(together, "Defendants") conspired to use rail fuel surcharges to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separate fee that the four railroads agreed to charge customers purportedly as a reimbursement for increases in the cost of fuel. Through their collective action, however, Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the individual Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the conspiracy period, including from Anheuser-Busch.

3.     Defendants BNSF, UP, CSX, and NS—which together control about 90% of rail freight traffic in the United States—began conspiring in 2003 (and continued conspiring for many years thereafter) to use an artificially inflated surcharge, purportedly to cover fuel costs, as the means to raise rates across the board and thereby increase prices and profits. But this plan faced a hurdle: as of 2003, the great majority of rail freight transportation agreements already included rate escalation provisions that weighted several cost factors (including fuel) based on an index called the All Inclusive Index ( the "AII") published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor (the "RCAF") based on the AII) already provided a mechanism by which the railroads could recover increases in fuel cost. By weighting different cost factors, the AII and related RCAF accounted for the impact of particular cost increases, including fuel.

4.     Defendants BNSF, UP, CSX, and NS devised and embarked on a scheme to remove fuel costs from the AII, so that a separate higher "fuel surcharge" could then be added to the total cost of the freight transportation. This permitted these major railroads to achieve their desired and mutually agreed result: a price increase that could be broadly applied to rail freight customers.

5.     Defendants implemented their conspiracy through a number of concerted actions.

6.      In July 2003, the two major western railroads—Defendants BNSF and UP (together, the "Western Railroads")—agreed to implement the same fuel surcharge program, resulting in the same fuel surcharges.  Until this time, to the extent fuel surcharges were used at all, the railroads had different fuel surcharge rates, reflecting (among other things) that each railroad had different fuel costs.  In July 2003, however, BNSF and UP for the first time agreed to charge the same fuel surcharges and base them on the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index").  BNSF and UP began to charge the same fuel surcharges pursuant to their agreement, using the HDF Index.

7.      Even after BNSF and UP took this collective action, however, a major barrier to widespread use of the fuel surcharges—the existing cost escalation indices (the RCAF and the AII on which it was based) that accounted for the cost of fuel—remained and were still in use in private contracts.  Defendants BNSF, UP, CSX, and NS then conspired to take collective action at the AAR to remove this barrier.  These four defendant railroads control the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry."  The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

8.      In the Fall of 2003 at meetings of the AAR, Defendants BNSF, UP, CSX, and NS conspired to cause the AAR to develop and publish a new cost escalation index with fuel removed. Pursuant to the collective action of BNSF, UP, CSX, and NS, the AAR in December 2003 suddenly announced the establishment of the new cost escalation index, called the All Inclusive Index **Less Fuel** (the "AIILF").  The AAR's official publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the All-Inclusive

Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."

9.     Never before had the AAR created a cost escalation index without a fuel cost component.  The collective action by BNSF, UP, CSX, and NS allowed Defendants to apply separate and artificially high Rail Fuel Surcharges broadly to their customers, since fuel would no longer automatically be covered by standard rate escalation clauses.

10.     Almost immediately following the collective action that led to the establishment of the "AIILF" price escalation index, and in furtherance of the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads") announced that each would apply identical fuel surcharges based on the West Texas Intermediate (or "WTI") Index (which in early 2004 was at a higher rate than the HDF Index that the Western Railroads simultaneously started to use in July 2003).  This announcement by the Eastern Railroads on the heels of the collective action in late 2003 to remove fuel from the AII and RCAF was the result of their conspiracy with the Western Railroads to impose artificially high Rail Fuel Surcharges.

11.     With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants BNSF, UP, CSX, and NS now each applied the fuel surcharge in new ways, including but not limited to surcharges as a percentage multiplier of the **total** base rate for the rail freight transportation.  That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now applied the percentage increase in fuel costs triggered by the applicable index to the **entire** cost of the freight transport.

