## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION (NO. II)

This document relates to:

*The J.M. Smucker Company v.*
*Union Pacific Railroad Company, et al.*
(Case number 1:20-cv-00525-BAH)

MDL Docket No. 2925
Misc. No. 20-0008 (BAH)

### FIRST AMENDED COMPLAINT

Plaintiff The J.M. Smucker Company ("Smucker" or "Plaintiff"), on behalf of itself and all corporate affiliates, brings this action for damages under the antitrust laws of the United States against Union Pacific Railroad Company ("UP"), BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS," and together with UP, BNSF, and CSX, "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1.     This is an antitrust action alleging that the country's largest Class I railroads uniformly increased the price of rail freight services on unregulated rail freight transportation traffic in the United States in violation of Sections 1 and 3 of the Sherman Act.  Plaintiff's claim is based on direct purchases from Defendants of unregulated rail freight transportation services between at least July 1, 2003 until at least December 31, 2008.  The term "unregulated," as used

in this Complaint, refers to rail freight transportation services with rates set by private contract or through means exempt from rate regulation under federal law.

2.      Defendants implemented the conspiracy by first agreeing to break from past industry practice and create a new rate adjustment index to apply to base freight rates that excluded the cost of fuel.  Defendants also agreed to charge a separate rail fuel surcharge. Through collective action, Defendants conspired to impose rail fuel surcharges that far exceeded any increases in Defendants' fuel costs. The rail fuel surcharges had no correlation to the actual cost of fuel but were purposely aimed at generating additional profits by raising the total price for rail freight services.  Defendants implemented the conspiracy across the board, with virtually no exceptions. Plaintiff brings this action to recover the millions of dollars it has overpaid for rail freight services since at least July 1, 2003.

3.      Beginning in the Spring of 2003, Defendants UP, BNSF, CSX, and NS, which together control approximately 90% of the rail freight traffic in the United States, participated in a series of in-person meetings, phone calls, and email communications with one another to establish and implement a new rate adjustment index and a new fuel surcharge program to be applied across every sector of their business, including but not limited to carload traffic and intermodal traffic.  These initiatives were not a simple adjustment to Defendants' billing practices, but a conspiracy to artificially raise the prices for rail freight services in the United States.

4.      Defendants and their co-conspirators (including but not limited to other railroad companies) orchestrated this scheme by applying the rail fuel surcharge as a percentage multiplier on the base rate.  This new method of calculation was a dramatic departure from past industry practice, and it would not have been possible without Defendants and their co-conspirators' coordination and concerted efforts to generate cartel profits.

5.      Before the conspiracy in 2003, the majority of rail freight transportation agreements included rate adjustment provisions that weighted a variety of cost factors, including fuel, based on the Rail Cost Adjustment Factor ("RCAF") indexes and/or the All Inclusive Index ("AII"). While the RCAF was published by the Surface Transportation Board ("STB")—the federal agency vested with authority over rate-regulated freight traffic—the AII was published by the Association of American Railroads ("AAR"), a railroad trade organization for which Defendants' respective CEOs served as board members at that time. Both indexes made it difficult for Defendants and their co-conspirators to impose a standalone rail fuel surcharge because fuel costs—and any *bona fide* price increases related thereto—were already incorporated into the indexes' calculation of rate adjustments for rail freight services. The application of an additional fuel surcharge as a percentage to the base rate would have obviously resulted in a double recovery for fuel costs.

6.      As a result, Defendants and their co-conspirators sought to eliminate the fuel component in the rate adjustment indexes and, in 2003, successfully conspired to cause the AAR to develop a new index called the All Inclusive Index Less Fuel ("AIILF"), which removed the fuel component. Adopting the AIILF as their base rate adjustment index allowed all Class I railroads to apply a new and artificially high fuel surcharge as a percentage of the base rate broadly to their customers, including Smucker.

7.      BNSF and UP (collectively the "Western Railroads") were the first to implement the price fixing scheme, applying the same fuel surcharge formula and coordinating their rail fuel surcharges at least as early as July 2003. Following the AAR's announcement of the establishment of the AIILF in December 2003 (the first success of Defendants' cartel agreement), CSX and NS (collectively the "Eastern Railroads") conspired to begin setting identical fuel surcharge rates at least as early as March 2004.

