## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br><br>*WestRock Co., et al. v. BNSF Railway Co., et al.,* 1:20-cv-00482-BAH | MDL Docket No. 2925<br><br>Misc. No. 20-8 (BAH) |

## <u>UNION PACIFIC RAILROAD COMPANY'S ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT; DEMAND FOR JURY TRIAL</u>

Defendant Union Pacific Railroad Company ("UP"), for itself only, answers the Second Amended Complaint ("Complaint") of WestRock Company, WestRock Coated Board, LLC, WestRock Virginia, LLC, WestRock Texas, L.P., WestRock CP, LLC, WestRock Converting, LLC, WestRock Southeast, LLC, WestRock Northwest, LLC, WestRock Mill Company, LLC, WestRock – Solvay, LLC, WestRock Minnesota Corporation, WestRock Kraft Paper, LLC, WestRock Container, LLC, WestRock Longview, LLC, and Smurfit-Stone Container Canada Inc. ("Plaintiffs"), as set forth below. UP denies each and every allegation of the Complaint, except as specifically stated, and denies that it violated in any way the antitrust laws under which Plaintiffs purport to bring this action.

## RESPONSE TO PLAINTIFFS' ALLEGATIONS

UP responds to the allegations of the Complaint's separately numbered paragraphs, as follows:

**NATURE OF THE ACTION**

1.      UP admits that both before and after 2003 it collected fuel surcharges from certain customers as a cost-recovery mechanism.  UP denies the remaining allegations in this paragraph.

2.      UP admits that Defendants compete with respect to certain traffic.  UP admits that a document titled Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, January 16, 2009, Study of Railroad Rates: 1985-2007, stated the quoted language attributed to it in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP further admits that a document produced in In re: Rail Freight Fuel Surcharge Antitrust Litigation, Case No. 07-489 (D.D.C.) ("the Putative Class Action") contained the language quoted in the last sentence of this paragraph, but denies Plaintiffs' characterization of the document.  UP denies the remaining allegations in this paragraph.

3.      UP admits that, prior to 2003, railroads had fuel surcharges that they used with certain customers.  UP admits that a document produced in the Putative Class Action which Plaintiffs describe as "a May 2002 Enterprise Wide Risk Assessment" contained the quoted language Plaintiffs attribute to it.  UP denies Plaintiffs' characterization of that document.  UP admits that a document produced in the Putative Class Action contained the quoted language attributed to Norfolk Southern Railway Company's ("NS") Pat Glennon in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP admits that an email produced in the Putative Class Action sent by Bob Toy stated the quoted language attributed to it in this paragraph. UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

4.      UP admits that it entered into private freight transportation contracts after passage of the Staggers Act and that some of those contracts included rate escalation provisions tied to various cost indices.  UP denies that the Rail Cost Adjustment Factor ("RCAF") or the All

Inclusive Index ("AII") captured its actual increases in fuel costs.  UP admits that James R. Young stated in an earnings conference call in October 2004 that "RCAF is what it is. It looks at actual costs through the industry."  UP denies that Mr. Young's statement meant that adjustments based on RCAF permitted full and timely recovery of actual fuel cost increases.  During that same earnings call, Mr. Young explained that UP uses fuel surcharges "to neutralize the volatility of fuel prices."  UP denies the remaining allegations in this paragraph.

5.    UP admits that the Surface Transportation Board ("STB") issued a ruling in January 2007 directed to rate-based rail fuel surcharges related to regulated traffic.  UP asserts that the ruling speaks for itself and on that basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and should be stricken.  UP denies the remaining allegations in this paragraph.

6.    UP lacks sufficient information to form a belief about the truth of the allegation in the first sentence or last sentence of this paragraph, and on that basis denies them.  UP admits that one item on a multi-part agenda for a planned meeting involving UP and CSX Transportation, Inc. ("CSX") in March 2003 was "fuel surcharge methodology."  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

7.    UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

8.    UP admits that on March 20, 2003, CSX issued a press release titled "CSX Transportation Announces Modifications To Its Fuel Cost Recovery Program."  UP admits that in April 2003, it announced and sought concurrence for a change to the calculation of one of its WTI-index-based fuel surcharges, which UP did not ultimately implement.  UP denies Plaintiffs'

characterizations of these events and documents concerning them.  UP denies the remaining allegations in this paragraph.

