**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Mitsui O.S.K. Lines, Ltd.**<br>Shosen Mitsui Building, 1-1<br>Toranomon 2-Chome, Minato-ku<br>Tokyo 105-8688 | Civil Action No. |
| **MOLAM Legacy, Inc.**<br>10 Woodbridge Center Drive<br>Woodbridge, NJ 07095, | MDL Docket No. 2925<br>Misc. No. 20-008 (BAH)<br><br>Judge: |
| Plaintiffs, | |
| v. | |
| **CSX Transportation, Inc.**<br>500 Water Street<br>Jacksonville, Florida 32202 | |
| **Norfolk Southern Railway Company**<br>Three Commercial Place<br>Norfolk, Virginia 23510 | |
| **Union Pacific Railroad Company**<br>1400 Douglas Street<br>Omaha, Nebraska 68179 | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiffs, Mitsui O.S.K Lines, Ltd. and MOLAM Legacy, Inc. (together, "MOL" or "Plaintiffs") bring this Complaint against CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") (collectively, "Defendants") for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

## PARTIES

**Plaintiffs**

1.      Plaintiff Mitsui O.S.K. Lines, Ltd ("Mitsui") is now and was at all times material herein a corporation duly organized and existing under the laws of Japan. Plaintiff was and still is a Vessel Operating Common Carrier of goods for hire between United States ports and foreign ports, regulated by U.S. law and regulations. At all times relevant, Mitsui relied on rail transportation to transport cargo and shipping containers throughout the country.

2.      Plaintiff MOLAM Legacy, Inc. ("MOLAM") formerly known as MOL (America) Inc., is incorporated under the laws of the State of Delaware. From 1991 until 2018, MOLAM, as general agent of Mitsui, managed its intermodal transportation business in North America.

3.      During the Relevant Period, MOL purchased unregulated rail freight transportation services directly from and paid intermodal FSCs directly to the Defendants for rail transportation services within the United States.

**Defendants**

4.      Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and interconnects with other railroads, including the other Defendants. At all times relevant, a related company to CSX called CSX Intermodal. Inc. ("CSXI") acted as an intermediary in arranging rail services. CSXI and CSXT acted in concert for purposes of carrying out the price fixing conspiracy alleged herein.

5.     Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and interconnects with other railroads, including the other Defendants.

6.     Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP serves primarily the western two-thirds of the United States, and interconnects with other railroads, including the other Defendants, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in this district pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) and 28 U.S.C. § 1391. Defendants maintain offices, transact business, have agents, and/or are found within this District; a substantial part of the events giving rise to the claims occurred in this District; and Defendants regularly conduct business in interstate commerce that is carried out in part in this District. In addition, at times relevant, Plaintiffs' principal U.S. agency was headquartered in Concord, California, within this district and transacted business with all Defendants from that office.

9.     This Court has personal jurisdiction over each Defendant. Without limitation, each Defendant (a) transacted business within this District, (b) directly or indirectly sold or delivered rail transportation services in this District, (c) has substantial contacts with this District, and (d) engaged in an illegal price-fixing conspiracy that had the intended effect of causing injury to persons and entities found in or doing business in this District.

10.     INTRADISTRICT ASSIGNMENT – Cargo and containers involved in rail carriage affected by the conspiracy routinely originated and terminated in and around the Port of Oakland, California. As noted above, Plaintiffs' principal U.S. agency was headquartered in Concord, California, within this district and transacted business with all Defendants from that office. For these reasons, this matter is properly assigned to the San Francisco or Oakland Divisions of this Court.

## **<u>INTRODUCTION</u>**

11.     Defendants violated Sections 1 and 3 of the Sherman Act and damaged Plaintiffs under Section 4 of the Clayton Act by conspiring to increase the rates Plaintiffs paid for rate-unregulated rail freight transportation services directly from the Defendants during the period from 2003 through at least December 31, 2008. As used herein, "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

12.     Defendants conspired to impose rate-based rail fuel surcharges, which were added to customers' bills, including the Plaintiffs' bills, as a means to artificially and unlawfully increase the amount paid for rate-unregulated rail freight transportation services and to fix, maintain, and/or stabilize the price for those services in the United States. A rate-based rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that railroads included in their calculation of the fee for transportation, with the fee set as a stated percentage of the shipper's rate. The railroads claimed that the Rail Fuel Surcharge compensated them for rising fuel costs, but in actual practice, it was not related to the actual costs the railroads paid for fuel but was instead simply a means to raise and fix the price of rate-unregulated rail freight transportation services. Because competition previously had constrained their ability to increase prices, Defendants took collective action and

conspired to impose Rail Fuel Surcharges calculated as a percentage of the otherwise applicable rates. On a nationwide scale, this conspiracy enabled Defendants to collect billions of dollars of additional supra-competitive profits during the conspiracy.

13.     Defendants managed to implement this anticompetitive surcharge by harmonizing the way their companies calculated fuel surcharges in several ways. First, they each linked their surcharge rates to one of two price indexes – the Retail On-Highway Diesel Fuel ("HDF") and West Texas Intermediate ("WTI") indexes. They also agreed to set the trigger points at which their surcharges kicked in to very similar values, and set those trigger points at sufficiently low levels that the Rail Fuel Surcharges remained in effect continuously for years, despite fluctuations in oil prices. The amounts of the surcharges (expressed as percentages of the otherwise applicable rates) were also consistent across Defendants.