12.     BNSF, UP, CSX, and NS maintained their conspiracy during the Time Period by uniformly computing the surcharges by methods including but not limited to a percentage of the

rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly.  Defendants also published their Rail Fuel Surcharges on their websites to facilitate the scheme and detect any deviation from uniform pricing—something they had not done before the conspiracy.

13.    This agreed approach led to significant over-charges and yielded Defendants billions of dollars of additional profits.  In 10-K filings with the Securities and Exchange Commission, each Defendant reported substantial increases in revenue attributable to its fuel surcharge program year after year after the conspiracy began.  For example, UP reported $112 million from fuel surcharge revenue in 2003 and about $2.3 billion in 2008 (more than 20 times the 2003 amount). NS reported in 2006 that its 2005 revenues increased by $1.2 billion in 2005, and that about one-third of that increase was attributable to the new, inflated fuel surcharges.

14.    In a ruling in early 2007, the Surface Transportation Board ("STB")—which has authority over rate-regulated freight traffic that is not within the claims alleged here—found that Defendants' rail fuel surcharges were "unreasonable" and did not relate to the railroads' actual cost of fuel.  In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism.  Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

15.     An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that the Defendants had over-recovered their actual fuel costs by more than $6 billion during the period from 2003 through the First Quarter of 2007.

16.     As a direct and proximate result of the price-fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Anheuser-Busch in its business and property.

17.     Anheuser-Busch has paid a higher price for unregulated rail freight transportation than it would have paid absent the concerted unlawful activity alleged herein.

18.     Anheuser-Busch brings this action seeking damages for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.

## CLASS ACTION PROCEEDINGS

19.     On November 6, 2007, the United States Judicial Panel on Multidistrict Litigation consolidated 18 separate class actions filed in 2007 across six districts and transferred them to the United States District Court for the District of Columbia.  *See In re Rail Freight Fuel Surcharge Antitrust Litigation*, 587 F. Supp. 2d 27, 29 (D.D.C. 2008).  Plaintiffs were divided into putative classes of direct and indirect purchasers.  *Id*.  Both classes alleged that Defendants violated Section 1 of the Sherman Act by conspiring to fix prices through their use of fuel surcharges and that plaintiffs were entitled to treble damages and attorneys' fees under Section 4 of the Clayton Act.  *Id*.

20.     On November 7, 2008, the United States District Court for the District of Columbia denied Defendants' motion to dismiss, holding that the plaintiff classes sufficiently alleged Defendants' agreement to fix prices in restraint of trade.  *Id.*

21.     In a 2012 decision certifying the class of direct purchasers, the United States District Court for the District of Columbia found that the fuel surcharges Defendants put in place in Spring 2003 "were of a different breed."  *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 287 F.R.D. 1, 48 (D.D.C. 2012).  In particular, the court found that "[t]he evidence shows that [Defendants] employed these fuel surcharges in lockstep, lowered the trigger price for the imposition of the fuel surcharge, and adjusted the fuel surcharge based on the 30-day average fuel price rather than only when the trigger was exceeded for 30 (or more) consecutive days. Defendants' own executives admitted that the new fuel surcharge programs applied by Defendants during the class period were different—that is, they were more aggressive and yielded more revenue than earlier programs."  *Id.*  Following this certification of the class, however, the United States Court of Appeals for the District of Columbia reversed and remanded for the district court to consider the Supreme Court's then-new decision in *Comcast Corp. v. Behrend,* 569 U.S. 27 (2013).  *See In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F.3d 244, 253–255 (2013) (citing *Comcast*, 569 U.S. at 35–38).

22.     On remand, the district court denied class certification but found that "plaintiffs again present substantial documentary evidence that indicates that [Defendants] (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers."  *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 292 F. Supp. 3d 14, 103 (D.D.C. 2017).