8.      All four Defendants calculated fuel surcharges using a price index and charged a percentage for every incremental increase in price over the threshold amount set by the index. Specifically, on carload traffic, the Western Railroads applied identical fuel surcharge formulas based on the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") Index. Similarly, the Eastern Railroads applied identical fuel surcharge formulas using the West Texas Intermediate ("WTI") Index.  With the same price indexes and formulas, the two Western Railroads charged identical or nearly identical fuel surcharge rates as one another on carload traffic every month for years.  The two Eastern Railroads likewise charged identical or nearly identical fuel surcharge rates as one another every month for years.

9.      The railroads also applied a similar percent-of-price methodology to calculate fuel surcharges for their intermodal traffic, reaching nearly identical rates as one another during the same time period.

10.      By uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly, Defendants were able to create artificially inflated profit centers for years.  In 10-K filings with the Securities and Exchange Commission, each Defendant reported substantial increases in revenue attributable to its fuel surcharge program year after year after the conspiracy began.  For example, UP reported $112 million from fuel surcharge revenue in 2003 and approximately $2.3 billion in 2008 (more than 20 times the 2003 amount).  NS reported that its 2005 revenues increased by $1.2 billion in 2005, and that approximately one-third of that increase was attributable to higher Rail Freight Surcharge.

11.      In order to maintain and enforce their conspiracy, Defendants took various collective actions contrary to past industry practice, such as publicly publishing their monthly fuel

surcharge rates, refusing to negotiate discounts or waivers with customers, and resisting long-term contracts.

12.     In 2007, the STB, which has authority over rate-regulated freight traffic for which Plaintiff is not suing here, ruled that Defendants' practice of calculating fuel surcharges as a percentage of a base rate was "unreasonable" and did not relate to the railroads' actual cost of fuel. (The STB also expressly stated that it lacked jurisdiction over the private contracts and other freight traffic exempt from rate regulation that is the subject of Plaintiff's claim.)  In its ruling, the STB explained:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.

> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

13.     The STB decision is consistent with an independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE").  The study found the difference between Defendants' rail fuel surcharge revenue (as publicly reported and estimated) and Defendants' publicly reported actual fuel costs during the conspiracy exceeded $6 billion.

14.     As a direct and proximate result of the conspiracy alleged here, Defendants have retrained competition in the market for unregulated rail transportation services and injured Plaintiff in its business and property. Plaintiff has paid a higher price for unregulated rail freight transportation than it would have paid absent the concerted unlawful activity alleged here.

15.     Plaintiff seeks damages based on the rail freight shipments made under its private transportation contracts and through means exempt from rate regulation under federal law. This Complaint does not seek damages or relief based on Plaintiff's purchases of rate-regulated freight transportation services, if any.

## PARTIES

16.     Plaintiff The J.M. Smucker Company is an Ohio corporation with its principal place of business in Orville, Ohio.  It is one of the world's leading producers of consumer packaged goods.  Smucker operates three primary lines of business: coffee, consumer foods, and pet foods and snacks. Smucker directly purchased rail freight transportation services from, and paid rail fuel surcharges to, each of the Defendants during the conspiracy. The prices paid by Smucker were artificially high as a result of Defendants' conspiracy.

17.     Smucker brings these claims on behalf of itself and all affiliates within its corporate family, including but not limited to all subsidiaries and all acquired companies for which Smucker obtained the right to such claims.

18.     Defendant Union Pacific Railroad Company has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with

other rail carriers to handle freight to and from other parts of the country.  UP has initiated litigation and been named as a defendant in litigation in the Northern District of Ohio on one or more occasions.  Plaintiff purchased rail freight transportation services directly from UP.

19.     Defendant BNSF Railway Company has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.   BNSF is a wholly owned subsidiary of Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad.  BNSF operates a direct-rail intermodal service connecting the Ohio Valley region to California six days a week; the Ohio Valley terminal is located in North Baltimore, Ohio.  Plaintiff purchased rail freight transportation services directly from BNSF.