9.      UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph, and on that basis denies them.

10.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  That same document also identified differences between BNSF's and UP's intended fuel surcharge approaches.  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

11.     UP admits that documents produced in the Putative Class Action contain the quoted language.  UP denies Plaintiffs' characterizations of those documents, including because these same documents illustrate continued competition and unilateral, non-parallel conduct among Defendants.  UP denies the remaining allegations in this paragraph.

12.     UP admits that there was a June 2003 alliance meeting between UP and CSX, and that notes were taken of that meeting.  UP denies Plaintiffs' characterizations of that event and document.  UP denies the remaining allegations in this paragraph.

13.     UP denies the first sentence of this paragraph.  UP admits that a document produced by BNSF Railway Company ("BNSF") in the Putative Class Action contains the language quoted in the last sentence of this paragraph.  UP denies Plaintiffs' characterizations of that document.  UP lacks sufficient information to form a belief about the truth of allegations concerning BNSF's internal assessments, and on that basis, denies them.  UP denies the remaining allegations in this paragraph.

14.     UP denies the first sentence of this paragraph.  UP admits that documents produced in the Putative Class Action contain the unbracketed words quoted in the bullet points of this

paragraph, without added emphasis.  UP denies Plaintiffs' characterizations of those documents. UP denies the remaining allegations in this paragraph.

15.     UP admits that the AII and the RCAF were indices published by the Association of American Railroads ("AAR"), a railroad trade association, that weighted a variety of cost factors. UP denies that the AAR's announcement of the AII-LF was pursuant to, or the result of, a conspiracy, or that the decision was unlawful collective action.  UP denies the remaining allegations in this paragraph.

16.     UP admits that NS's chief executive officer Charles W. Moorman, submitted a written statement to Congress in 2007 that stated the quoted language in this paragraph.  UP denies Plaintiffs' characterization of Mr. Moorman's statements.  UP denies the remaining allegations in this paragraph.

17.     UP admits that a document titled, The Current Financial State Of The Class I Freight Rail Industry ("Staff Report") states, among other things, the quoted language in this paragraph and contains a chart similar to Figure 1.  UP denies Plaintiffs' characterizations of the Staff Report, and denies Plaintiffs' implication that the statements in the Staff Report concern either fuel prices or fuel surcharges.  UP denies the remaining allegations in this paragraph.

18.     UP admits that the American Chemistry Council and an entity calling itself Consumers United for Rail Equity issued a purported study of railroad fuel surcharge revenue in 2007.  UP denies that that study accurately analyzed or reported its fuel surcharge revenue or fuel costs.  UP denies the remaining allegations in this paragraph.

19.     UP admits that documents filed in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations in this paragraph.

**PARTIES**

20.     Based on a review of publicly available information, UP admits that WestRock Company ("WestRock") is a corporation organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

21.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph and on that basis denies them.

22.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph and on that basis denies them.

23.     Based on a review of publicly available information, UP admits MeadWestvaco was a corporation organized under the laws of Delaware with its principal place of business at One High Ridge Park in Stamford, Connecticut 06905.  After a reasonable inquiry, UP admits that MeadWestvaco had a contract with UP for rail transportation services during the relevant period. UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

24.     Based on a review of publicly available information, UP admits that Rock-Tenn was a corporation organized under the laws of Georgia with its principal place of business at 504 Thrasher Street, Norcross, Georgia 30071.  After a reasonable inquiry, UP admits that Rock-Tenn had a contract with UP for rail transportation services during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

25.     Based on a review of publicly available information, UP admits that KapStone is a corporation organized under the laws of Delaware.  After a reasonable inquiry, UP denies that

KapStone purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

26.     After a reasonable inquiry, UP denies that WestRock Coated Board, LLC purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

27.     Based on a review of publicly available information, UP admits that WestRock Virginia, LLC ("WestRock Virginia") is a limited liability company organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road, Suite 125, Atlanta, Georgia 30328.  After a reasonable inquiry, UP denies that WestRock Virginia purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

28.     Based on a review of publicly available information, UP admits that WestRock Texas, L.P. ("WestRock Texas") is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.  After a reasonable inquiry, UP denies that WestRock Texas purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