14.     After the railroad industry was deregulated in the 1980s with the Staggers Rail Act of 1980 ("Staggers Act"), Pub. L. No. 96-448, 94 Stat. 1895, 49 U.S.C. §§ 10101 *et seq.*, railroads could no longer impose across-the-board rate increases. The only practicable way the railroads could impose an across-the-board price increase was by agreeing to impose a uniform surcharge to rail rates and imposing it on as many customers as possible.

15.     Defendants CSX, NS, and UP—which together with a fourth company, BNSF Railway Company ("BNSF") control about 90% of rail freight traffic in the United States—conspired starting in about 2003 to use the Rail Fuel Surcharges as the means to raise rates across the board by amounts far in excess of their actual fuel costs, and thereby increase their profits. This was a single conspiracy to impose across-the-board fuel surcharges on all customers for all products for private rail freight transportation contracts.

16.     One key step in furtherance of this conspiracy was to marginalize and replace the All Inclusive Index ("AII"). The AII was published by the Association of American Railroads ("AAR"), a railroad trade association in which all of the Defendants were members and active participants. The AII was an index previously used in many long-term rail freight transportation agreements to raise—or in theory reduce—the price of rail transportation to account for changes in the costs of the goods and services used to provide rail transportation. Fuel was one of the inputs included in the AII, but there were others. The AII and a related index called the Rail Cost Adjustment Factor ("RCAF") provided the railroads with a means to recover any increase in fuel costs, and for customers to receive the benefit of any reduction in fuel costs, at least in some instances. Both the AII and the RCAF reflected changes in actual prices and/or costs faced by the industry.

17.     The AII and the RCAF were a barrier to the imposition of across-the-board rate increases based on a fuel surcharge because those indexes included an explicit component for fuel that already factored in changes to fuel prices. In order to avoid this barrier, Defendants conspired to take collective action through the AAR to marginalize and replace the AII and RCAF with an index that did not include an explicit fuel component. At AAR meetings in the Fall of 2003, Defendants and other co-conspirators conspired to cause the AAR to develop and publish a replacement rate adjustment index that purported to exclude the fuel component. By agreeing to exclude fuel from the index, the Defendants claimed they were free to add separate fuel surcharges, purportedly to recover increased fuel costs but in reality to increase freight rates across the board, and collectively increase their profits, which was their common goal.

18.     Pursuant to this agreement and conspiracy, the AAR announced in December 2003 the establishment of the "All Inclusive Index Less Fuel" ("AII-LF"). The AAR's official

publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the [AII] . . . with the exception of the exclusion of the fuel component." This announcement and the underlying removal of fuel from the AII and RCAF were the collective actions of the Defendants. The AII-LF was a first for the railroad industry because it purported to provide a rate adjustment index for rail shipments but did not include fuel.

19.     The publication of the AII-LF enhanced the impact of a conspiracy that was already well underway. In July 2003, BNSF and UP agreed to implement an identical percent-of-rate fuel surcharge program on their carload traffic. Fuel surcharges had been applied only intermittently and largely unsuccessfully, and when they were used, each railroad relied upon different rates, reflecting their differing fuel costs. In July 2003, though, BNSF and UP for the first time agreed to coordinate their fuel surcharges on their carload traffic and base them on the U.S. Department of Energy (DOE) HDF Index, even though the price paid for highway diesel fuel was substantially higher than the price railroads paid for diesel fuel in bulk. BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least 2008 on rate-unregulated carload traffic subject to a rate-based fuel surcharge, and starting in 2004 began to collectively impose even higher rate-based fuel surcharges on their coal traffic. Implementation of the AII-LF in December 2003 facilitated BNSF and UP's imposition of the inflated fuel surcharges based on the HDF Index and calculated using the base shipping rate, as adjusted by the AII-LF (in most instances), rather than what the Defendants paid for fuel. UP President James Young acknowledged during an October 2004 earnings call that UP was "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF." According to Young, by July 2007, approximately "eighty

to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

20.     Soon after the AAR adopted the AII-LF, CSX and NS, which previously had used different fuel surcharges from each other, announced that each would apply identical West Texas Intermediate ("WTI") Index-based fuel surcharges to their carload traffic. This announcement by CSX and NS, coming right after their collective action in late 2003 to remove fuel from the AII and RCAF, was the result of their conspiracy with BNSF and UP to impose artificially high Rail Fuel Surcharges in a coordinated fashion. CSX and NS charged the exact same fuel surcharges (or rebased fuel surcharges), through at least 2008 on rate-unregulated traffic subject to a rate-based fuel surcharge. This identical decision by CSX and NS, made just after the Defendants' collective action in late 2003 to remove fuel from the AII and RCAF, eliminates any reasonable possibility that CSX and NS decided independently to use the WTI Index in early 2004.

21.     With the AII-LF in place, the Defendants were able to use the Rail Fuel Surcharges as a revenue-generating and profit-enhancing device, rather than a mere cost-recovery mechanism. The Defendants each applied the AII-LF to the entire base rate for the rail freight transportation, without excluding any portion of the base rate associated with fuel. The Railroads then applied the percentage fuel surcharge to the entire base rate as already adjusted by the AII-LF. The fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. The AII-LF removed the fuel component of the AII and RCAF altogether, rather than holding that fuel component constant. The Railroads removed the fuel component from the new AII-LF index, applied the AII-LF to the entire base rate, and then applied the percentage increase in fuel price to the AII-LF-adjusted rate for freight transport. Through this agreed change, the index no longer reflected the actual fuel costs incurred by Defendants.