23.     On August 16, 2019, the D.C. Circuit affirmed the denial of certification.  *See In re Rail Freight Fuel Surcharge Antitrust Litigation*, 934 F.3d 619, 620 (D.C. Cir. 2019).

24.     Since the D.C. Circuit's ruling, over 100 separate lawsuits have been filed in federal courts across the United States against the four defendants by direct purchasers such as Anheuser-Busch seeking damages for price fixing in violation of Section 1 of the Sherman Act.

25.      The statute of limitations on Anheuser-Busch's claims was tolled during the class action and through the agreement of the parties.  *See Am. Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

## PARTIES

26.     Plaintiff Anheuser-Busch, LLC (formerly known as and successor to Anheuser-Busch, Inc.) is a limited liability company formed and organized under the laws of Missouri, having its principal place of business at One Busch Place, St. Louis, Missouri 63118.  Plaintiff Anheuser-Busch Companies, LLC (formerly known as and successor to Anheuser-Busch Companies, Inc.) is a Delaware limited liability company formed and organized under the laws of Delaware, having its principal place of business at One Busch Place, St. Louis, Missouri 63118. Anheuser-Busch, through itself and wholly-owned affiliates, purchased unregulated rail freight transportation directly from Defendants during the Time Period; and during the Time Period all four Defendants charged Rail Fuel Surcharges to Anheuser-Busch as part of that unregulated rail freight transportation.

27.     Anheuser-Busch paid supracompetitive prices on rail freight transportation services even when the railroads did not charge a rail fuel surcharge based on a percentage of the base rate. This is because, among other reasons, the railroads used the conspiracy—and the threat of

artificially high rail fuel surcharges—to adjust the components of freight pricing through other types of fuel surcharges.

28.     The prices Anheuser-Busch paid to Defendants for unregulated rail freight transportation services were greater than the prices Anheuser-Busch would have paid absent the conspiracy alleged herein.  Anheuser-Busch has therefore been injured in its business and property by reason of Defendants' antitrust violations.

29.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has initiated litigation and been named as a defendant in litigation in this District on one or more occasions.  Anheuser-Busch purchased rail freight transportation services directly from CSX.

30.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.   NS operates an intermodal terminal at 333 East Carrie Avenue, St. Louis, Missouri 63147, which is located in this District.  NS has initiated litigation and been named as a defendant in litigation in this District on one or more occasions.  Anheuser-Busch purchased rail freight transportation services directly from NS.

31.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a wholly owned subsidiary of Burlington Northern Santa Fe LLC, successor company to Burlington Northern Santa Fe

Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.  BNSF operates an intermodal facility at 3500 Wellington Avenue, St. Louis, Missouri 63139, which is located in this District.  BNSF has initiated litigation and been named as a defendant in litigation in this District on one or more occasions.  Anheuser-Busch purchased rail freight transportation services directly from BNSF.

32.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains uniform schedules with other rail carriers to handle freight to and from other parts of the country.  As of 2018, UP owned and operated 1,541 miles of track in Missouri.  From 2014 to 2018, UP originated an average of 223,914 cars and terminated an average of 284,757 cars each year in Missouri.  UP operates a major freight car repair and painting facility at 491 Main Street, De Soto, Missouri 63020, which is located in this District.  UP has initiated litigation and been named as a defendant in litigation in this District on one or more occasions.  Anheuser-Busch purchased rail freight transportation services directly from UP.

**JURISDICTION AND VENUE**

33.     Anheuser-Busch brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries it sustained by reason of Defendants' violations of Section 1 and Section 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3.

34.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

35.     Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Time Period one or more of Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Anheuser-Busch's claims occurred and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

36.     This Court has personal jurisdiction over each Defendant because, among other things, each:  (a) transacted business in this District; (b) entered into contracts with companies, including Anheuser-Busch, located in this District; (c) directly or indirectly sold and delivered rail transportation services in this District; (d) has substantial aggregate contacts with this District; and (e) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

37.     During the Time Period, Defendants accounted for over 90% of all rail shipments within the United States.  The AAR Policy and Economics Department reported that freight railroads operating in the United States had aggregate freight revenue of $54 billion in 2006.