20.     Defendant CSX Transportation, Inc. has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX operates the Cleveland intermodal terminal at 601 E. 152nd Street, Cleveland, Ohio 44110, and the Northwest Ohio (ICTF)/Toledo intermodal terminal at 17000 Deshler Road, North Baltimore, Ohio 45872.  Plaintiff purchased rail freight transportation services directly from CSX.

21.     Defendant Norfolk Southern Railway Company has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.  NS has railway lines throughout the eastern United States. NS operates its Cleveland intermodal terminal at 5300

Greenhurst Drive, Maple Heights, Ohio 44137 and the Toledo intermodal terminal at 2101 Hill Avenue, Toledo, Ohio 43607. Plaintiff purchased rail freight transportation services directly from NS.

22.     Other unnamed major Class I[1] railroads also adopted Defendants' fuel surcharge formulas and applied Rail Freight Surcharge on unregulated private rail freight transportation traffic at least after July 2003[2] and are participants as co-conspirators in Defendants' anticompetitive actions.

23.     Each Defendant is jointly and severally liable for the anticompetitive actions taken by the other Defendants.

## JURISDICTION AND VENUE

24.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs for the injuries sustained by Smucker by reason of Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §1.

25.     This Court has original jurisdiction over the subject matter pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

26.     Venue is proper in this judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because during the relevant period a substantial part of the events giving rise to Smucker's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out in this District.  In addition, one or more of the Defendants resided, transacted business, were found, or had agents in this District.

---

[1] Class I railroads are those with revenues in excess of $250 million in 1991 dollars, or $463.8 million in 2017 dollars.  *See* STB Ex Parte No. 748, ID No. 46493 (June 14, 2018), *available at* https://www.stb.gov/decisions/ReadingRoom.nsf/51d7c65c6f78e79385256541007f0580/0b6202d2a4e94571852582 aa0042c00d?OpenDocument.

[2] These other railroads were also AAR members when the conspiracy began and implemented rail freight surcharges in accordance with the anticompetitive agreement described herein.

27.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, Plaintiff and other rail customers located and doing business in this District.

## INTERSTATE TRADE AND COMMERCE

28.     Since at least July 1, 2003, Defendants have accounted for over 90 percent of all rail shipments within the United States. In 2006 alone, total railroad operating revenue of Class I railroads exceeded $52 billion, and by 2008 it exceeded $61 billion.  Current total Class I railroad operating revenues exceed $76 billion.

29.     Defendants and their co-conspirators' activities substantially affected interstate commerce. Defendants and their co-conspirators used the instrumentalities of interstate commerce to sell and market rail freight transportation services, and they conducted rail shipments in the flow of interstate commerce to shippers and customers throughout the United States.

30.     Defendants and their co-conspirators' unlawful activities had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

31.     Prior to 1980, the federal government regulated virtually every facet of railroad operation.  Railroads filed tariff rates with the Interstate Commerce Commission ("ICC"), and in conjunction, they were able to ask the ICC for industry-wide rate increases, which could then be imposed collectively nationwide in a lawful manner.

32.     The Staggers Rail Act of 1980 ("Staggers Act") substantially deregulated the railroad industry, allowing the railroads the ability to contractually establish rates for their services without regulatory review.

33.     After deregulation, the railroad industry became significantly concentrated.  The number of Class I railroads greatly decreased, from thirty-five in 1980 to only seven today.

34.     As a result, the railroad industry is under the control of only a handful of companies. Just four railroads, BNSF, UP, CSX and NS, account for more than 90 percent of all railroad traffic in the United States.  In addition, competition from smaller carriers has been negligible due to the railroad industry's high fixed costs and significant barriers to entry, such as the need to invest in tracks, stations, yards, and switching facilities that take decades to develop.

35.     Now, more than 80 percent of rail shipments are not rate regulated and instead are either set by private transportation contracts or otherwise exempt from regulation.  Before deregulation, railroads could collectively agree to ask a federal agency to obtain uniform increases in freight rates, but post-deregulation they can no longer do so.  Instead, to increase the rates they charge customers, the railroads have unlawfully colluded with one another.