29.     Based on a review of publicly available information, UP admits that WestRock CP, LLC ("WestRock CP") is a limited liability company organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328. After a reasonable inquiry, UP admits that WestRock CP  had a contract with UP for rail

transportation services during the relevant period.  After a reasonable inquiry, UP admits that Smurfit-Stone Container Corporation had a contract with UP for rail transportation services during the relevant period.  After a reasonable inquiry, UP denies that Smurfit-Stone Container Enterprises, Inc. purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that Stone Container Corporation purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that Jefferson Smurfit Corporation purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that Simpson Tacoma Kraft Company purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

30.     Based on a review of publicly available information, UP admits that WestRock Converting, LLC ("WestRock Converting") is a limited liability company organized under the laws of Georgia with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.  Based on a review of publicly available information, UP admits that WestRock Converting is the surviving entity following the merger between WestRock – Rex, LLC and WestRock Converting.  After a reasonable inquiry, UP denies that WestRock Converting purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

31.     Based on a review of publicly available information, UP admits that WestRock Southeast, LLC ("WestRock Southeast") is a limited liability company organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta,

Georgia 30328.  After a reasonable inquiry, UP denies that WestRock Southeast purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that WestRock SPFT, LLC purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that SP Fiber Holdings purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that SPN AcquisitionCo, LLC purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP admits that SP Newsprint Co., LLC had a contract with UP for rail transportation services during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

32.     Based on a review of publicly available information, UP admits that WestRock Northwest, LLC ("WestRock Northwest") is a limited liability company organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.  After a reasonable inquiry, UP denies that WestRock Northwest purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that WestRock SPFT, LLC purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that SP Fiber Holdings purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP denies that SPN AcquisitionCo, LLC purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP admits that SP Newsprint Co., LLC had a contract with UP for rail transportation services during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

33.     Based on a review of publicly available information, UP admits that WestRock Mill Company, LLC ("WestRock Mill Company") is a limited liability company organized under the

laws of Georgia and has its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.  After a reasonable inquiry, UP denies that WestRock Mill Company purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP admits that Rock-Tenn had a contract with UP for rail transportation services during the relevant period.  After a reasonable inquiry, UP denies that Gulf States Paper Corporation purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

34.    Based on a review of publicly available information, UP admits that WestRock – Solvay, LLC ("WestRock – Solvay") is a limited liability company organized under the laws of Delaware.  After a reasonable inquiry, UP denies that WestRock – Solvay purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP admits that Rock-Tenn had a contract with UP for rail transportation services during the relevant period. After a reasonable inquiry, UP denies that Southern Container Corporation purchased rail transportation services from UP during the relevant period.  UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

35.    Based on a review of publicly available information, UP admits that WestRock Minnesota Corporation ("WestRock Minnesota") is a corporation organized under the laws of Delaware.  After a reasonable inquiry, UP denies that WestRock Minnesota purchased rail transportation services from UP during the relevant period.  After a reasonable inquiry, UP admits that Rock-Tenn had a contract with UP for rail transportation services during the relevant period.

UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

36.     Based on a review of publicly available information, UP admits that WestRock Kraft Paper, LLC ("WestRock Kraft Paper") is a limited liability company organized under the laws of Delaware with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.   After a reasonable inquiry, UP denies that WestRock Kraft Paper purchased rail transportation services from UP during the relevant period.   After a reasonable inquiry, UP denies that KapStone purchased rail transportation services from UP during the relevant period.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

37.     Based on a review of publicly available information, UP admits that WestRock Container, LLC ("WestRock Container") is a limited liability company organized under the laws of Georgia with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.   After a reasonable inquiry, UP denies that WestRock Container purchased rail transportation services from UP during the relevant period.   After a reasonable inquiry, UP denies that KapStone purchased rail transportation services from UP during the relevant period.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

38.     Based on a review of publicly available information, UP admits that WestRock Longview, LLC ("WestRock Longview") is a corporation organized under the laws of Washington with its principal place of business at 1000 Abernathy Road NE, Suite 125, Atlanta, Georgia 30328.   Based on a review of publicly available information, UP admits that Longview Fibre Paper & Packaging, Inc., was a corporation organized under the laws of Washington.   After a reasonable

inquiry, UP denies that WestRock Longview purchased rail transportation services from UP during the relevant period.   After a reasonable inquiry, UP denies that KapStone purchased rail transportation services from UP during the relevant period.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

39.     Based on a review of publicly available information, UP admits that Smurfit-Stone Container Canada Inc. ("SSCC") is a company organized under the laws of Nova Scotia.   After a reasonable inquiry, UP denies that SSCC purchased rail transportation services from UP during the relevant period.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph and on that basis denies them.