22.     The collective actions of Defendants, including effectively removing fuel from the AII and RCAF by creating the new AII-LF, and moving in lockstep on fuel surcharges, cannot be explained as the result of routine market conduct to reflect increasing fuel prices or costs, or even to do so more efficiently. The fuel cost component in the AII and RCAF was already fully effective for reflecting changes in actual fuel prices and even allowed for over-recovery insofar as the railroad fuel costs did not increase as rapidly as the fuel prices measured in the AII. Indeed, the AII and RCAF had been designed to ensure that fuel and other price increases could be recovered, regardless of the size of the fuel cost increase. Rather, by creating a new cost index without fuel (the AII-LF), Defendants devised and implemented a means to impose an across-the-board rate increase for rail freight transportation services. Instead of competing on fuel prices (which was not possible because Defendants paid different fuel prices and had differing fuel costs), Defendants collectively created an across-the-board rate increase that had not been possible since partial deregulation eliminated across-the-board, lawful collective railroad pricing activities.

23.     Defendants were able to maintain their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport rate and by agreeing upon closely aligned trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. Previously, the UP had explained to the Surface Transportation Board ("STB") that private pricing was crucial to encouraging competition, but Defendants changed to public pricing as part of, and to facilitate, their conspiracy. There was no reasonable business justification for this uniform adoption of a publicized pricing mechanism.

24.     Defendants also took other collective action to enforce the conspiracy and make it effective. For example, in many cases, they largely stopped entering into long-term contracts and

entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions, thereby making it easier to implement the fuel surcharges, which were adjusted monthly. In many other cases, Defendants also limited the previously prevailing practice, in circumstances where more than one railroad was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, Defendants increasingly switched to having each railroad on an interline trip send a separate bill (with its own fuel surcharge). This facilitated each Defendant recouping its share of the supra-competitive profits. Such a switch to separate invoicing on interline trips could be accomplished only through collective action of the Defendants. However, Defendants refused in other cases to separate their rates, where doing so might help a shipper to challenge the rates of only one railroad at the STB. Defendants also began refusing to negotiate discounts on rail freight rates—even in circumstances where individual railroads had previously been willing to do so.

25.    The Defendants also collectively imposed Rail Fuel Surcharges for common carrier rail transportation regulated by the STB. When the Rail Fuel Surcharges as applied to regulated transportation were challenged, the STB found in January 2007 that the railroads' rate-based Rail Fuel Surcharges were "unreasonable" because the surcharges did not relate to the railroads' actual cost of fuel. The STB also noted that "[b]ecause railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate . . . cannot fairly be described as merely a cost recovery mechanism." See Rail Fuel Surcharges, Ex Parte No. 661, at 6 (STB served Jan. 26, 2007). The STB also said that the railroads had engaged in "misleading" practices in connection with the fuel surcharges. Id. at 7. While the STB's findings were significant, the STB acknowledged that it would need to expand its regulatory jurisdiction if

it were to regulate rail rates and services governed by contract or that it had exempted from regulation, like those at issue in the case. Id. at 13.

26.     A United States District Court has already found that there is "strong evidence of conspiracy." In 2008, a putative class action was filed against BNSF, CSX, NS, and UP alleging price fixing in violation of Section 1 of the Sherman Act. The District Court for the District of Columbia granted class certification in 2012. In re Rail Freight Fuel Surcharge Antitrust Litig., 287 F.R.D. 1, 74 (D.D.C. 2012). After the United States Court of Appeals for the District of Columbia vacated class certification, the District Court concluded on remand that plaintiffs failed to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" as required for class certification under Federal Rule of Civil Procedure 23(b)(3). In re Rail Freight Fuel Surcharge Antitrust Litig., 292 F. Supp. 3d 14, 32 (D.D.C. 2017) (quoting Fed. R. Civ. P. 23(b)(3)), aff'd, 934 F.3d 619 (D.C. Cir. 2019). However, the Court also stated that "Plaintiff's documentary evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges in the class period is substantial." Id. at 102.

27.     Indeed, there is "substantial documentary evidence" indicating that "defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." Id. at 103. Moreover, the "evidence shows that defendants employed these fuel surcharges in lockstep." Id. at 104.

28.     The surcharge imposed by Defendants increased their revenues far in excess of the Defendants' actual costs for fuel. By way of example, UP reported over $1 billion in revenue from the surcharge in 2005 alone.

29.     As a direct result of their fuel surcharge conspiracy, Defendants collected billions of dollars of revenues in excess of their actual incremental increase in fuel costs from the specific customers, including Plaintiffs, on whom they imposed the surcharge. Collection of these supra-competitive profits injured and damaged shippers, including Plaintiffs, who were the targets of the conspiracy.

30.     Defendants' illegal conduct has injured Plaintiffs in this action. Plaintiffs paid illegally-inflated fuel surcharges for the shipment of many types of empty shipping containers and loaded shipping containers of goods, including but not limited to apparel, footwear, electronics, chemicals, foodstuffs, household goods, pharmaceuticals, auto parts, vehicles, machinery, toys, freight of all kinds, and other goods that they would not have paid but for the conspiracy alleged herein. Each of these Plaintiffs is entitled under Section 4 of the Clayton Act, 15 U.S.C. § 15, to damages for violation of Sections 1 and 3 of the Sherman Act.

## FACTUAL BACKGROUND

I.   **CONGRESS ENACTED THE STAGGERS ACT TO FOSTER COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION**

31.     For almost a hundred years, the Interstate Commerce Commission (the "ICC") regulated rates for shipment of freight and required those rates to be published in tariffs.