38.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce.  During the Time Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.  Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

39.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

40.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act").  This landmark legislation marked a dramatic change in the evolution of U.S. railroads.  After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation unilaterally.

41.     Before the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission (the "ICC").  During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.  Today, by contrast, most rail shipments move under private transportation contracts, which are not rate-regulated.

42.     Since 1980, the number of Class I railroads has declined dramatically.  The railroad industry is now highly concentrated:  four of these railroads—Defendants BNSF, UP, CSX, and NS—operate almost all railroad track in the U.S. and in 2006 accounted for over $50 billion in total annual revenue.  Given the high fixed costs in the railroad industry and its significant barriers to entry, there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

43.     Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, the opposite occurred—railroads have engaged in concerted behavior and customers like Anheuser-Busch paid supracompetitive prices.

**DEFENDANTS CONSPIRED TO INCREASE RATES THROUGH THE USE OF
"FUEL SURCHARGES"**

44.     As a result of deregulation, Defendants could no longer ask the ICC or its successor,

the STB, for across-the-board rate increases.  Instead, Defendants developed a new way to increase

prices and revenues through the mechanism of a uniform surcharge.  Under the guise of rising fuel

prices, Defendants conspired to create and implement Rail Fuel Surcharges to achieve across-the-

board rate increases.

45.     Following the passage of the Staggers Act in 1980, railroads increasingly entered

into private freight transportation contracts that included cost escalation provisions often tied to

the AII and the RCAF (which is based on the AII).  Both the RCAF and the AII were published

by the AAR, and both indices included fuel costs as a factor.  The AII and RCAF weighted various

cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other

expenses—so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected

in the index.  Any actual increase in fuel costs was captured in the AII and the RCAF.  The indices,

and the weighted factors within them, were designed for this purpose.

46.     In 2003, Defendants BNSF, UP, CSX, and NS seized upon fuel as the means to

create the type of across-the-board rate increase for which these railroads, in the era of

deregulation, could no longer apply to a regulatory body.  Defendants embarked upon and

implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the

AII), in order to justify the widespread application of separate "fuel surcharges."  With fuel no

longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to

raise total freight prices—and that is precisely what Defendants went on to do.

47.     Before 2003, at least some Defendants imposed so-called "fuel surcharges" on

private rail freight transportation, but (a) these fuel surcharges were applied in isolated instances,

and (b) each Defendant had different fuel surcharge rates, reflecting, among other things, the differing fuel costs of each railroad.  At that time, such surcharges were the exception, with the AII and RCAF indices widely used to capture increases in fuel and other costs.

48.     In 2003, however, Defendants took a series of concerted actions to switch to a new system that would allow the widespread use of Rail Fuel Surcharges as a revenue enhancement mechanism.  The top executives of each of the Defendants met regularly at restaurants and recreational and conference facilities, including at biannual meetings of the National Freight Transportation Association ("NFTA").  Defendants' top executives also met in Washington, DC for AAR board meetings.  The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

49.     Within just months of the Spring 2003 NFTA meeting, the two Western Railroads, BNSF and UP, began to charge the same Rail Fuel Surcharges.  That year, UP switched to the HDF Index pursuant to an agreement with BNSF.  From then on, the Western Railroads moved in lockstep and charged the same Rail Fuel Surcharge percentage for each month of the Time Period.

50.     BNSF and UP agreed to administer the HDF Index in the same way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5% for every five cent increase above $1.35 per gallon.

51.     The Western Railroads also conspired on when they would change their fuel surcharge.  They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation.  So, for example, if the HDF Index average price changed in January, the Western

Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52.     Even after having agreed to charge the same fuel surcharges, however, BNSF and UP still faced an obstacle to widespread use of fuel surcharges—specifically, many private contracts already had cost escalation provisions that accounted for fuel. Defendants solved this problem by conspiring to remove fuel from the widely used cost escalation indices, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four Defendants could participate, and from which all four could earn excessive profits.