**THE CONSPIRACY**

36.     Because of intense consolidation of the rail industry, the STB (the ICC's successor) imposed a moratorium on new major mergers in the rail industry in March 2000.  Then, in June 2001, it announced stricter standards for mergers of large carriers. These actions meant it would be very difficult for the railroads to consolidate through mergers and thereby reduce competition to increase market share and prices.

37.     Unable to further consolidate through merger, and now lacking the ability to lawfully push rate increases through the ICC, Defendants sought new ways to increase revenues

in the face of falling rail freight prices.

38.     Defendants turned to collusion to increase their rates by imposing uniform rail fuel surcharges on their customers, claiming that the increases were due to rising fuel costs.  But rather than track the supposed fuel cost increases, the surcharges were calculated as a percentage of the total freight price.

39.     This method of calculation for the fuel component of a rail freight contract was rarely used in the industry.  Before the conspiracy began, most of Defendants' rail freight contracts included rate adjustment provisions tied to the AII and RCAF indexes.  These indexes included several costs, such as labor, materials, equipment rent, depreciation, interest, other expenses, as well as fuel.  Accordingly, these indexes would reflect the impact of a cost increase of any one factor.  If fuel costs rose, the indexes would account for that increase, and any fuel charge increase would be reflected in Defendants' rates.

40.     In the years leading up to 2003, Defendants had imposed some "fuel surcharges" on their rail customers but only in isolated instances.  These surcharges varied because they reflected, among other things, differing fuel costs for each railroad.

41.     In addition, before the conspiracy began, Defendants generally had difficulty imposing fuel surcharges on their customers.  For example, a BNSF internal 2002 report stated that "[t]he trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it.  We do loose [*sic*] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."  A January 2003 BNSF memorandum further noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."  The then-manager of NS's pricing systems stated that fuel surcharges were only "theoretically billable" in

2001 and 2002, while UP's chief financial officer acknowledged that, between 2000 and 2002, UP had "no policy position" on fuel surcharges beyond certain "isolated situations where there were surcharges." A CSX executive described the pre-conspiracy fuel surcharges as "fairly minimal."

42.     As found by one federal court, the pre-conspiracy fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*").

43.     Beginning no later than Spring 2003, Defendants' top executives met regularly at conferences, restaurants, and recreational events. For example, these executives met with each other at the biannual National Freight Transportation Association ("NFTA") meetings and at AAR board meetings in Washington D.C.

44.     Within just months of a Spring 2003 NFTA meeting in Arizona, BNSF and UP abruptly started to impose identical Rail Freight Surcharges on their carload traffic.

45.     Before July 2003, UP's fuel surcharge changed monthly based on the WTI index, but UP switched to basing its fuel surcharges off the HDF index beginning in July 2003, the same index used by BNSF.

46.     BNSF and UP also began to use the same formula and implemented changes on the same schedule. They announced the updated fuel surcharges at the first day of the month following the change to the HDF index, and then applied the new surcharges one month thereafter. For instance, if the fuel price changed in February, BNSF and UP would announce their new rail fuel surcharge percentages on March 1, and then impose those surcharges for shipments in April.

47.     The Western Railroads' simultaneous imposition of fuel surcharges using an identical method based on the HDF index reflects that they did so upon agreement with each other,

not as independent responses to any common market forces.

48.     Indeed, UP had modified its existing fuel surcharge program only two months before it decided to implement the identical fuel surcharge formula used by BNSF.  The timing strongly suggests that UP's unexpected adjustment was the result of concerted, rather than independent, action.

49.     However, even though BNSF and UP agreed to charge identical fuel surcharges, they still could not successfully impose them because of the widespread existence of contracts that used the AII and RCAF cost indexes, which already accounted for fuel costs.  Accordingly, all four Defendants and their co-conspirators conspired to remove the fuel component from the AII, thus leaving them free to impose separate fuel surcharges and earn cartel profits without being accused of double recovery of fuel costs.