40.     UP denies the allegations in this paragraph.

41.     UP admits that CSX is a major freight railroad with railway lines in the eastern United States.   Based on a review of public filings, CSX's principal executive offices are located at 500 Water Street, 15th Floor, Jacksonville, Florida 32202.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph.

42.     UP admits that NS is a major freight railroad with railway lines in the eastern United States.   Based on a review of public filings, NS's principal executive offices are located at Three Commercial Place Norfolk, Virginia 23510-2191.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph.

43.     UP admits that BNSF is a major freight railroad with railway lines in the western United States.   Based on a review of public filings, BNSF's principal executive office is located at 2650 Lou Menk Drive, Fort Worth, Texas 76131-2830.   UP lacks sufficient information to form a belief about the truth of the remaining allegations in this paragraph.

44.     UP admits the allegations in this paragraph.

## JURISDICTION AND VENUE

45.     UP admits that the Complaint purports to plead federal antitrust claims against Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 1 of the Sherman Act, 15 U.S.C. § 1.  UP denies it has violated the antitrust laws, or that the Complaint states a claim under those statutes.

46.     This paragraph states a legal conclusion for which no response is necessary.  To the extent a response is deemed required, UP denies the allegations in this paragraph.

47.     This paragraph states a legal conclusion for which no response is necessary.  To the extent a response is deemed required, UP denies the allegations in this paragraph.

48.     UP does not contest personal jurisdiction in this case.  UP denies the remaining allegations in this paragraph.

## INTERSTATE TRADE AND COMMERCE

49.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph and on that basis denies them.

50.     UP admits that it sells rail transportation services that affect interstate commerce. UP denies that it has engaged in a conspiracy or has co-conspirators.  UP denies the remaining allegations in this paragraph.

51.     UP denies the allegations in this paragraph.

## DEREGULATION OF THE RAILROAD INDUSTRY

52.     UP admits that the Staggers Rail Act (the "Staggers Act") of 1980 partially deregulated the railroad industry.  The third sentence of this paragraph states legal conclusions to which no response is necessary.  To the extent a response is deemed required to the third sentence

of this paragraph, UP denies those allegations.  UP denies the remaining allegations in this paragraph.

53.     UP admits that, prior to the Staggers Act, railroads generally charged rates established in published tariffs filed with the ICC.  The second sentence of this paragraph states legal conclusions to which no response is necessary.  To the extent a response is deemed required to the second sentence of this paragraph, UP denies those allegations.  UP denies the remaining allegations in this paragraph.

54.     UP lacks sufficient information to form a belief about the truth of the allegation that 80% or more of all rail shipments move under private transportation contracts or are otherwise exempt from rate regulation, and on that basis denies it.  UP denies that it has colluded on freight rates.  UP denies the remaining allegations in this paragraph.

55.     UP admits that there are now seven Class I railroads in the United States as Plaintiffs define the term, and that two of those railroads are owned by Canadian entities.  UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph concerning other Defendants' percentage of track operation and revenues and on that basis denies them.  UP denies the remaining allegations in this paragraph.

56.     UP denies the allegations in this paragraph.

### DEFENDANTS [ALLEGEDLY] SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD

57.     UP denies the unnumbered heading that appears before this paragraph.  UP admits that a document titled, Study of Railroad Rates: 1985-2007 states the quoted language in this paragraph and contains a chart similar to Figure 1.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

58.     UP denies the allegations in this paragraph.

59.     UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations in this paragraph.

60.     UP admits that, prior to 2003, railroads had fuel surcharges that they used with customers.  UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations in this paragraph.

61.     UP denies the allegations in this paragraph.

62.     UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those document.  UP denies the remaining allegations in this paragraph.

63.     UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations in this paragraph.

64.     UP admits that the RCAF included a factor for fuel costs as well as other factors.  UP denies that the RCAF captured its actual increases in fuel costs.  UP denies the remaining allegations in this paragraph.