32.     Under the prior regulatory scheme, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

33.     In 1980, Congress passed the Staggers Act, which partially de-regulated the railroads and allowed rail carriers to set rates for rail transportation without government oversight in many instances. In particular, railroads and their customers were granted the statutory authority to negotiate their own individual rail transportation contracts, which were not rate-regulated. In

other cases, the ICC exempted railroad-provided transportation from rate regulation. The Staggers Act also resulted in the ICC's phasing out across-the-board industry-wide rate increases.

34.     Instead of direct government oversight, the Staggers Act required rail consumers to rely on market forces and general antitrust laws to maintain fair and competitive prices. As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709: "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, at 58 (1980), reprinted in 1980 U.S.C.C.A.N. 3978, 4003.

35.     In 1995, Congress replaced the ICC with a new agency—the STB—which assumed some of the ICC's former functions, but more than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency. This case involves such non-regulated rail traffic.

36.     At the time the Staggers Act was passed, the freight rail industry was far less concentrated, with 35 Class I railroads operating within the United States. ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.) By the early 2000s, the industry was highly concentrated—only seven Class I freight railroads subject to STB regulation operated within the United States. Of these, BNSF, CSX, NS, and UP control the vast majority of rail shipments. These four Class I Railroads received approximately 90% of all freight rail revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

37.     By the early 2000s, the industry had also consolidated to the point where further Class I mergers were very difficult, if not impossible. In response to the proposed merger of BNSF and Canadian National, the STB, which succeeded the ICC, introduced a moratorium on new

mergers and then promulgated more stringent standards for review of Class I mergers. At the same time, railroads were experiencing surging freight demand and tight capacity.

38.     In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge to as many customers as possible. As explained below, Defendants were able to increase their prices by conspiring to adopt Rail Fuel Surcharges under the guise of rising fuel prices.

## II.     IMPLEMENTATION OF THE SCHEME: THE DEFENDANTS CONSPIRE TO DEPART FROM PAST PRACTICE AND CHANGE THE INDEXES USED TO COMPENSATE FOR INCREASED COSTS

39.     After the Staggers Act allowed railroads to negotiate individual contracts with consumers, railroads often incorporated rate escalation provisions tied to the AII and the RCAF (which is based on the AII) into contracts to provide protection against rising input prices over the life of the contract. The AAR published the AII, and first the ICC and then the STB published the RCAF, which is based closely on the AAR's AII. The AII and RCAF both include a fuel component. The AII and RCAF weight various index components—labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses—based on actual railroad expenses so that the impact of price changes in the individual components such as fuel are reflected in the index. Any actual increase in fuel prices, no matter how large, are captured in the AII and RCAF. The Indexes, and the weighted components within them, were designed for this purpose.

40.     Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances because the railroads were constrained by competition, and (b) each of the Defendants

had different fuel surcharges, reflecting, among other things, the differing fuel prices and costs of each railroad. At that time, such surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel and other prices and costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system on carload traffic that would allow the widespread use of Rail Fuel Surcharges as a profit enhancement mechanism.

41.     From at least the Spring of 2003 and continuing through at least 2008, the top executives of each of the Defendants and their co-conspirators met regularly to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants and their co-conspirators met to consider and discuss developments in the railroad industry. Top executives of Defendants and the co-conspirators also met when they came to Washington, DC for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

42.     In the Fall of 2003, BNSF and UP initiated an effort in the AAR to convince the members to agree on a fuel surcharge program that would enable the railroads to remove fuel as a component of the weighted RCAF and AII, and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total price for the freight transport, regardless of the actual cost of fuel for that movement. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, BNSF, CSX, NS, and UP agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

43.     CSX, NS, and UP, which together with BNSF dominate the AAR board, caused the AAR to announce in December 2003 the creation of the unprecedented, new AII-LF. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a

component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AII-LF specified the fourth quarter of 2002 as its base period. Defendants BNSF, CSX, NS, and UP conspired to cause the AAR to inaugurate the AII-LF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges applied against the total rate for rail freight transportation.

44.     The creation of the AII-LF was an essential first step of the Defendants' conspiracy to use Rail Fuel Surcharges to increase their prices. Because the RCAF and AII already compensated the railroads for increases in fuel costs, Defendants knew that they would be accused by customers of "double-dipping" if they added a fuel surcharge to the then-existing cost escalation provisions, BNSF, CSX, NS, and UP agreed to address this problem by conspiring to remove the fuel component from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

45.     The creation of the AII-LF itself was a notable departure from past practice, and marked the first time that the AAR created a rate escalation index without a fuel cost component. While fuel was not included as a component of the AII-LF, the Defendants still applied the AII-LF to the entire base rate, including the fuel component, so that the entire base rate was increased by the AII-LF before application of the fuel surcharge.

46.     There was no legitimate business justification or natural explanation for the collective action of BNSF, CSX, NS, and UP to cause the AAR to adopt and publish the AII-LF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel prices or costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used rate escalation indexes. The AII and RCAF both included a fuel cost component and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs, and more, throughout the conspiracy period. Thus, the motivation of BNSF, CSX, NS, and UP in collectively causing the adoption of the AII-LF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

47.     The actions by Defendants thus were not independent responses to a common problem of increasing fuel prices or costs. Rather, the only purpose in taking these collective actions was: (a) to begin assessing a stand-alone fuel surcharge applied to revenue (i.e., the entire base rate for the freight shipment as first adjusted by the AII-LF in many instances), not costs; (b) to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; (c) to eliminate the constraint that competition had imposed on their ability to raise prices; and (d) to ensure collective enforcement of the program. Pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the entire otherwise applicable rate for the freight shipment (notwithstanding the fact fuel accounts for only a portion of the costs of the shipment).