53.     In Fall 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a fuel surcharge program that would remove fuel costs from the weighted RCAF and AII (which already permitted Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism.

54.     Defendants, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF) —that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index:  the All-Inclusive Index Less Fuel.  This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." *In re Rail Fuel Surcharges*, 292 F. Supp. 3d at 37.

55.     BNSF's chief economist admitted that BNSF worked through the AAR to eliminate fuel costs from the RCAF in order to facilitate the imposition of separate fuel surcharges by the railroads:

> In December 2003 [Matt Rose, BNSF's chief executive officer], single-handedly got the A.A.R. to establish a non-fuel RCAF index, now called the All-Inclusive Index Less Fuel . . . .  In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this. . . .  [T]he combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come.  In fact, . . . **the entire rail industry should benefit** from the escalation options the index provides.

*In re Rail Fuel Surcharges*, 292 F. Supp. 3d at 32–33 (quoting letter from BNSF chief economist) (emphasis added).

56.     Defendants BNSF, UP, CSX, and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin charging separate, standalone Rail Fuel Surcharges.  Creating this new index was an essential step taken by Defendants to allow implementation and continuation of their scheme to increase the cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs.

57.     Almost immediately after the announcement in December 2003 of the new AIILF, and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep to impose fuel surcharges based on the WTI Index.

58.     Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil.  When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel.

59.     The Eastern Railroads also conspired on when they would change their fuel surcharge—two calendar months after the WTI Index had adjusted, thereby adopting the same fuel

-16-

surcharge price timing used by the Western Railroads.  Defendants could apply the same fuel surcharge percentage month after month.  The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

60.     The Eastern Railroads' conspiracy is reflected in their simultaneous selection and adoption of the same unique combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed.

61.     The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could have only been accomplished by Defendants' conspiratorial action of removing fuel from the widely used cost escalation indices.  The AII and RCAF both included a fuel cost component, and Defendants had used these indices for decades to measure and recover fuel-cost increases.

62.     Under their new AIILF-based fuel surcharge programs, Defendants increased their fuel surcharges at much higher rates than the actual increase in fuel costs.

63.     Defendants' inflated fuel surcharges also did not account for improvements in fuel efficiency.  BNSF disclosed in 2005 that its fuel efficiency had improved by 9% over the previous ten years.  By 2006, railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

64.     To "kick off" its 2006 ad campaign, NS promoted its alleged energy efficiency in an advertisement published in the *Wall Street Journal*, stating:

> At Norfolk Southern, we're conscientious at the pump.  We've always worked to increase capacity while using less fuel.  From

> improved infrastructure and shorter routes to onboard computers,
> we've been able to accomplish an efficiency unimaginable just a few
> years ago.  Today, we can move a ton of freight an average of 410
> miles on just one gallon of diesel fuel.  Mileage like this keeps
> America's economy moving.

65.     And in a 2007 publication, the AAR wrote that Defendants' fuel efficiency was "constantly improving."  Yet despite Defendants' increased fuel efficiency, their fuel surcharges continued to soar.

66.     Defendants' uniform Rail Fuel Surcharges yielded revenue beyond actual fuel cost increases.  "Defendants' own executives admitted that the new fuel surcharges were 'more aggressive' and 'yielded more revenue.'"  *In re Rail Fuel Surcharges*, 292 F. Supp. 3d at 208 (quoting deposition of NS executive).  The then-manager of NS pricing systems described them as "a blatant general rate increase."  *Id.* (quoting NS email).  A CSX public filing also identified the "fuel surcharge program" as a "primary component[ ] of the [company's] revenue gain."  *Id.* at 210 (quoting CSX Form 10-K).  One BNSF employee described the fuel surcharge program as "a revenue maximization program, not protection against fuel prices."  *Id.* (quoting BNSF email). UP employees conveyed that they saw "nothing wrong" with recovering fuel costs "at a rate greater than 100%."  *Id.* at 238 (quoting UP email).