50.     In the Fall of 2003, BNSF and UP started efforts to get the AAR board to agree to a fuel surcharge program by eliminating the fuel component from the AII index and reweighting the remaining non-fuel components.  In AAR board meetings and discussions in October and December 2003, Defendants and their co-conspirators agreed to eliminate the fuel component from the index.

51.     As a result of the collusive and concerted actions of Defendants, who dominate the AAR, in December 2003 the AAR created a new All-Inclusive Index Less Fuel, which now excluded fuel as a component.  The December 2003 AAR announcement stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel.  This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."  This was the first time the AAR created a cost adjustment index that did not include fuel as a cost factor.

52.     As a result of Defendants' successful conspiracy to have the AAR create the new

AIILF, the Western Railroads were now able to successfully impose fuel surcharges in accordance

with the agreement they had made in July 2003.

53.     As illustrated by the following chart, the Western Railroads' announced rail fuel

surcharges percentages on carload traffic varied before the conspiracy began but were *identical*

starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES – WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0 |
| Jul-02 | 1% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | - | - |
| Oct-02 | 1% | - |
| Nov-02 | 2% | - |
| Dec-02 | 2.5% | - |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |

| Dec-04 | 9.0% | 9.0% |
|---|---|---|
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.50% | 15.50% |
| Aug-07 | 16.00% | 16.00% |
| Sep-07 | 16.50% | 16.50% |
| Oct-07 | 16.50% | 16.50% |
| Nov-07 | 17.50% | 17.50% |
| Dec-07 | 18.50% | 18.50% |
| Jan-08 | 21.50% | 21.50% |
| Feb-08 | 21.00% | 21.00% |
| Mar-08 | 21.00% | 21.00% |
| Apr-08 | 21.50% | 21.50% |
| May-08 | 26.50% | 26.50% |
| Jun-08 | 28.50% | 28.50% |
| Jul-08 | 32.00% | 32.00% |
| Aug-08 | 34.50% | 34.50% |

| Sep-08 | 35.00% | 35.00% |
| Oct-08 | 31.00% | 31.00% |
| Nov-08 | 28.00% | 28.00% |
| Dec-08 | 23.50% | 23.50% |

54.     The new AIILF allowed the Eastern Railroads to also impose new fuel surcharges soon after the index was announced in December 2003, in a manner similar to the Western Railroads, *i.e.*, they too calculated the fuel surcharges by using a price index (albeit using the West Texas Intermediate index ("WTI") instead of HDF) and charging a percentage for every incremental increase in price over the threshold amount set by the WTI.  The imposition of fuel surcharges using an identical method based on the WTI index reflects that the Eastern Railroads did so upon agreement with one another, not as independent responses to any common market forces.

55.     The Eastern Railroads also agreed to impose any changes two months after the WTI Index had changed.  For example, if the WTI average price exceeded the trigger price in January, the Eastern Railroads would assess the applicable fuel surcharge percentage in March.  Each month, the Eastern Railroads published their monthly fuel surcharge percentages on their websites, making coordination easier and any deviations obvious.

56.     For over four years, the Eastern Railroads implemented new fuel surcharges at the same time when the Western Railroads imposed new fuel surcharges, despite that fuel costs and fuel efficiency varied widely among the Defendants.  Viewing the Eastern Railroads' new fuel surcharge programs in the aggregate, Defendants CSX and NS's sudden shift in imposing fuel surcharges was clearly a direct result of the conspiracy of all four Defendants and their co-conspirators to change the index, not as independent responses to any common market forces.