65.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of that document.  UP denies that the RCAF captured its actual increases in fuel costs.  UP denies the remaining allegations in this paragraph.

66.     UP denies the allegations in this paragraph.

**DEFENDANTS [ALLEGEDLY] CONSPIRE IN 2003 TO RAISE PRICES BY [ALLEGEDLY] ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES**

67.     UP denies the unnumbered heading that appears before this paragraph.  UP denies the allegations in this paragraph.

68.     UP denies the allegations in this paragraph.

69.     UP denies the allegations in this paragraph.

70.     UP denies the allegations in this paragraph.

71.     UP admits that a fuel surcharge proposal was drafted in March 2003 that, among other changes, described an escalation of 0.4% for each dollar increase in the WTI index beyond $28.00.  UP denies Plaintiffs' characterizations of that proposal.  UP denies the remaining allegations in this paragraph.

72.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

73.     UP admits that a document produced in the Putative Class Action reflects a CSX news release dated March 20, 2003 titled CSX Transportation Announces Modifications To Its Fuel Cost Recovery Program, which stated that "the surcharge will be adjusted up or down 0.4% for every dollar increase or decrease in oil prices above $23/barrel.  These charges will be determined monthly based on the thirty-day average price of West Texas Intermediate (WTI) crude oil.  When fuel prices drop below $23/barrel, no fuel surcharge will apply."  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

74.     UP admits that a document produced in the Putative Class Action reflects a CSX news release dated March 20, 2003 titled CSX Transportation Announces Modifications To Its Fuel Cost Recovery Program, which stated that "the surcharge will be adjusted up or down 0.4%

for every dollar increase or decrease in oil prices above $23/barrel.  These charges will be determined monthly based on the thirty-day average price of West Texas Intermediate (WTI) crude oil.  When fuel prices drop below $23/barrel, no fuel surcharge will apply."  UP denies Plaintiffs' characterizations of that document.  UP admits that a document produced in the Putative Class Action contained the quoted language in the last sentence of this paragraph.  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

75.    UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations in this paragraph.

76.    UP admits that a document produced in the Putative Class Action titled "BNSF - NS. Senior Team Meeting Agenda March 18, 2003" contained a section describing a "General Business Review Discussion" on "Interline Volumes by Business Group" and "Projections for Q-2," which included the quoted language in this paragraph.  UP admits that, among others, the names David Goode, Steve Tobias, Hank Wolf, Ike Prillaman, Jim McClellan, Mike McClellan, Mark Manion, Don Seale, Matt Rose, Carl Ice, John Lanigan, Tom Hund, Pete Rickerhauseer, and Steve Branscum are listed in the same document.  UP denies Plaintiffs' characterizations of that document.  UP denies the remaining allegations in this paragraph.

77.    UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

78.    UP admits that the National Freight Transportation Association held a meeting in Litchfield Park, Arizona.  UP admits that certain railroad executives attended certain AAR board meetings at which appropriate topics concerning the rail industry were discussed.  UP admits that

a document produced in the Putative Class Action contained the quoted language in this paragraph. UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

79.     UP admits that a document produced in the Putative Class Action was titled "BNSF-CSX Alliance Meeting Jacksonville, FL April 1, 2003" and listed, among others, the names Mike Giftos and John Lanigan.  UP denies the remaining allegations in this paragraph.

80.     UP lacks sufficient information to form a belief about the truth of the allegation about what BNSF was "leaning toward," and on that basis denies it.  UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.   UP denies the remaining allegations in this paragraph.

81.     UP admits that in late 2002 it announced a carload fuel surcharge based upon the WTI index, and that in 2003 it announced a carload fuel surcharge based upon the HDF index.  UP admits that prior to 2003 BNSF had fuel surcharges that were based on the HDF index.  UP denies the remaining allegations in this paragraph.

82.     UP admits that one of UP's carload fuel surcharges applied a surcharge of 0.5% for every five cent increase above $1.35 per gallon in the HDF index, and that this formula resulted in the same percentage surcharge as one of BNSF's published surcharges above a price of $1.35 per gallon in the HDF index.  UP admits that in 2003 it announced a carload fuel surcharge based upon the HDF index.  UP denies the remaining allegations in this paragraph.