48.     The creation and publication of a rate escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the carload Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, CSX, NS, and UP to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

## III.   IMPLEMENTATION OF THE SCHEME: THE DEFENDANTS CONSPIRE TO ADOPT FUEL SURCHARGES

49.     Almost immediately after the announcement in December 2003 of the new AII-LF, pursuant to the conspiracy, Defendants CSX and NS, suddenly moved in lockstep with fuel surcharges based on the WTI Index. This lockstep move was part and parcel of, and flowed from, the aforementioned agreements implemented and executed by BNSF, CSX, NS, and UP in late 2003.

50.     Specifically, CSX and NS agreed to apply a rate fuel surcharge on their carload traffic whenever the monthly average WTI price exceeded $23 per barrel. When that happened, CSX and NS increased their rates by 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. For example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2.4 percent.

51.     CSX and NS also coordinated the timing of changes to their fuel surcharge—i.e., two calendar months after the WTI Index had adjusted—thereby adopting the same fuel surcharge price timing used by BNSF and UP. For example, if the WTI average price exceeded $23 per barrel in January, CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge

percentage month after month. CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52.     CSX and NS's coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel; applying the surcharge in the second calendar month after the average price of WTI oil had changed; and applying the fuel surcharge as the rate (including the implicit fuel component) was already increased by the AII-LF.

53.     Also within months of the Spring 2003 NFTA meeting, and as early as July 2003, BNSF and UP suddenly began to coordinate their Rail Fuel Surcharges, just as CSX and NS were doing. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the relevant period for much of their carload rate-unregulated traffic subject to a rate-based fuel surcharge.

54.     BNSF and UP agreed to a consistent approach for administering the HDF-based fuel surcharges. When the HDF Index equaled or exceeded $1.35 per gallon, BNSF and UP both applied a surcharge of 1.5 percent plus an additional 0.5 for every five cent increase above $1.35 per gallon. Thus, if the HDF Index rose to $1.60 per gallon, BNSF and UP would apply a surcharge of 4 percent.

55.     BNSF and UP also coordinated the timing of changes to their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month

after the month in which there was a change in the HDF Index average price calculation. If the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

56.     BNSF and UP's coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting closely-aligned trigger points, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

57.     UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

58.     As a result of Defendants' concerted action, rates (including Rail Fuel Surcharges) charged to rail shippers and customers, including Plaintiffs, were raised to or maintained at supra-competitive levels during the relevant period.

59.     Defendants initially applied these surcharges not only to regulated rates, but also to the private contracts, exempt traffic, and other traffic not subject to rate regulation under federal law, i.e., the rate-unregulated traffic at issue here.

60.     With the conspiracy underway, BNSF and UP, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the relevant period on most rate-unregulated carload traffic subject to a rate-based fuel surcharge.

61.     Other shippers have alleged that the chart below shows that the Fuel Surcharge percentages charged by BNSF and UP for carload freight shipments varied before June 2003 but were identical from that date through at least 2008:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 5.0% | 2.0% |
| Jun-03 | 3.0% | 3.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |

| MONTH | BNSF | UP |
|-------|------|-----|
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |
| Jun-08 | 28.5% | 28.5% |
| Jul-08 | 32.0% | 32.0% |
| Aug-08 | 34.5% | 34.5% |
| Sep-08 | 35.0% | 35.0% |
| Oct-08 | 31.0% | 31.0% |
| Nov-08 | 28.0% | 28.0% |
| Dec-08 | 23.5% | 23.5% |

As discussed above, as part of their conspiracy BNSF and UP imposed higher rate-based fuel surcharges on their coal traffic, starting in 2004 and continued to do so through at least 2008 on rate-unregulated coal traffic subject to rate-based fuel surcharges.

62.     There also was uniformity between CSX and NS in the monthly WTI Index-based surcharge percentages that they charged for most of the 2003-2008 time period to carload customers subject to a rate-based fuel surcharge.

63.     The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before March 2004, but were identical starting in March 2004, as alleged by other rail shippers:

**Monthly Surcharge Percentages – CSX and NS**

| MONTH | CSX | NS |
|-------|------|-----|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |

23

| MONTH | CSX | NS |
|-------|------|------|
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |
| Jul-07 | 16.4% | 16.4% |
| Aug-07 | 18.0% | 18.0% |

| MONTH | CSX | NS |
|---|---|---|
| Sep-07 | 20.8% | 20.8% |
| Oct-07 | 20.0% | 20.0% |
| Nov-07 | 22.8% | 22.8% |
| Dec-07 | 25.2% | 25.2% |
| Jan-08 | 28.8% | 28.8% |
| Feb-08 | 27.6% | 27.6% |
| Mar-08 | 28.0% | 28.0% |
| Apr-08 | 29.2% | 29.2% |
| May-08 | 33.2% | 33.2% |
| Jun-08 | 36.0% | 36.0% |
| Jul-08 | 41.2% | 41.2% |
| Aug-08 | 44.4% | 44.4% |
| Sep-08 | 44.4% | 44.4% |
| Oct-08 | 37.6% | 37.6% |
| Nov-08 | 32.4% | 32.4% |
| Dec-08 | 21.6% | 21.6% |

64.     Plaintiffs experienced substantially similar activity as alleged herein by other rail shippers in relation to its contracts with and fuel surcharges imposed by the Defendants.

65.     During the relevant time period, attempts by Plaintiffs to negotiate different fuel surcharges with Defendants were rejected.