67.     Together, Defendants BNSF, UP, CSX, and NS were able to use the fuel surcharge as an easy way to increase profits dramatically.

68.     As a result of the concerted action among BNSF, UP, CSX, and NS, prices of Rail Fuel Surcharges charged to customers (including Anheuser-Busch) were raised to or maintained at supracompetitive levels during the Time Period.

## IMPLEMENTATION OF THE SCHEME:  THE FUEL SURCHARGES IMPOSED BY THE DEFENDANTS

69.    As detailed above, Defendants BNSF, UP, CSX, and NS agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges charged for the rail freight transportation involved.  This meant that the Rail Fuel Surcharges could operate as a means to impose an effective across-the-board rate increase, and thereby raise prices far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF).  Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

70.    In stark contrast to this uniformity in Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differed widely among the Defendant railroads.  That Defendants nonetheless moved in uniform lockstep indicates that Defendants conspired to fix prices for Rail Fuel Surcharges.  In addition, the advance announcements of each Defendant's Fuel Surcharges were an important implementation and enforcement mechanism for the conspiracy.

71.    Railroad industry analysts noted the curious "convergence" in Rail Fuel Surcharge methodologies adopted by Defendants.  For example, after concluding in 2003 that the Rail Fuel Surcharges charged by Defendants were "not supported" by fuel cost increases, one analyst stated that they were "puzzled by the fact that the railroads appear to be **matching** fuel surcharges rather than developing their own pricing initiatives."  (John Gallagher, "Following the Competition," *Traffic World*, July 14, 2003 (emphasis added).)

72.    BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon.  Thus, BNSF's

cost of fuel increased 14.4% from Third Quarter 2003 to 2004.  In contrast, the surcharge charged by BNSF based on the HDF Third Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in Third Quarter 2004, amounting to a 25.3% increase.  As a result of this disparity, customers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to 2004.  Customers purchasing unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

73.     In conspiring on fuel surcharges, each Defendant acted against its independent short-term, economic self-interest.  In a competitive environment, free of conspiracy, carriers with lower fuel costs would impose a lower surcharge or none at all, and thereby increase market share at the expense of competing railroads.

74.     As shown in the table below, Defendants' market shares remained stable following the 2003 agreements:

**Railroad Market Share: Originated Tons and Carloads 2003 - 2008[1]**

| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
|---|---|---|---|---|---|---|
| **BNSF** | | | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| % of Total | 28.4% | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| | | | | | | |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| % of Total | 27.8% | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| | | | | | | |
| **CSX** | | | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| % of Total | 24.0% | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| | | | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| % of Total | 23.7% | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| | | | | | | |
| **NS** | | | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| % of Total | 19.0% | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |
| | | | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| % of Total | 18.5% | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| | | | | | | |
| **UP** | | | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| % of Total | 28.6% | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |
| | | | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| % of Total | 30.0% | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |
| | | | | | | |
| Total | | | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

[1]AAR Railroad Facts and Analysis of Class I Railroads

## THE STB DECISION

75.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied.  *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

76.     In those STB proceedings, over 25 companies that use Defendants' services submitted written comments, noting that "[t]he railroads [had] chosen not to provide [them] with appropriate documentation to help [them] understand their fuel surcharge methodologies" but based on their analysis of publicly available information, these companies believed that "the fuel surcharges [were] allowing the railroads to over-recover their incremental fuel cost and [had] become a method of revenue enhancement." *Rail Fuel Surcharges*, STB Ex Parte No. 661, ID No. 216389 (Apr. 27, 2006).

77.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB made clear that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

78.     Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue here.