57.     As illustrated by the following chart, the Eastern Railroads' announced fuel surcharge percentages as applied to the base rate on carload traffic varied before the conspiracy

began, but were *identical* starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES – EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |

| | | |
|---|---|---|
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |
| Jul-07 | 16.4% | 16.4% |
| Aug-07 | 18.0% | 18.0% |
| Sep-07 | 20.8% | 20.8% |
| Oct-07 | 20.0% | 20.0% |
| Nov-07 | 22.8% | 22.8% |
| Dec-07 | 25.2% | 25.2% |
| Jan-08 | 28.8% | 28.8% |
| Feb-08 | 27.6% | 27.6% |
| Mar-08 | 28.0% | 28.0% |
| Apr-08 | 29.2% | 29.2% |
| May-08 | 33.2% | 33.2% |
| Jun-08 | 36.0% | 36.0% |
| Jul-08 | 41.2% | 41.2% |
| Aug-08 | 44.4% | 44.4% |
| Sep-08 | 44.4% | 44.4% |
| Oct-08 | 37.6% | 37.6% |
| Nov-08 | 32.4% | 32.4% |
| Dec-08 | 21.6% | 21.6% |

58.     As one federal court found, the fuel surcharge programs adopted by Defendants during the conspiracy "were more aggressive and yielded more revenue than earlier programs." *Rail Freight I*, 287 F.R.D. at 48. This is because, among other reasons, Defendants calculated the "surcharge" as a percentage increase of the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

## DEFENDANTS UNIFORMLY APPLIED THE RAIL FUEL SURCHARGES WITH ALMOST NO EXCEPTIONS

59.     Defendants agreed to impose fuel surcharges on as many customers as possible, applying them to published tariff rates, contract traffic, and exempt traffic not subject to federal

rate regulation.  Defendants did this *instead* of trying to gain market share by undercutting their competitors by not imposing fuel surcharges.

60.     As of January 2004, BNSF pricing guidelines stated that "Every Contract should include a fuel surcharge clause.  All new and all renewing contract negotiations should have a fuel surcharge as the goal."  BNSF meeting notes reflected that there were "[v]irtually no exceptions" to imposing these surcharges.  An NS vice president acknowledged that the railroad's "policy [was] to apply the standard fuel surcharge to as many customers as possible."  Internal UP emails also stated that "all contracts without fuel language will have fuel language upon renewal."  CSX also required that "any multiyear deals" include the fuel surcharges.

61.     Defendants' fuel surcharge programs were a "widespread and uniform application of standardized fuel surcharges" during the conspiracy.  *Rail Freight I*, 287 F.R.D. at 48.

62.     There is no legitimate business justification or natural explanation for Defendants' collective action to cause the AAR to adopt and publish the AIILF or to apply fuel surcharges virtually without exception.   The AII and RCAF indexes, used by Defendants for decades, accounted for fuel costs and would have permitted Defendants to fully recover any increases in fuel costs that occurred after the conspiracy began. But obtaining cartel profits, not cost recovery, was Defendants' goal.

63.     Under their new AIILF-based fuel surcharge programs, Defendants increased their fuel surcharges at much higher rates than the actual increase in fuel costs.  For example, from the third quarter of 2003 and the third quarter of 2004, BNSF's fuel costs increased by 14.4%, however, its fuel surcharge increased by 25.3% during the same period.  As a result, BNSF shippers paid substantially more than BNSF's actual cost of fuel during this time.  Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods.

64.     Defendants' fuel surcharges also did not account for improvements in fuel efficiency. BNSF disclosed in 2005 that its fuel efficiency had improved by 9% over the past 10 years.  By 2006, railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

65.     In 2006, NS touted its alleged efficiency in an advertisement published in the Wall Street Journal, stating:

> At Norfolk Southern, we're conscientious at the pump. We've always worked to increase capacity while using less fuel. From improved infrastructure and shorter routes to onboard computers, we've been able to accomplish an efficiency unimaginable just a few years ago. Today, we can move a ton of freight an average of 410 miles on just one gallon of diesel fuel. Mileage like this keeps America's economy moving.

66.     And in a 2007 publication, the AAR wrote that Defendants' fuel efficiency was "constantly improving."  Despite Defendants' increased fuel efficiency, however, their fuel surcharges, calculated by a percentage of the base rate, continued to soar and did not reflect these fuel efficiency gains.

67.     Indeed, since the fourth quarter of 2007, the overall fuel consumption by Defendants has decreased 3-5%, yet Defendants continued to collect millions in profits in connection with fuel surcharges.