83.     UP denies the allegations in this paragraph.

84.     UP admits that one of UP's carload fuel surcharges applied a surcharge of 0.5% for every five cent increase above $1.35 per gallon in the HDF index, and that this formula resulted in

the same percentage surcharge as one of BNSF's published surcharges above a price of $1.35 per gallon in the HDF index.  UP admits that the formula for one of its fuel surcharges applied changes to the surcharge on the second month after a change in the HDF price.  UP denies the remaining allegations in this paragraph.

85.     UP admits that it announced a change to the calculation of one of its WTI-index-based fuel surcharges in 2003 which it did not implement.  UP denies the remaining allegations in this paragraph.

86.     UP denies the allegations in this paragraph.

87.     UP admits that NS announced a change to the calculation of its WTI-index-based fuel surcharges beginning in March 2004.  UP denies the remaining allegations in this paragraph.

88.     UP denies the allegations in this paragraph.

**[ALLEGED] PUBLICATION OF THE AIILF AND FIXING FSC RATES**

89.     UP denies the unnumbered heading that appears before this paragraph.  UP denies the allegations in this paragraph.

90.     UP denies the allegations in this paragraph.

91.     UP admits that the AAR announced the AII-LF in the fall of 2003.  UP admits that the AII-LF is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component. UP asserts that the AAR's publication speaks for itself.  UP denies that the AAR's announcement of the AII-LF was pursuant to, or the result of, a conspiracy, or that the decision was unlawful collective action.  UP denies the remaining allegations in this paragraph.

92.     UP denies the allegations in this paragraph.

93.     UP lacks sufficient information to form a belief about the truth of the allegations in this paragraph, and on that basis, denies them.

94.     UP denies the allegations in this paragraph.

95.     UP lacks sufficient information to form a belief as to the truth of the allegations regarding the activities of the "Eastern Railroads," and on that basis denies them.  UP denies the remaining allegations in this paragraph.

96.     UP denies the allegations in this paragraph.

97.     UP denies the allegations in this paragraph.

98.     UP admits that the AII and the RCAF both included a fuel cost component and that UP used both indices from time to time.  UP denies the remaining allegations in this paragraph.

99.     UP denies the allegations in this paragraph.

100.    UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

101.    UP denies the allegations in this paragraph.

102.    UP lacks sufficient information to form a belief about the truth of the allegations relating to the FSC percentages charged by other defendants and on that basis denies them.  UP denies the remaining allegations in this paragraph and the allegations contained in Footnote 1.

103.    UP denies the allegations in this paragraph.

104.    UP admits that it has altered its FSC programs at various times.  UP denies that those alterations were the result of or related to any conspiratorial or unlawful conduct.  UP denies the remaining allegations in this paragraph.

105.    UP denies the allegations in this paragraph.

106.    UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of that document.  UP

admits that certain employees from UP attended an Alliance Meeting on June 3, 2003 but denies Plaintiffs' characterization of that Alliance Meeting.  UP does not have sufficient information to form a belief as to the allegations concerning BNSF and CSX employees, and on that basis, denies them.  UP denies the remaining allegations in this paragraph.

107.    UP denies the allegations in this paragraph.

## [ALLEGED] IMPLEMENTATION OF THE SCHEME: DEFENDANTS' [ALLEGED] ACROSS-THE-BOARD APPLICATION OF FSCS

108.    UP denies the unnumbered heading that appears before this paragraph.  UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations in this paragraph.

109.    UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents.  UP denies the remaining allegations of this paragraph.

110.    UP admits that documents produced in the Putative Class Action contained the quoted term.  UP denies Plaintiffs' characterization of them, including because these same documents illustrate continued competition and unilateral, non-parallel conduct among the Defendants.  UP denies the remaining allegations in this paragraph.

111.    UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP lacks sufficient information to form a belief as to the truth of the allegations concerning other defendants' marketing efforts and on that basis, denies the remaining allegations in this paragraph.

112.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

113.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

114.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

115.     UP denies the allegations in this paragraph.

116.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

117.     UP denies the allegations in this paragraph.

118.     UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

119.     UP admits NS's chief executive officer, Charles W. Moorman, submitted a written statement to Congress in 2007 which contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of Mr. Moorman's statements.  UP denies the remaining allegations in this paragraph.