66.     In 2006, NS published a "rebased" rate-based fuel surcharge that it applied, starting in July 2006, to some of its carload traffic. This rebased fuel surcharge simply added or "baked in" some or all of NS's previously imposed supra-competitive fuel surcharges into a shipper's base rate, and then applied a new stand-alone fuel surcharge anytime the WTI Index exceeded $64/barrel. NS's rebasing was a sleight-of-hand exercise that produced fuel surcharge recoveries that closely matched the ones it received from its non-rebased fuel surcharges.

67.     In stark contrast to this uniformity in their fuel surcharges, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for years indicates that Defendants were coordinating their behavior and conspiring to fix prices for Rail Fuel Surcharges. In addition, the advanced announcement of each Defendant's Fuel Surcharges was an important practice to implementing and enforcing the conspiracy.

68.     Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." (John Gallagher, Following the Competition, Traffic World, July 14, 2003).

69.     Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual incremental fuel cost increases. According to an economic analysis on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by more than $6.5 billion between 2005 and the first quarter of 2007.

70.     Another reason the Defendants' Rail Fuel Surcharges do not evidence a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles

on one gallon of diesel fuel. The fact that Defendants rate-based fuel surcharges did not reflect improvements in fuel efficiency is further evidence that the Rail Fuel Surcharges were not a mechanism to recover changes in fuel costs but instead were a mechanism collectively designed to raise prices.

71.     There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges unrelated to actual changes in fuel costs for more than a four-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increase in fuel prices experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – first, to decouple fuel prices from the historical railroad rate adjustment indices and, second, to agree upon new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages.

72.     In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, railroads with lower fuel costs and/or better efficiency could impose a lower surcharge that reflected actual fuel consumption for movements and thereby increase market share and revenue at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

73.     Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many

shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

74.     Defendants hatched a single conspiracy extending to all shippers, regardless of traffic type, including Plaintiffs. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether

75.     As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiffs) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

## IV.    OTHER ELEMENTS OF THE CONSPIRACY

76.     At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants and their co-conspirators also took other steps in furtherance of the conspiracy. For their coal traffic, BNSF and UP generally ceased entering into individually-negotiated contracts and instead insisted on offering form-based arrangements. They also shortened the terms of such arrangements (to no more than three years or even a single year), in contrast to the longer-

term arrangements that they previously favored. They also established rates in advance, even before they were requested, in a sharp departure from their previous practice. They also made the rates more broadly available, even to their competitors, whereas they previously had insisted on strict confidentiality. In addition, the two railroads became much less likely to take business from each other, and each railroad tended to maintain its own roster of customers.

77.     For other types of traffic, the Defendants largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts extending up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

78.     This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase their market share, and their pricing became more visible to each other in order to reduce competition.

79.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised their prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Instead, the Defendants collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

80.    In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

81.    In furtherance of the conspiracy, Defendants also decreased on some traffic the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, where a shipment required movement on more than one railroad, the Defendants moved increasingly to billing rates separately for each railroad, rather than as one quote for the entire shipment. Defendants collectively made this change for two reasons: to provide transparency to one another as to what each railroad was charging on interline shipments and to allow each Defendant to bill separately for its applicable Rail Fuel Surcharge. In other cases, the railroads insisted on the use of "through rates" in order to prevent shippers from being able to challenge the rate for only part of the movement at the STB.

82.    Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates. In fact, as can be seen from the table that follows, Defendants' market shares became more stable following the 2003 agreements than they had historically been.

### Railroad Market Share: Originated Tons and Carloads 1998 - 2003[1]

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| **BNSF** |  |  |  |  |  |  |
| Carloads Originated | 6,739,202 | 6,876,523 | 6,909,907 | 6,928,188 | 6,999,061 | 7,662,699 |

---
[1] AAR Railroad Facts and Analysis of Class I Railroads

| | | | | | | |
|---|---|---|---|---|---|---|
| Percent of Total Originated Carloads | 31.9% | 28.4% | 26.5% | 27.0% | 26.9% | 28.4% |
| Tons Originated | 429,408,242 | 440,180,814 | 434,255,161 | 442,932,381 | 438,123,355 | 460,789,676 |
| Percent of Total Originated Tons | 31.1% | 28.5% | 26.8% | 27.2% | 26.9% | 27.8% |
| CSXT[2] | | | | | | |
| Carloads Originated | 4,184,418 | 5,842,422 | 6,542,784 | 6,321,945 | 6,335,611 | 6,470,386 |
| Percent of Total Originated Carloads | 19.8% | 24.1% | 25.1% | 24.6% | 24.4% | 24.0% |
| Tons Originated | 306,034,673 | 378,007,852 | 406,314,179 | 399,970,764 | 392,903,118 | 391,993,962 |
| Percent of Total Originated Tons | 22.1% | 24.5% | 25.1% | 24.5% | 24.1% | 23.7% |
| NS[2] | | | | | | |
| Carloads Originated | 3,621,159 | 4,351,478 | 5,214,436 | 5,025,864 | 5,098,926 | 5,115,859 |
| Percent of Total Originated Carloads | 17.1% | 18.0% | 20.0% | 19.6% | 19.6% | 19.0% |
| Tons Originated | 233,133,810 | 270,383,729 | 320,700,204 | 310,449,934 | 307,770,415 | 306,322,113 |
| Percent of Total Originated Tons | 16.9% | 17.5% | 19.8% | 19.0% | 18.9% | 18.5% |
| UP | | | | | | |
| Carloads Originated | 6,570,086 | 7,137,090 | 7,384,503 | 7,393,306 | 7,580,376 | 7,692,160 |
| Percent of Total Originated Carloads | 31.1% | 29.5% | 28.3% | 28.8% | 29.1% | 28.6% |
| Tons Originated | 413,615,706 | 453,417,016 | 459,428,341 | 476,759,328 | 489,305,241 | 497,373,006 |
| Percent of Total Originated Tons | 29.9% | 29.4% | 28.3% | 29.2% | 30.1% | 30.0% |
| Total | | | | | | |
| Carloads Originated | 21,114,865 | 24,207,513 | 26,051,630 | 25,669,303 | 26,013,974 | 26,941,104 |
| Tons Originated | 1,382,192,431 | 1,541,989,411 | 1,620,697,885 | 1,630,112,407 | 1,628,102,129 | 1,656,478,757 |