## DEFENDANTS' CONSPIRACY WORKED

79.     Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy.  Through their conspiracy on Rail Fuel Surcharges, Defendants realized billions of

dollars in revenues during the Time Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the CEO of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [*sic*] started to move in the right direction."



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

80.     With the fuel surcharge programs driving a significant portion of Defendants' revenues, Defendants increased their market capitalization from approximately $46 billion to approximately $80 billion between July 1, 2003 and December 31, 2008. And as reported by the American Chemistry Council and Consumers United for Rail Equity, the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

**EFFECTS OF THE CONSPIRACY**

81.     Beginning in or about 2003 and continuing in force or effect, or both, through 2008, with an effect that continued thereafter, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy not to compete on the sale of unregulated rail freight transportation services in the United States in unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act.

82.     The unlawful collusion, combination, or conspiracy alleged herein had the following effects, among others:

  a.     The Rail Fuel Surcharges charged to Anheuser-Busch for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels;

  b.     The price of unregulated freight transportation services was fixed or stabilized at supracompetitive levels;

  c.     Anheuser-Busch has been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

  d.     Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

83.     Meanwhile, during this time, Anheuser-Busch suffered from the lack of free, open, and unrestricted competition in the market for unregulated rail freight transportation by paying rates well above competitive levels and which could not be otherwise negotiated.

84.     After the conspiracy was exposed, each Defendant modified its fuel surcharge program.  Notwithstanding the changes, no Defendant withdrew from the conspiracy and the effect

of Defendants' conspiracy persisted.  Indeed, because of the lingering effects of Defendants' conduct, Anheuser-Busch continued to pay supracompetitive prices even after 2007–2008.

85.     By reason of the violations of Section 1 of the Sherman Act, Anheuser-Busch has sustained injury to its business or property.  The injury sustained by Anheuser-Busch is, at a minimum, the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of Section 1 and Section 3 Of The Sherman Act)

86.     Anheuser-Busch incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

87.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 and Section 3 of the Sherman Act.

88.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for rail freight transportation handled through private contracts and other means exempt from regulation, including but not limited to Rail Fuel Surcharges.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

89.     Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

90. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to Anheuser-Busch for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Prices paid for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

c. Anheuser-Busch has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

d. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

91. As a proximate result of Defendants' unlawful conduct, Anheuser-Busch has suffered injury in that it paid supracompetitive prices during the Time Period.

WHEREFORE, Anheuser-Busch prays for relief as follows:

(1)     That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act;

(2)     That Anheuser-Busch recovers compensatory damages, as provided by law, determined to have been sustained as to Anheuser-Busch, and that judgment be entered against Defendants on behalf of Anheuser-Busch;

(3)     That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4)     That Anheuser-Busch recovers treble damages, as provided by law;

(5)     That Anheuser-Busch recovers its costs of the suit, including attorneys' fees, as provided by law; and

(6)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Anheuser-Busch demands

a jury trial as to all issues triable by a jury.


Dated:  June 5, 2020

By: */s/ Brian D. Wallach*
Brian D. Wallach (DC Bar No. 432349)
Gregory W. Langsdale (DC Bar No. 500716)
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, NW
Washington, DC 20001
Telephone: (202) 862-2200
brian.wallach@cwt.com
greg.langsdale@cwt.com

Brandon J.B. Boulware (Mo. Bar No. 54150)
BOULWARE LAW LLC
1600 Genessee Street, Suite 416
Kansas City, Missouri 64102
Telephone: (816) 492-2826
brandon@boulware-law.com

James F. Bennett (Mo. Bar No. 46826)
DOWD BENNETT LLP
7733 Forsyth Boulevard, Suite 1410
St. Louis, Missouri 63014
Telephone: (314) 889-7300
jbennett@dowdbennett.com

*Counsel for Plaintiffs Anheuser-Busch, LLC and Anheuser-Busch Companies, LLC*