68.     Based on this evidence, and as found by the STB, the driving purpose of Defendants' uniform fuel surcharges were to yield revenue beyond actual fuel cost increases. Defendants' own executives admitted that the new fuel surcharges were "more aggressive" and "yielded more revenue."  The then-manager of NS pricing systems described them as "a blatant general rate increase."  A CSX public filing also identified the "fuel surcharge program" as a "primary component…of the [company's] revenue gain."  One BNSF employee described the fuel surcharge program as "a revenue maximization program, not protection against fuel prices."  UP

employees conveyed that they saw "nothing wrong" with recovering fuel costs "at a rate greater than 100%."

69.     There is also no plausible explanation that these actions were taken independently by Defendants.  The creation of the new AIILF index was not required by any regulatory body, but instead was the result of Defendants' joint decision to design and implement a base rate adjustment index without a fuel component which would then allow them to create supracompetitive fuel surcharges that they could collectively impose on customers.

70.     Defendants acted against their own independent economic interests by agreeing to collude on fuel surcharges.  Without collusion, railroads with lower fuel costs would have no need for fuel surcharges and thus increase their market share.  Rather than compete with one another, Defendants adopted an industry-wide pattern of uniform fuel surcharges pricing based on the total price of freight, dramatically increasing their fuel surcharge revenues beyond actual increases in costs and ultimately harming consumers.

71.     Industry analysts took note of the shift in fuel surcharge practices.  For example, one analyst concluded in 2003 that rising fuel costs did not "support[ ]" the imposition of these new fuel surcharges and that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." ("Following the Competition," *Traffic World*, July 14, 2003).

72.     Beginning in 2006, the STB sought public comments concerning the railroad industry's practice of computing fuel surcharges as a percentage of base rate for rate-regulated rail freight transport. Over 25 companies that use the Defendants' services submitted written comments, noting that "[t]he railroads [had] chosen not to provide [them] with appropriate documentation to help [them] understand their fuel surcharge methodologies" but based on its

analysis of publicly available information, these companies believed that "the fuel surcharges [were] allowing the railroads to over-recover their incremental fuel cost and [had] become a method of revenue enhancement."  STB Ex Parte No. 661, ID No. 216389 (Apr. 27, 2006).

73.     On January 25, 2007, the STB issued its decision, agreeing that the railroads' practice of computing fuel surcharges as a percentage of base rate for rate-regulated traffic was an "unreasonable practice" with little correlation between the surcharges applied and the actual change in fuel costs.  STB Ex Parte No. 661 (Jan. 25, 2007).

74.     In furtherance of the conspiracy, Defendants generally declined to negotiate discounts on the fuel surcharges and base rates, even though Defendants had entertained such negotiations prior to 2003.

## DEFENDANTS' CONSPIRACY WORKED

75.     Defendants' conspiracy succeeded, as Defendants increased their prices to artificially high levels and generated record profits.

76.     For example, UP stated in its 10-K filings that it earned $112 million in commodity revenue from its fuel surcharge program in 2003, then $330 million in 2004 (almost a 200% increase), $963 million in 2005 (another near-200% increase), approximately $1.6 billion in 2006 (66% increase), approximately $1.5 billion in 2007, and approximately $2.3 billion in 2008.

77.     Similarly, BNSF stated in its 10-K filings that it earned $110 million in fuel surcharge revenue in 2003, $357 million in 2004, approximately $1.1 billion in 2005, and approximately $1.7 billion in 2006.

78.     BNSF was also aware of the clear impact of the fuel surcharge program on CSX's and NS's revenues, stating in an internal memorandum that CSX and NS "have a 'profit-center' with their Fuel Surcharge Programs for the customers that participate." *In re Rail Freight Fuel*

*Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 104-05 (D.D.C. 2017) ("*Rail Freight II*").

79.     In 2006, NS reported that its revenues increased by $1.2 billion in 2005, with approximately one-third of the increase attributable to "higher fuel surcharge amounts," while CSX reported that approximately 50 percent of its revenue was subject to fuel surcharges in 2005. The following year, CSX reported that "[t]he primary components of [its] revenue gain" between 2006 and 2007 were continued yield management and its fuel surcharge program, "which drove revenue per unit across all major markets."