120.     UP denies the allegations in this paragraph.

## THE STB DECISION

121.    UP admits that the Surface Transportation Board ("STB") issued a ruling in January 2007 directed to rail fuel surcharges.  UP asserts that the ruling speaks for itself and on that basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and should be stricken.  To the extent a response is deemed required, UP denies the balance of the allegations in this paragraph.

122.    UP admits that the STB issued a ruling in January 2007 directed to rail fuel surcharges.  UP asserts that the ruling speaks for itself and on that basis denies Plaintiffs' characterization of the ruling, which is inappropriate for a complaint and should be stricken.  To the extent a response is deemed required, UP denies the balance of the allegations in this paragraph.

123.    UP denies the allegations in this paragraph.

## THE [ALLEGED] CONSPIRACY SUCCEEDS

124.    UP denies the unnumbered heading that appears before this paragraph.  UP denies the allegations in this paragraph.

125.    UP admits that documents produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterizations of those documents. UP denies the remaining allegations in this paragraph.

126.    UP admits that a document produced in the Putative Class Action contained the quoted language in this paragraph.  UP denies Plaintiffs' characterization of that document.  UP denies the remaining allegations in this paragraph.

127.    UP lacks sufficient information to form a belief as to the truth of the allegations concerning other defendants' costs and revenues, and on that basis denies them.  UP denies the remaining allegations in this paragraph.

128.    UP lacks sufficient information to form a belief as to the truth of the allegations concerning other defendants' fuel efficiency, and on that basis denies them.  UP denies the remaining allegations in this paragraph.

129.    UP admits that James Young stated in an interview in 2007 that UP is now "putting in place fuel surcharge mechanisms," and that "three or four years ago they were really nonexistent."  In response to a separate question concerning capital investment, Mr. Young stated that UP is committed to a high level of capital spending as long as UP's financial returns continue to improve.  He added that it has only been in the last couple of years that the financial returns in the rail business have started to move in the right direction.  UP denies the remaining allegations in this paragraph.

130.    UP denies the allegations in this paragraph.

131.    UP admits that a document titled Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, January 16, 2009, Study of Railroad Rates: 1985-2007, contained the quoted language in this paragraph attributed to it.  UP denies Plaintiffs' characterization of that document.  UP admits that a document produced in the Putative Class Action contained the quoted language in the first sentence of this paragraph, but denies Plaintiffs' characterization of the document.  UP denies the remaining allegations in this paragraph.

132.    UP admits that a document titled, The Current Financial State Of The Class I Freight Rail Industry ("Staff Report") stated that quoted language in this paragraph and contains a chart similar to Figure 1.  UP denies Plaintiffs' characterizations of the Staff Report, and denies Plaintiffs' implication that the statements in the Staff Report concern either fuel prices or fuel surcharges.  UP denies the remaining allegations in this paragraph.

## COUNT I

### (Violation Of Section 1 Of The Sherman
### Act And Section 4 Of The Clayton Act)

133.    UP incorporates by reference its responses to the preceding numbered paragraphs.

134.    UP denies the allegations in this paragraph.

135.    UP denies the allegations in this paragraph.

136.    UP denies the allegations in this paragraph.

137.    UP denies the allegations in this paragraph.

138.    UP denies the allegations in this paragraph, including all of its sub-parts.

139.    UP denies the allegations in this paragraph.

140.    UP denies the allegations in this paragraph.

## PLAINTIFFS' PRAYER FOR RELIEF

UP denies that Plaintiffs are entitled to any of the relief they seek.

## DEMAND FOR JURY TRIAL

Defendant Union Pacific Railroad Company hereby demands a trial by jury on all issues so triable.

## UNION PACIFIC'S AFFIRMATIVE DEFENSES

UP asserts the following defenses without in any way alleging it has the burden of proof with respect to any of the defenses or that the Plaintiffs are relieved of their burden to prove each and every element of their claims and damages, if any, to which Plaintiffs claim they are entitled. The defenses apply to each and every cause of action alleged.

### FIRST AFFIRMATIVE DEFENSE
### (Statute of Limitations)

141.    Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations, including 15 U.S.C. § 15b.  Plaintiffs' claims are also barred in whole or in part by

limitations on the time for bringing claims specified in particular contracts between Plaintiffs and UP.

### SECOND AFFIRMATIVE DEFENSE
### (Estoppel, Waiver)

142.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of estoppel and waiver.