## Railroad Market Share: Originated Tons and Carloads 2004 - 2008[1]

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| BNSF | | | | | |
| Carloads Originated | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| Percent of Total Originated Carloads | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| Tons Originated | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| Percent of Total Originated Tons | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| CSXT | | | | | |
| Carloads Originated | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| Percent of Total Originated Carloads | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| Tons Originated | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| Percent of Total Originated Tons | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| NS | | | | | |
| Carloads Originated | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| Percent of Total Originated Carloads | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |
| Tons Originated | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| Percent of Total Originated Tons | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| UP | | | | | |
| Carloads Originated | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| Percent of Total Originated Carloads | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |

[2] Data for 1998 and 1999 does not include all of the acquisition Conrail traffic

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Tons Originated | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| Percent of Total Originated Tons | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |
| Total | | | | | |
| Carloads Originated | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

## V.   ADDITIONAL EVIDENCE OF ANTICOMPETITIVE CONDUCT

83.     Apart from this direct evidence of price fixing, there is further support that
Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked
by certain structural and other characteristics that make a price fixing conspiracy feasible:

(a)     Defendants had a strong collective motive to enter into a price fixing conspiracy
because conditions existed in the railroad industry that were conducive to collusion.

(b)     The railroad industry is highly concentrated. During the period 2003 to 2008, there
were only seven Class I freight railroads. Defendants represented four of those
Class I railroads and they accounted for well over 90 percent of the nation's rail
traffic.

(c)     There are high fixed costs in the railroad industry. Those high fixed costs, together
with high concentration, facilitated a price fixing cartel.

(d)     There are enormous barriers to entry into the railroad industry. To compete,
railroads must invest in a vast network of tracks, stations, yards, and switching
facilities. These investments take decades to develop, and require onerous
regulatory and environmental reviews and approval. Land or easements are often
needed, necessitating the involvement of multiple local governments and the
exercise of eminent domain power. Because rail infrastructure is of minimal value
for other purposes, and because rail networks are difficult to build, the fixed costs
are largely sunk, creating additional entry barriers. Entry also requires that a new

entrant capture a significant market share from existing carriers in order to survive. Entry is thus both expensive and risky.

(e)     Rail Fuel Surcharges, when computed as a percentage of rates, are highly standardized and fungible. Defendants structured their Rail Fuel Surcharges as a percentage of the otherwise applicable rates and then published the percentages on their websites so the colluding railroads could monitor the conspiracy without the necessity of frequent communications. It is well recognized that markets having uniform and homogeneous products or services, such as rail freight transportation services, are susceptible to price fixing.

(f)     The railroad industry has a long record of price fixing and other anticompetitive behavior. In the first antitrust case dealing with the railroad industry, United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." The Rail Fuel Surcharge program engaged in by the Defendants is strikingly similar to those collective rate-making practices of the past.

(g)     The CEOs of Defendants and their co-conspirators are all board members of the AAR, which facilitated exchange of pricing information. The AAR is described as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly, and board members (and their staff) regularly communicate between meetings.

## VI.    THE STB DECISION

84.    The Defendants imposed the Rail Fuel Surcharges for both unregulated and exempt transportation (which are at issue here) as well as for common carrier tariffs regulated by the STB. Shippers challenged the Rail Fuel Surcharges in proceedings before the STB.

85.    On January 26, 2007, the STB served a decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of the otherwise applicable rate for rate-regulated rail freight transport was a "misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. Rail Fuel Surcharges, Ex Parte No. 661 (STB served Jan. 26, 2007).

86.    The STB further stated that "the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled." Id.

87.    The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

88.    Pursuant to their conspiracy, Defendants and co-conspirators applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts and other unregulated freight transportation at issue in this case.

## VII.    DEFENDANTS' SUPRA-COMPETITIVE PROFITS

89.    According to an economic analysis on railroad fuel surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by more than $6.5 billion between 2005 and the first quarter of 2007. The study's findings were based upon regulatory findings and other estimates from Defendants.

34

90.     According to the article "Rail Fuel Surcharges – Fact Versus Fiction" in the trade press report Rail Business by Argus Media Inc. (Volume 14, 15) dated April 14, 2008, the "change[s] in railroads['] overall operating expenses (including fuel) do not justify the large fuel surcharges railroads are applying to their movements." The article named several factors that have led to the circumstances in which railroads' fuel surcharges are greater than the change in total operating expense.

(a)     Companies have established escalation methods, including fuel surcharges, to assure that they do not under-recover their costs of fuel as the price of oil has increased substantially. "[A] company will therefore frequently establish a margin of error in an escalation method that will ensure it is fully protected from cost increases. However, what is a small dollar margin of error . . . becomes a very large dollar margin of error as oil prices increase . . . ."

(b)     "[A]s railroads implemented practices to better manage their cost of fuel internally, they did not reflect these fuel cost improvements in their external fuel surcharge programs." In fact, "none of the four major US railroads revised their surcharge programs to account for the actions management took to control the cost of fuel."