80.     With the fuel surcharge programs driving a significant portion of Defendants' revenues, Defendants increased their market capitalization from approximately $46 billion to approximately $80 billion between July 1, 2003 and December 31, 2008.



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

81.     Defendants realized these anticompetitive profits while at the same time maintaining stable market shares. In a but-for world free of Defendants' conspiracy, each Defendant would have sought to increase its market share by undercutting competitors by reducing or eliminating fuel surcharges altogether.  But as seen below, Defendants' market share remained steady during conspiracy.

| Railroad Market Share: Originated Tons and Carloads 2003 - 2008[1] | | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| **BNSF** | | | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| % of Total | 28.4% | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| | | | | | | |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| % of Total | 27.8% | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| | | | | | | |
| **CSX** | | | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| % of Total | 24.0% | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| | | | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| % of Total | 23.7% | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| | | | | | | |
| **NS** | | | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| % of Total | 19.0% | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |
| | | | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| % of Total | 18.5% | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| | | | | | | |
| **UP** | | | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| % of Total | 28.6% | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |
| | | | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| % of Total | 30.0% | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |
| | | | | | | |
| Total | | | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

[1]AAR Railroad Facts and Analysis of Class I Railroads

## CONTINUING EFFECTS OF THE CONSPIRACY

82.     After the conspiracy was exposed, each Defendant modified its fuel surcharge program.  Notwithstanding the changes, no Defendant withdrew from the conspiracy and the effect

of Defendants' conspiracy persisted.   Indeed, because of the lingering effects of Defendants'

conduct, Plaintiff paid supracompetitive prices even after 2007-2008.

### THE CLASS ACTION

83.     In 2007, several putative class actions were filed against Defendants based on

similar conduct alleged here.  The Judicial Panel on Multi-District Litigation consolidated the class

actions before the Honorable Paul L. Friedman in the United States District Court for the District

of Columbia (1:07-mc-00489) (the "MDL Action").  The MDL Action proceeded as a putative

direct purchaser class action, of which Plaintiff would have been a member.

84.     After nearly a decade of proceedings and multiple rounds of briefing on class

certification, Judge Friedman denied class certification on October 10, 2017. *In re Rail Freight

Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017). The D.C. Circuit affirmed the

denial.

85.     Plaintiff's claim was tolled during the class action and after the denial of class certification.

## COUNT I
## (VIOLATIONS OF SECTION 1 AND 3 OF THE SHERMAN ACT
## AND SECTION 4 OF THE CLAYTON ACT)

86.     Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

87.     Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for rail freight transportation services handled through private contracts and other means exempt from regulation, including but not limited to the price of rail fuel surcharges.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

88.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

89.     The contract, combination or conspiracy has had the following effects:

a.     Prices charged to Plaintiff for unregulated rail freight transportation services were fixed and/or maintained at supra-competitive levels, including but not limited to the price of rail fuel surcharges;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

c. Competition in establishing the prices paid, customers of, and territories for rail freight services has been unlawfully restrained, suppressed and eliminated.

90.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury in that it has paid inflated prices for unregulated rail freight services since at least July 1, 2003.

**WHEREFORE,** Plaintiff prays for relief as follows:

(1)     That the unlawful contract, combination and conspiracy alleged be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

(2)     That Plaintiff recovers compensatory damages, as provided by law, determined to have been sustained to it from Defendants, and that judgment be entered against Defendants and in favor of Plaintiff;

(3)     That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4)     That Plaintiff recovers treble damages, as provided by law;

(5)     That Plaintiff recovers its costs of the suit, including attorneys' fees, as provided by law; and

(6)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  June 5, 2020                    By: */s/  Brandon J.B. Boulware*    
Brandon J.B. Boulware
Jeremy M. Suhr
BOULWARE LAW LLC
1600 Genessee Street, Suite 416
Kansas City, Missouri 64102
Telephone: (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th day of June 2020, a copy of the foregoing document was filed with the court's electronic filing system which sent notification of such filing to all counsel of record.

*/s/  Brandon J.B. Boulware*    
**Attorney for Plaintiff**