### THIRD AFFIRMATIVE DEFENSE
### (10706 Statutory Protections)

143.    Defendants' alleged conduct with respect to communications concerning interline railroad services and other railroad services was privileged under law, including, but not limited to, the statutory privileges described in 49 U.S.C. § 10706.

### FOURTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

144.    Plaintiffs are barred from recovery by reason of their failure to mitigate, minimize, or avoid the damages alleged in the Complaint.

### FIFTH AFFIRMATIVE DEFENSE
### (Laches)

145.    Plaintiffs' claims are barred by the doctrine of laches.

### SIXTH AFFIRMATIVE DEFENSE
### (Exclusive Jurisdiction)

146.    Plaintiffs' claims are barred under federal laws granting exclusive jurisdiction to the STB, including 49 U.S.C. § 10501, et seq., to the extent those claims are based on conduct that is subject to the jurisdiction of the STB.

### SEVENTH AFFIRMATIVE DEFENSE
### (Set-Off)

147.    Any alleged claim for damages by Plaintiffs WestRock Company, WestRock Coated Board, LLC, WestRock Virginia, LLC, WestRock Texas, L.P., WestRock CP, LLC, WestRock Converting, LLC, WestRock Southeast, LLC, WestRock Northwest, LLC, WestRock Mill Company, LLC, WestRock – Solvay, LLC, WestRock Minnesota Corporation, WestRock

Kraft Paper, LLC, WestRock Container, LLC, WestRock Longview, LLC, and Smurfit-Stone Container Canada Inc. is subject to set-off against any money that WestRock Company, WestRock Coated Board, LLC, WestRock Virginia, LLC, WestRock Texas, L.P., WestRock CP, LLC, WestRock Converting, LLC, WestRock Southeast, LLC, WestRock Northwest, LLC, WestRock Mill Company, LLC, WestRock – Solvay, LLC, WestRock Minnesota Corporation, WestRock Kraft Paper, LLC, WestRock Container, LLC, WestRock Longview, LLC, and Smurfit-Stone Container Canada Inc. owe to UP for rail services provided by UP.

## EIGHTH AFFIRMATIVE DEFENSE
### (Standing)

148.    Plaintiffs lack standing to assert the antitrust claims that they allege.

## NINTH AFFIRMATIVE DEFENSE
### (Pass-On)

149.    Plaintiffs' claims are barred in whole or in part by the pass-on defense.

## TENTH AFFIRMATIVE DEFENSE
### (Implied Preemption)

150.    Plaintiffs' claims are preempted by virtue of the federal regulatory scheme governing the provision of rail freight services, including under the filed rate doctrine.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

151.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

## TWELFTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim for Relief)

152.    Plaintiffs fail to state facts or claims against UP sufficient to state a claim upon which relief may be granted.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Arbitration)

153.    Plaintiffs' claims against UP are barred, in whole or in part, to the extent that Plaintiffs agreed to arbitrate claims related to their relevant contracts with UP.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (49 U.S.C. § 11101)

154.    Plaintiffs' claims are barred, in whole or in part, because those claims improperly infer the existence of a conspiracy based on UP's common carrier obligation to disclose rates and provide shippers with advance notice of rate changes pursuant to 49 U.S.C. § 11101.

## FIFTEENTH AFFIRMATIVE DEFENSE

155.    UP incorporates any other affirmative defenses pleaded by other Defendants that do not conflict with UP's affirmative defenses.

## PRAYER FOR RELIEF

WHEREFORE, UP prays for relief from judgment as follows:

1.    That judgment be entered in favor of UP and against Plaintiffs on all their claims;

2.    That Plaintiffs take nothing by their Complaint;

3.    That the Complaint be dismissed with prejudice;

4.    That UP recover all attorneys' fees, costs, and expenses incurred in defense of this action; and

5.    That the Court grant UP such further relief as the Court deems just and proper.

Dated: February 16, 2021

Respectfully submitted,

*/s/ Allyson M. Maltas*
Allyson M. Maltas (Bar I.D. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201
allyson.maltas@lw.com

Daniel M. Wall
Timothy L. O'Mara
Tyler P. Young
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
dan.wall@lw.com
tim.o'mara@lw.com
tyler.young@lw.com

*Counsel for Defendant*
*Union Pacific Railroad Company*