(c)     "[T]he STB did not hold a hearing on fuel surcharges until May 2006. This was more than four years after the railroads initiated their fuel surcharge programs." However, "the time to make sure a program like fuel surcharges is working properly is before the dollars generated by the program had a big impact on the railroads' financial statements."

(d)     Finally, "when the STB issued the results of its findings from the fuel surcharge hearing it did not require railroads to provide any retroactive reporting on fuel expenses and fuel surcharge revenue."

91.     Because fuel surcharges would normally be designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But as discussed above, Defendants used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

92.     Defendants reaped huge, supra-competitive profits as a result of the success of their conspiracy. During the period of the conspiracy (July 2003 to at least 2008), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

93.     In 2008, a putative class action was filed against BNSF, CSX, NS, and UP alleging price fixing in violation of Section 1 of the Sherman Act as well as violations of state antitrust and consumer protection law. Filing the putative class action tolled the statute of limitations on

Plaintiffs' claims. The District Court for the District of Columbia granted certification of the class in 2012. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 74 (D.D.C. 2012). On appeal, the United States Court of Appeals for the District of Columbia vacated class certification. *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013). On remand, the District Court denied the motion to certify the class, which was ultimately affirmed by the Court of Appeals. *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 292 F. Supp. 3d 14, 145 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).

## VIII.   DEFENDANTS' ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL

94.     Defendants' anticompetitive conduct caused dramatically higher rail rates for freight and increased profits. Shippers, end users, and the public were injured as a result.

95.     Defendants' anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce. During the relevant period, the Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each of them used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services. The Defendants added the Rail Fuel Surcharges to Plaintiffs' rail shipments made in interstate commerce. Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce and have denied those who ship the benefits of free, open and unrestricted competition.

## IX.   PLAINTIFFS SUFFERED INJURY BY VIRTUE OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

96.     As a result of Defendants' conduct MOL has paid supra-competitive rates to ship freight, lost profits, and lost the benefits of competition. These are injuries of the type the antitrust

laws are designed to prevent, and Plaintiffs incurred these injuries as direct purchasers of rail shipping services.

97.     During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, MOL paid one or more of the Defendants for rate-unregulated rail transportation in interstate commerce that included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy, including payments pursuant to shipping arrangements including contracts, pricing authorities, and private price lists applicable to its inbound and outbound shipments of cargo and shipping containers.

98.     The prices MOL paid to Defendants for rate-unregulated rail freight transportation services on which the unlawful Rail Fuel Surcharges were imposed were greater than the prices MOL would have paid absent the conspiracy alleged herein. MOL has therefore been injured in its business and property by reason of Defendants' antitrust violations.

99.     Furthermore, by imposing unreasonable and unlawful fuel surcharges on MOL, the Defendants unreasonably increased MOL's cost of doing business, and damaged MOL's ability to compete, including against any other intermodal shippers who may have been treated more favorably by the Defendants, thereby causing further harm.

100.     As a consequence of the matters alleged herein, Plaintiffs have been injured in its business and property by reason of Defendants' antitrust violations.

**COUNT I**
**Price Fixing (Fuel Surcharge) in Violation of Sections 1 and 3 of the**
**Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15**
**(By all Plaintiffs against all Defendants)**

101.     Plaintiffs fully incorporate by reference the allegations in all of the preceding paragraphs herein.

102.     The Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in interstate commerce in violation of Sections 1 and 3 of the Sherman Act and Section 4 of the Clayton Act. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to use Rail Fuel Surcharges as a method of increasing prices charged to shippers like Plaintiffs. The contract, combination, or conspiracy also resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to refrain from competing against each other in regard to rail fuel surcharges for freight.

103.     This conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which they fixed, maintained, and standardized prices for Rail Fuel Surcharges for Plaintiffs' non-regulated transportation. This conspiracy constitutes a per se violation of Sections 1 and 3 of the Sherman Act and Section 4 of the Clayton Act and constitutes an unreasonable and unlawful restraint of trade.

104.     Because of this conspiracy, among other things:

(a)      Defendants and their co-conspirators fixed prices charged to Plaintiffs and other shippers and customers for Rail Fuel Surcharges applied to unregulated contract-based rail freight transportation, and maintained those prices at supra-competitive levels;

(b)      Plaintiffs and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

(c)      Competition in establishing the prices for rail freight services has been unlawfully restrained, suppressed, and eliminated.

105.    As a proximate result of the Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supra-competitive prices for Rail Fuel Surcharges applied to rate-unregulated rail freight transportation from approximately July 1, 2003 to at least December 31, 2008 and have otherwise been damaged as above described.

## X.    CONCLUSION AND DEMAND FOR JURY TRIAL

106.    Wherefore, Plaintiffs pray for relief as follows:

(a)    That the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act;

(b)    That Plaintiffs recover compensatory damages, as provided by law;

(c)    That Plaintiffs recover treble damages, as provided by law;

(d)    That Plaintiffs and the Class recover their costs of the suit, including reasonable attorneys' fees, as provided by law; and

(e)    For such further relief as the Court may deem just and proper.

107.    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: April 1, 2021             By:   /s/ *Benjamin D. Brown*

Benjamin D. Brown (DC Bar No. 495836)
Robert A. Braun (DC Bar No. 1023352.)
Leonardo Chingcuanco (DC Bar No. 1719708)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
lchingcuanco@cohenmilstein.com

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
101 Second Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Mitsui O.S.K. Lines, Ltd. and*
*MOLAM Legacy, Inc.*