**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II) | MDL Docket No. 2925 Misc. Action No. 20-00008 (BAH) |
| This document relates to: ALL CASES | Chief Judge Beryl A. Howell |

**<u>MEMORANDUM OPINION</u>**

After nearly fifteen years of litigation in this District related to their central allegations that defendants, the four largest railroads operating in the United States, engaged in a multi-year price-fixing conspiracy to increase the price of rail-freight transport, plaintiffs in this multidistrict litigation, *In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*MDL II*"), MDL No. 2952, Misc. A. No. 20-00008 (BAH) (D.D.C.), seek an order requiring extensive new discovery, including four years, or even more, of additional transaction data for certain plaintiffs' purchases of rail-freight transport from defendants. Pls.' Mot. Compel Produc. Post-2008 Transaction Data & Price Authorities ("Pls.' Mot.") at 1, ECF No. 543. Defendants, for their part, oppose plaintiffs' request and move for reconsideration of this Court's unambiguous conclusion in its decision on their motions to dismiss ten individual complaints that "'Plaintiffs' allegations of harm caused by effects of the July 1, 2003–December 31, 2008 conspiracy that extended beyond December 31, 2008 are tolled'" under the exception to the running of the statute of limitations for former putative class members set forth in *American Pipe & Construction Co. v. Utah* ("*American Pipe*"), 414 U.S. 538 (1974), and may proceed. Defs.' Mot. Recons. & Opp'n Pls.' Mot. Compel ("Defs.' Mot.") at 1, ECF No. 561 (quoting *In re Rail*

*Freight Fuel Surcharge Antitrust Litig. (No. II)* ("*Tolling Decision*"), MDL No. 2925, Misc. A. No. 20-00008 (BAH), 2020 WL 5016922, at \*24 (D.D.C. Aug. 25, 2020)).

A hearing on the pending motions was held on May 6, 2021. *See* Min. Entry (May 6, 2021); Tr. of Hr'g (May 6, 2021) ("May 6 Hr'g Tr."), ECF No. 620. For the reasons set forth below, defendants' Motion for Reconsideration is denied and plaintiffs' Motion to Compel is granted in part and denied in part.

## I.    BACKGROUND

The extensive factual and procedural background of this multidistrict litigation has been fully summarized in the *Tolling Decision* denying defendants' motions to dismiss, in whole or part, ten individual complaints in *MDL II. See Tolling Decision*, 2020 WL 5016922, at \*1–6. Only those facts necessary for resolving the instant motions are provided herein.

### A.    Creation of MDL II and the *Tolling Decision*

The more than 300 rail-freight-shipper plaintiffs in *MDL II* allege that defendants "engaged in a multi-year price-fixing conspiracy to increase the price of rail freight transport through their coordinated efforts to cause an industry trade group to adopt a new cost index that excluded the cost of fuel and then to implement, in lockstep, artificially inflated fuel surcharges, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15." *Id.* at \*1. This theory was originally advanced in another multidistrict litigation created in 2007 and still pending in this District, *In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*MDL I*"), MDL No. 1869, No. 07-mc-00489-PLF-GMH (D.D.C.), "in which a putative class of direct purchasers of unregulated rail freight services alleged the same conspiracy, occurring from 2003 to 2008, against the same defendants," *Tolling Decision*, 2020 WL 5016922, at \*1 (citing *In re Rail Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 13 (D.D.C. 2012)). The class was defined as direct purchasers of rail-freight transport who paid "a

standalone rail freight fuel surcharge applied as a percentage of the base rate" at "any time from July 1, 2003 until December 31, 2008" (the "*MDL I* class period"). *Id.* at \*4 (internal quotation marks and citation omitted); *see also id.* at \*14–17. Class certification was denied in 2019, *see In re Rail Freight Fuel Surcharge Antitrust Litig.—MDL No. 1869*, 934 F.3d 619, 627 (D.C. Cir. 2019), and plaintiffs, former absent putative class members in *MDL I*, subsequently brought individual complaints largely repeating the claims of the putative class, *Tolling Decision*, 2020 WL 5016922, at \*1, \*5–6.

On February 6, 2020, the Judicial Panel on Multidistrict Litigation ("JPML") consolidated twenty-six individual cases brought by former putative class members in *MDL I* for pretrial proceedings in this Court in *MDL II*. Transfer Order at 1, ECF No. 1. Since its creation, another eighty-one cases initiated by former putative class members have been consolidated in this multidistrict litigation, for a total of 107 individual cases and over 300 plaintiffs as of this writing. The *MDL II* plaintiffs, like the putative *MDL I* class, allege that defendants' conspiracy took place between July 1, 2003 and December 31, 2008, but their individual actions were filed between November 2019 and April 2021. Their claims would therefore be untimely under the Clayton Act's four-year statute of limitations, *see* 15 U.S.C. § 15b, but for the tolling made generally available to former putative class members under *American Pipe*. The *American Pipe* rule "suspends the applicable statute of limitations," 414 U.S. at 554, as to all putative class members' individual claims concerning "the same evidence, memories, and witnesses as the subject matter of the original class suit," *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 393 n.14 (1977) (internal quotation marks and citation omitted), "until class certification is denied," *Crown, Cork & Seal Co. v. Parker* ("*Crown*"), 462 U.S. 345, 354 (1983). The statute of limitations as to most of the *MDL II* plaintiffs' claims, which are substantively identical to the

claims of the *MDL I* class, thus began to run only after the 2019 denial of class certification in *MDL I*.  *See Tolling Decision*, 2020 WL 5016922, at *12.

A handful of the *MDL II* complaints contain allegations that differ from the allegations of the putative *MDL I* class, including, as relevant here, allegations that certain plaintiffs experienced continuing harm from the conspiracy after December 31, 2008, the date on which the putative class period in *MDL I* ended, because they "continued to pay supracompetitive [fuel surcharges] to [d]efendants for several years after the conspiracy ended, pursuant to the multi-year contracts [they] had entered or renegotiated with [d]efendants prior to the end of the conspiracy."  *Id.* at *9 (first, second, and fourth alterations in original) (internal quotation marks and citation omitted).  Defendants moved to dismiss or strike allegations in these ten complaints, arguing that their divergence from the former class's allegations deprived them of the benefit of *American Pipe* tolling and rendered them untimely.  *See id.* at *6–9, *12.  Their motions were denied.  *Id.* at *29–30.  As to the challenged complaints' allegations of post-2008 lingering effects of the 2003–2008 conspiracy, the *Tolling Decision* found that "[n]o undue prejudice to defendants results from tolling plaintiffs' allegations of harm resulting from lingering effects of the conspiracy outside the class period: because the underlying conduct occurred during the class period, defendants have fair notice of their substance, and the number and identities of potential plaintiffs, from the earlier class proceedings."  *Id.* at *24.  Under this logic, "plaintiffs' allegations of harm resulting from lingering effects of the conspiracy outside the [*MDL I*] class period" of July 1, 2003 to December 31, 2008 stemming from defendants' conduct during the class period were tolled, *id.*, but allegations of continuing conspiratorial conduct after December 31, 2008 were time-barred, *see id.* at *25.[1]

---

[1]      Plaintiffs Nippon Yusen Kabushiki Kaisha and NYK Line (North America) Inc. (together, the "NYK plaintiffs"), whose complaint was among those targeted by defendants' motions to dismiss, *see Tolling Decision*,

### B.      Discovery in MDL II

At the time of *MDL II*'s creation in early 2020, plaintiffs represented to the JPML that

"all the fact discovery as to Defendants ha[d] been done" in *MDL I*, Tr. of Proceedings ("JPML

Hr'g Tr.") at 11:15-16, *MDL II*, MDL No. 2925 (J.P.M.L. Jan. 30, 2020), ECF No. 136, and that,

as a result, any new fact discovery needed in *MDL II* would be "proportionately . . . much, much

smaller than what's been done to date" and would be largely restricted to "things related to

specific new Plaintiffs," *id.* at 11:20-22, in particular, "individualized damages discovery,"

Related Pls.' Joint Resp. Defs.' Mot. Transfer, Consol. &/or Coordination of Rail Freight Fuel

Surcharge Antitrust Actions, *MDL II*, MDL No. 2925 (J.P.M.L. Dec. 12, 2019), ECF No. 87.

The Panel thus reported that plaintiffs would "have access to the full discovery record developed

in [*MDL I*], and that any remaining discovery in the new cases will be very limited and case-

specific."  Transfer Order at 2.

Plaintiffs made similar representations at the initial scheduling conference in *MDL II*,

indicating that "all of the defendants' transaction data including for all shippers that were alleged

to have been in the [putative *MDL I*] class" had been produced and subject to expert analysis in

*MDL I*, Tr. of Video-Tel. Scheduling Conf. (May 22, 2020) at 53:19-22, ECF No. 110, and, as a

result, the most burdensome and time-consuming discovery needed in *MDL II* was already

complete, with the exception of "some particular additional transaction data" that might be

---

2020 WL 5016922, at *8–9, sought clarification or reconsideration of the *Tolling Decision*'s determination that their "allegations about [a] 2009–2013 contract" between NYK plaintiffs and defendants that they claimed contained the same artificially high fuel surcharge as contracts entered during the 2003–2008 conspiracy period "are time-barred," *id.* at *27; *see In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)* ("*NYK Recons. Decision*"), MDL No. 2925, Misc. A. No. 20-00008 (BAH), Civ. A. No. 20-790 (BAH), 2020 WL 6198487, at *1 (D.D.C. Oct. 22, 2020).  This request was denied on the grounds, previously articulated in the *Tolling Decision*, that "allegations concerning a supracompetitive fuel surcharge formula in a 2009 contract do not satisfy the criteria for tolling because they are 'factually separate from the 2003–2008 conspiracy pursued by the putative class' in *MDL I* and defendants therefore did not have fair notice that the contract was at issue."  *NYK Recons. Decision*, 2020 WL 6198487, at *2 (quoting *Tolling Decision*, 2020 WL 5016922, at *27).

required, *id.* at 53:18-19.  Based on the parties' discussion of their anticipated discovery needs at the scheduling conference, an initial Scheduling Order was entered, setting a deadline of October 1, 2021 for the completion of all fact discovery.  Order (May 22, 2020) ("Scheduling Order") ¶ 5, ECF No. 102.

### C.    The Present Dispute

On February 2, 2021, two days before a previously scheduled status conference was to be held, plaintiffs submitted an email to the Court in accordance with the procedure for discovery disputes outlined in the Scheduling Order, *see* Scheduling Order at 3, advising that the parties had reached impasse about "the extent to which Defendants will produce . . . transaction data from 2009–2012."  Defs.' Mot., Ex. 2, Email from Alden L. Atkins, Partner, Vinson & Elkins LLP, to the Court (Feb. 2, 2021, 3:59 PM) ("Disc. Dispute Email") at 1, ECF No. 561-3.  Such information had been provided in *MDL I* for transactions made by defendants for all shipments with any customer for the nine-year period from January 1, 2000 to December 31, 2008 (the "*MDL I* data set"), but was neither requested nor produced for the years after 2008 in that multidistrict litigation.  *See id.* at 3–4; Tr. of Status Conf. (Feb. 4, 2021) ("Feb. 4 Status Conf. Tr.") at 15:22-23, ECF No. 516.[2]  As an early step in fact discovery in *MDL II*, defendants produced the full *MDL I* data set to *MDL II* plaintiffs.  Disc. Dispute Email at 1; Decl. of Daniel M. Jaffe Supp. Pls.' Mot. Compel Produc. Post-2008 Transaction Data & Price Authorities ("Jaffe Decl.") ¶ 6, ECF No. 543-2.

---

[2]     *MDL I* was filed in November 2007, *see* Transfer Order, *MDL I*, MDL No. 1869, No. 07-mc-00489-PLF-GMH (D.D.C. Nov. 14, 2007), ECF No. 1, more than a year before the class-period end date of December 31, 2008, and discovery began in late 2008, after disposition of defendants' motion to dismiss, *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 37 (D.D.C. 2008); Feb. 4 Status Conf. Tr. at 15:2-10.  Of course, post-2008 lingering-effects damages had not yet occurred at that time.  As a result, the central focus of discovery in *MDL I* was defendants' allegedly conspiratorial conduct and damages incurred by plaintiffs during the 2003–2008 class period.  *See* Feb. 4 Status Conf. Tr. at 15:22–16:15.

Despite having received this extensive body of information for 2000–2008, plaintiffs requested, in their February 2 email, that defendants be compelled to "produce all transaction data for 2009–2012 for the same data fields that Defendants have produced for 2000–2008" for all rail-freight shippers, claiming that broad set of data was "necessary to assess and prove damages for the continuing effects of Defendants' conspiracy."  Disc. Dispute Email at 1. Defendants opposed production of any post-2008 transaction data, arguing that the *MDL I* data set "sufficed in *MDL I* and should suffice in *MDL II*," *id.* at 4, but offered "to produce relevant transaction data for those Plaintiffs that have actually alleged or could at least provide a basis to allege that they paid a rate-based fuel surcharge after 2008 under a pre-2009 contract" by citing an applicable contract or other relevant price authority, *id.* at 5.[3]  Plaintiffs rejected this compromise, contending that defendants' approach "would lead to endless disputes, would cause delay, would be enormously burdensome, and would create substantial risk that Defendants' data production would be incomplete."  *Id.* at 2.  They expressed further concern that "[m]any plaintiffs have incomplete records due to the passage of time."  *Id.*  This limitation, in combination with defendants' incomplete and slow production of relevant price authorities to this point, therefore meant that these plaintiffs would be unable to demonstrate to defendants' satisfaction that they qualified for production of post-2008 transaction data.  *Id.*  As a result, the parties reached impasse.

The transaction-data dispute was discussed, but not resolved, at the previously scheduled February 4, 2021 status conference.  When asked why *MDL II* plaintiffs were seeking 2009– 2012 transaction data that had not been produced or discussed in *MDL I*, plaintiffs' counsel

---

[3]      A price authority, in the rail-freight context, is a "[c]ontract, quote, circular, or tariff containing rates and rules governing their application."  Jaffe Decl., Ex. 2, Ass'n of Am. R.R.s, *Railway Accounting Rules* ("*R.R. Rules*") 59 (2021), ECF No. 543-3 (emphasis omitted).

stated that "the damage period that was the focus of [*MDL I*] and that remains the focus of the case ends on December 31st, 2008; and there has been no claim ever made in that case, which was filed in 2007, for damages in the period after December 13th, 2008 [sic]."  Feb. 4 Status Conf. Tr. at 14:15-19.  He emphasized that "[t]here was really no claim for lingering effects damages" in *MDL I*.  *Id.* at 16:13-14; *see also, e.g.*, *id.* at 31:8-14.  The parties were encouraged "to meet and confer again" on the transaction data dispute, and to "propose a briefing schedule" if they were unable to reach a solution.  *Id.* at 51:18, 21.

The parties accordingly resumed negotiations.  During this second conferral process, defendants offered to "provide 2009 transaction data related to all Plaintiffs and those affiliated entities Plaintiffs identified in their answers to interrogatories for whom Plaintiffs claim they are seeking damages," without "requir[ing] Plaintiffs to identify a specific contract or rate authority entitling them to receive this data."  Defs.' Mot., Ex. 7, Email from Ronald K. Wray, II, Partner, Gallivan, White & Boyd P.A., to Pls.' Counsel (Feb. 15, 2021, 2:51 PM) ("Defs.' Feb. 15 Email") at 2, ECF No. 561-8.  In exchange, they asked that plaintiffs "agree to drop their requests for non-Plaintiff data and for data after 2009."  *Id.*  Plaintiffs counter-proposed the following terms: (1) plaintiffs would "agree to accept 2009 data" restricted to "the named plaintiffs and the entities they named in their recent interrogatory responses"; (2) defendants "would produce transaction data for longer time periods for plaintiffs for which Defendants have already agreed . . . to produce such data" in the parties' conferral process; (3) defendants "would also agree to produce data after 2009 for plaintiffs that can document a pricing authority/contract in effect during this period"; and (4) defendants would locate the data by "search[ing] for variations of plaintiff names," including names and spellings "previously identified in MDL I transactional data."  Defs.' Mot., Ex. 8, Email from Alden L. Atkins, Partner, Vinson & Elkins

LLP, to Defs.' Counsel (Feb. 18, 2021, 11:07 AM) at 1, ECF No. 561-9.  Defendants sought

clarification of the scope of the post-2009 data anticipated by the counterproposal, specifically,

"whether . . . Plaintiffs are seeking data beyond 2012"; whether plaintiffs are "seeking post-2009

data for price authorities that were essentially open offers of transportation or for evergreen

contracts that remained in effect unless canceled by either party"; and whether plaintiffs "seek to

include contracts" with nondefendant railroads in assessing the relevant post-2009 transaction

data.  *Id.*, Ex. 9, Email from Ronald K. Wray, II, Partner, Gallivan, White & Boyd P.A., to Pls.'

Counsel (Feb. 22, 2021, 11:07 PM) at 1–2, ECF No. 561-10.[4]

As to the post-2012 data, plaintiffs confirmed that "some Plaintiffs have contracts or

price authorities from the conspiracy period that were in effect after 2012," while others lacked

sufficient information to determine whether their conspiracy-period pricing lasted past 2012, and

that plaintiffs were therefore "unwilling to consent to a discovery agreement that could

effectively waive claims for damages after 2012 due to a lack of transaction data."  *Id.*, Ex. 10,

Letter from Pls.' Counsel to Defs.' Counsel (Mar. 2, 2021) ("Pls.' Lingering-Effects Letter") at

2, ECF No. 561-11.  They offered a compromise under which "Defendants would agree to

produce data through 2012 for contracts in effect through that time," while plaintiffs "would

reserve their right to request data after 2012 for pre-2009 contracts and price authorities in effect

after 2012, and Defendants would reserve their right to oppose such a request."  *Id.*  As to the

question of evergreen contracts and open offers, plaintiffs clarified that, in their view, they

"reserve their rights to request any relevant data demonstrating lingering effects . . . whether

---

[4]     An "evergreen contract is a contract that simply renews each year unless canceled by one of the parties,"
May 6 Hr'g Tr. at 64:8-10 (statement by Ronald K. Wray, II, Gallivan, White & Boyd, P.A., Counsel for Defendant
Norfolk Southern Railway Co.), while an "open offer of transportation" is an offer published by a railroad, for
example, on its "website," via "a circular," or through "some other mechanism" that "a shipper can accept" by
placing an order for rail-freight transportation under the offer, *id.* at 65:5-15 (statement by Mr. Wray).

based on open offers of transportation, evergreen contracts, or other price authorities."  *Id.*

Finally, as to contracts with nondefendant railroads, plaintiffs proposed "that they would not use

a contract with a non-Defendant . . . to justify a request for data after 2009 at this time," but

"would reserve their right to seek such data later."  *Id*. at 3.

On March 11, 2021, the parties indicated that they had again reached impasse and

requested entry of a stipulated briefing schedule on plaintiffs' planned motion to compel

production of post-2008 transaction data and an anticipated motion by defendants for

reconsideration of the *Tolling Decision*'s holding that plaintiffs' claims for lingering-effects

damages are tolled under *American Pipe*.  Mot. Stipulated Briefing Schedule & Proposed Order,

ECF No. 542.  A schedule for briefing on these two motions was accordingly set, *see* Min. Order

(Mar. 12, 2021); Min. Order (Apr. 16, 2021), with the last brief submitted on April 23, 2021, *see*

Defs.' Reply Mem. L. Supp. Defs.' Mot. Recons. ("Defs.' Reply"), ECF No. 619.  A hearing on

both motions was held on May 6, 2021, as part of a previously scheduled status conference.  *See*

Min. Entry (May 6, 2021).  The two motions are now ripe for resolution.

## II.   LEGAL STANDARDS

### A.   Motion for Reconsideration

Motions to reconsider interlocutory orders may be granted at any time before the entry of

a final judgment, pursuant to Federal Rule of Civil Procedure 54(b), "'as justice requires.'"

*Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015) (quoting *Greene v. Union Mut. Life Ins. Co. of

Am.*, 764 F.2d 19, 22 (1st Cir. 1985) (Breyer, J.)); *see also Capitol Sprinkler Inspection, Inc. v.

Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (noting that Rule 54(b) "recognizes [a

court's] inherent power to reconsider an interlocutory order 'as justice requires'" (quoting

*Greene*, 764 F.2d at 22)).  In this District, that "abstract phrase" is interpreted "narrowly" to

permit reconsideration "'only when the movant demonstrates: (1) an intervening change in the

law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first

order.'" *King & Spalding, LLP v. U.S. Dep't of Health & Hum. Servs.*, 395 F. Supp. 3d 116,

119–20 (D.D.C. 2019) (quoting *Bernier v. Trump*, 299 F. Supp. 3d 150, 156 (D.D.C. 2018)); *see*

*also Bayshore Cmty. Hosp. v. Azar*, 325 F. Supp. 3d 18, 22 (D.D.C. 2018); *Hispanic Affs.*

*Project v. Perez*, 319 F.R.D. 3, 6 (D.D.C. 2016); *Murphy v. Exec. Off. for U.S. Att'ys*, 11 F.

Supp. 3d 7, 8 (D.D.C. 2014).  Although this list may not exhaust the potential justifications for

reconsideration, exercise of the discretion granted under Rule 54(b) to revisit earlier rulings in

the same case is "'subject to the caveat that where litigants have once battled for the court's

decision, they should neither be required, nor without good reason permitted, to battle for it

again.'" *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 257 (4th Cir.

2018) (quoting *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,*

*LLP*, 322 F.3d 147, 167 (2d Cir. 2003)); *see also Nat. Res. Def. Council, Inc. v. EPA*, 490 F.

Supp. 3d 190, 194–95 (D.D.C. 2020) (same); *Jordan v. U.S. Dep't of Justice*, Civ. No. 17-2702

(RC), 2019 WL 2028399, at *2 (D.D.C. May 8, 2019) (same).  "'The burden is on the moving

party to show that reconsideration is appropriate and that harm or injustice would result if

reconsideration were denied.'" *Lovely-Coley v. District of Columbia*, 255 F. Supp. 3d 1, 9

(D.D.C. 2017) (quoting *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893

F. Supp. 2d 258, 268 (D.D.C. 2012)).

> **B.    Motion to Compel**

Under Federal Rule of Civil Procedure 26, a party "may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case."  Fed. R. Civ. P. 26(b)(1).  Thus, in assessing a motion to compel discovery,

"courts must look carefully to the complaint's allegations to determine if the requested

discovery" satisfies Rule 26's relevancy and proportionality requirements.  *Strike 3 Holdings,*

*LLC v. Doe*, 964 F.3d 1203, 1210 (D.C. Cir. 2020).  "Relevancy in this context is 'broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case.'"  *In re Veiga*, 746 F. Supp. 2d 8, 19 (D.D.C. 2010) (quoting *Alexander v. FBI*, 194 F.R.D. 316, 325 (D.D.C. 2000)); *see also Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1012–13 (D.C. Cir. 1997).

If the requested discovery is found to be relevant, Rule 26's proportionality prong "requires district courts in all discovery matters 'to consider a number of factors potentially relevant to the question of undue burden,' including: (1) whether the discovery sought is 'unreasonably cumulative or duplicative'; (2) whether the discovery sought 'can be obtained from some other source that is more convenient, less burdensome, or less expensive'; and (3) whether the discovery sought is 'proportional to the needs of the case,' taking into account 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'"  *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 358 (D.D.C. 2018) (first quoting *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007); and then quoting Fed. R. Civ. P. 26(b)(1), (2)); *see also Strike 3 Holdings, LLC*, 964 F.3d at 1207 (noting that, under Rule 26, "[c]ourts are directed to assess proportionality by reference to" these factors); Fed. R. Civ. P. 26(b).

"The party seeking discovery must first demonstrate that the information sought" is both relevant and proportional and therefore falls "within the scope of discoverable information under Rule 26."  *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 202 F. Supp. 3d 1, 6

(D.D.C. 2016).  "If that party carries its burden, the party resisting discovery then must show

'why discovery should not be permitted.'"  *Id.* (quoting *Alexander*, 194 F.R.D. at 326).

Notwithstanding "[t]he broad presumption in favor of discovery of relevant information

embodied in Rule 26," *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 322 F.R.D. 1, 6

(D.D.C. 2017), a "district court has broad discretion to limit the scope of discovery pursuant to

[Rule] 26(b)," *Webb v. U.S. Vets. Initiative*, 993 F.3d 970, 974 (D.C. Cir. 2021); *see also*

*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 968 (D.C. Cir. 2016) ("'Rule 26

vests the trial judge with broad discretion to tailor discovery narrowly . . . .'" (omission in

original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998))).

## III.    DISCUSSION

Plaintiffs seek an order compelling defendants (1) to "produce the same fields of

transaction data for 2009 that they produced in [*MDL I*] for all Plaintiffs"; (2) to "produce

[transaction] data for 2010 to 2012 for Plaintiffs who identify a price authority entered into or in

effect on or before December 31, 2008 that they reasonably believe continued beyond 2009

within 30 days of presentment of the price authority"; and (3) to "substantially complete the

production of [conspiracy-period] price authorities applicable to the Plaintiffs by" June 1, 2021.

Pls.' Mot. at 1; *see also* Pls.' Mem. P. & A. Supp. Mot. Compel Produc. Post-2008 Transaction

Data & Price Authorities ("Pls.' Mem.") at 5, 15, ECF No. 543; Pls.' Mem. P. & A. Opp'n Defs.'

Mot. Recons. & Reply Supp. Mot. Compel Produc. Post-2008 Transaction Data & Price

Authorities ("Pls.' Reply") at 24 n.9, ECF No. 612.[5]  They contend that this information is

---

[5]      Plaintiffs originally requested that defendants be compelled to produce all price authorities applicable to plaintiffs "by May 1, 2021," Pls.' Mot. at 1, but subsequently extended that request to "June 1," Pls.' Reply at 24 n.9.  In addition, though plaintiffs represented that they sought to compel production of "their own post-2008 transaction data and transaction data for which no shipper is identified" through their pending motion, *id.* at 3 n.2, they clarified at the May 6, 2021 motions hearing that they are "no longer asking for" unidentified shipper data, May 6 Hr'g Tr. at 36:9; *see also id.* at 36:6-10, 37:12-15.

necessary "to prove and calculate" their lingering-effects damages and therefore falls within the scope of discoverable information under Rule 26.  Pls.' Mem. at 1.

Defendants oppose production of the requested materials, and move instead for the Court to "reconsider its ruling" in the *Tolling Decision* that plaintiffs' allegations regarding the harm they suffered from post-2008 lingering effects of the alleged 2003–2008 conspiracy are tolled and then, upon granting defendants' Motion for Reconsideration, deny plaintiffs' Motion to Compel as moot.  Defs.' Mot. at 1.  Alternatively, they ask that plaintiffs' request for production of 2010–2012 transaction data for certain plaintiffs be denied, and that defendants be "require[d] . . . only to produce 2009 transactional data for all Plaintiffs and affiliated entities." *Id*.  Whether plaintiffs' Motion to Compel presents a live dispute depends on resolution of defendants' Motion for Reconsideration, which itself turns on a correct understanding of the scope of the lingering-effects damages tolled in the *Tolling Decision*.  Consideration of the pending motions thus follows review of the *Tolling Decision*'s holding with respect to lingering-effects damages and evaluation of how the *Tolling Decision*'s reasoning applies to theories of lingering-effects damages not presented in the motions to dismiss.

### A.    Application of the *Tolling Decision*'s Conclusion that Certain Lingering-Effects Damages Are Tolled

#### 1.    Description of the **Tolling Decision***'s Holding with Respect to Lingering-Effects Damages*

The *Tolling Decision* evaluated the timeliness of plaintiffs' allegations of continuing harm from defendants' conspiracy after December 31, 2008 against the background principles of *American Pipe* tolling.  As described *supra* Part I.A and explained in detail in the *Tolling Decision*, *American Pipe* stops the running of the statute of limitations "'for all members of the putative class until class certification is denied'" as to "individual actions concerning 'the same evidence, memories, and witnesses as the subject matter of the original class suit.'"  *Tolling*

*Decision*, 2020 WL 5016922, at *11 (first quoting *Crown*, 462 U.S. at 354; and then quoting

*United Airlines, Inc.*, 432 U.S. at 393 n.14).  This rule is designed to promote both Federal Rule

of Civil Procedure 23's "goals of 'efficiency and economy of litigation[,]' by eliminating the

need for putative class members to file protective motions to intervene in the pending class

action to preserve their claims, and thus preventing a 'needless multiplicity of actions,'" *id.* (first

quoting *Am. Pipe*, 414 U.S. at 553; and then quoting *Crown*, 462 U.S. at 351), and "the functions

of statutes of limitations, which . . . [']promote justice by preventing surprises through the

revival of claims that have been allowed to slumber until evidence has been lost, memories have

faded, and witnesses have disappeared,'" *id.* (quoting *Am. Pipe*, 414 U.S. at 554).

The D.C. Circuit takes a "'functional'" approach to application of these guideposts of

*American Pipe* tolling "that emphasizes 'whether tolling under [the] circumstances would serve

the purposes underlying the class-action tolling doctrine.'"  *Id.* (alteration in original) (first

quoting *McCarthy v. Kleindienst*, 562 F.2d 1269, 1274 (D.C. Cir. 1977); and then quoting

*Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 527 (D.C. Cir. 2010)).  "Under

this approach, tolling for putative class members is appropriate so long as 'the defendant has

received fair notice' through the former class action 'of the number and generic identity of the

potential [plaintiffs] and their substantive claims.'"  *Id.* (alteration in original) (quoting

*McCarthy*, 562 F.2d at 1274).  The central inquiry within this framework is whether the claims

of former putative class members are "'predicated on the same acts'" as the conduct challenged

in the original class action, "such that 'there can be no doubt that the defendants have received

sufficient notice of the contours of potential claims.'"  *Id.* (quoting *McCarthy*, 562 F.2d at 1275).

The timeliness of plaintiffs' allegations of continuing harm from defendants' conspiracy after

December 31, 2008, the closing date of the *MDL I* class period, was evaluated in light of the

foregoing principles and the black-letter rule of antitrust law that "[t]he lingering effects of a completed conspiracy may be remediated upon successful proof of the underlying anticompetitive conduct."  *Id.* at *24 (collecting cases); *see also Zenith Radio Corp. v. Hazeltine Rsch. Inc.*, 401 U.S. 321, 338–39 (1971) (finding that, "[i]n the context of a continuing conspiracy," "each separate cause of action that . . . accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial").

Balancing *American Pipe*'s requirement of fair notice to defendants against its aim of preventing duplicative litigation, the *Tolling Decision* reasoned that "[s]ubstantial factual overlap between the original allegations [made in *MDL I*] and the new allegations [raised by *MDL II* plaintiffs], the touchstone of *American Pipe* analysis, remains essential," and that tolling is therefore permitted only for allegations "with a sufficient factual nexus" to the conduct alleged by the putative *MDL I* class "to ensure fair notice to defendants."  2020 WL 5016922, at *25. On this basis, the *Decision* distinguished allegations that defendants' conduct in furtherance of the conspiracy continued past the 2003–2008 period alleged by the putative *MDL I* class from allegations of lingering harms after 2008 resulting from defendants' purported conspiratorial conduct during the 2003–2008 class period.  It concluded that "[n]o undue prejudice to defendants result[ed] from tolling" of allegations as to which "the underlying conduct occurred during the class period" because "defendants ha[d] fair notice of their substance, and the number and identities of potential plaintiffs, from the earlier class proceedings" in *MDL I*.  *Id.* at *24. Consequently, "plaintiffs' allegations of harm resulting from lingering effects of the conspiracy outside the [*MDL I*] class period" of July 1, 2003 to December 31, 2008 stemming directly from

defendants' conduct during the class period are timely. *Id.* In contrast, "allegations outside the class period that address conduct or harm completely unrelated to conduct or harm that occurred within the class period are untimely," *id.* at \*25, because they "spring[] an unfair surprise on defendants by adding conduct that is factually separate from the 2003–2008 conspiracy pursued by the putative class" to the conduct on which defendants' eventual liability might be premised, *id.* at \*27. Thus, plaintiffs' allegations in the challenged complaints that defendants' conspiratorial conduct lasted past December 31, 2008 and that contracts between certain plaintiffs and defendants entered after December 31, 2008 contained artificially high fuel surcharges as a result of the conspiracy were time-barred. *See id.* at \*25–27.

The *Tolling Decision* hesitated, at the pleadings stage, to assess "[t]he duration and scope of the alleged effects of the conspiracy . . . before discovery and expert analysis." *Id.* at \*24. Now, some months later and with fact discovery well underway, the parties rely on the *Tolling Decision* to dispute the scope of discovery and, in so doing, seek to extend the *Tolling Decision*'s reasoning and holdings to types of price authorities and lingering-effects theories that were not directly at issue in the ten motions to dismiss resolved in that ruling. Of course, information sought in discovery solely to prove time-barred allegations is irrelevant and therefore beyond the scope of discoverable information under Rule 26. *See, e.g.*, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978) ("[I]t is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case."); *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 868 (D.C. Cir. 2008) (noting that, because allegations for which plaintiffs sought discovery "were untimely," "any [related] information . . . is likewise immaterial"); *Neals v. ParTech, Inc.*, No. 19-cv-05660, 2021 WL 463100, at \*6 (N.D.

Ill. Feb. 9, 2021) (observing that "rulings on the applicable statute of limitations may impact the scope of discovery requests" (emphasis omitted)).

The instant dispute between the parties involves plaintiffs' representations during the parties' conferral process and, again, at the May 6, 2021 motions hearing, that they may at some point seek, under the rubric of lingering-effects damages, alleged harms from purchases made more than four years after the end of the conspiracy period; for post-2008 purchases made pursuant to open offers of transportation, evergreen contracts, or other price authorities; or for contracts with nondefendant railroads and the possibility of related requests for post-2008 transaction data.  *See* May 6 Hr'g Tr. at 51:24–54:9; *supra* Part I.C.  Plaintiffs' claimed entitlement to potentially expansive post-2008 discovery from defendants highlights the need for clarification of how the *Tolling Decision*'s treatment of lingering-effects damages applies to then-undefined iterations of plaintiffs' claims of continuing harm resulting from the alleged 2003–2008 conspiracy in order to structure effectively the remaining fact discovery.

### 2. *Principles Guiding Application of the* Tolling Decision *to New Lingering-Effects Theories*

At the outset, it bears repeating that all claims raised by the *MDL II* plaintiffs would be untimely under the Clayton Act's four-year statute of limitations but for the benefit of *American Pipe* tolling.  *See* 15 U.S.C. § 15b; *supra* Part I.A.  The policies underlying statutes of limitations and *American Pipe* tolling therefore inform application of the *Tolling Decision*'s reasoning to new lingering-effects theories advanced by plaintiffs.  As the Supreme Court recognized in *American Pipe*, statutes of limitation are "'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"  *Am. Pipe*, 414 U.S. at 554 (quoting *Order of R.R. Telegraphers v. Ry. Exp. Agency*, 321 U.S. 342, 348–49 (1944)), with a

18

"'primar[y]' purpose . . . 'to protect defendants against stale or unduly delayed claims,'" *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) (alteration in original) (quoting *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)).  Statutes of limitations further "advance[e] 'the basic policies of . . . repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities,'" *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)), by "'encourag[ing] plaintiffs to pursue diligent prosecution of known claims,'" *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020) (quoting *Calif. Pub. Emps.' Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042, 2049 (2017)).  These ends reflect "a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'"  *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (quoting *Order of R.R. Telegraphers*, 321 U.S. at 349).

The *American Pipe* exception to the running of statutes of limitations balances these goals against Federal Rule of Civil Procedure 23's aim of preventing "a needless multiplicity of actions," *Crown*, 462 U.S. at 351, through its restriction of tolling to individual actions concerning "the same evidence, memories, and witnesses as the subject matter of the original class suit," *United Airlines, Inc.* 432 U.S. at 393 n.14 (quoting *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring)).  When an individual action satisfies this requirement, the defendant is "on notice as to the content of the claims against it and the set of potential plaintiffs who might assert those claims," which notice "satisfie[s] the purposes of the statute of limitations," even though time has run.  *Calif. Pub. Emps.' Ret. Sys.*, 137 S. Ct. at 2053.  *MDL II* plaintiffs'

allegations, including those concerning lingering-effects damages, are tolled under the *Tolling Decision* only to the extent that they align with these polices underlying *American Pipe* tolling.

Second, although "[t]he statute of limitations is an affirmative defense that [a] defendant must prove" by the applicable standard at each successive stage of litigation, *Firestone v. Firestone*, 76 F.3d 1205, 1210 (D.C. Cir. 1996), "the burden shifts back to a plaintiff who invokes an exception to the statute of limitations," *Minebea Co., Ltd. v. Papst*, 444 F. Supp. 2d 68, 175 (D.D.C. 2006) (collecting cases); *see also Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001) ("Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run.  If the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations."); *McGary v. Hessler-Radelet*, 156 F. Supp. 3d 28, 35 (D.D.C. 2016) ("Defendants must first carry their burden of showing that Plaintiff failed to file in a timely manner.  Only at that point does the burden shift to Plaintiff to show that the statute of limitations was . . . tolled.").  Plaintiffs therefore carry the burden of proving that their claims, which presumptively fall outside the Clayton Act's statute of limitations, are not time-barred because they qualify for *American Pipe* tolling.  The requisite showing at the pleadings stage, at which time "dismissal is appropriate only if the complaint on its face is conclusively time-barred," *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014) (internal quotation marks and citation omitted), is minimal. Nonetheless, the *Tolling Decision* concluded that this showing was not made with respect to *MDL II* plaintiffs' allegations involving conduct after December 31, 2008, which allegations lacked the necessary factual nexus with the claims pursued by the putative *MDL II* class to benefit from *American Pipe* tolling and therefore were found to be time-barred.  *See* 2020 WL

5016922, at *24–27.  The same is true of any new efforts by plaintiffs to secure lingering-effects damages that similarly would require litigation of post-2008 conduct.

Relatedly, the *Tolling Decision*'s reasoning and holding with respect to lingering-effects damages was framed around bilateral, term-limited contracts between certain *MDL II* plaintiffs and a defendant for the purchase of rail-freight transportation services, the only type of "price authority" identified as at issue in the ten motions to dismiss.  *See id.*  In concluding that allegations of lingering effects related to purchases under such agreements were timely, the *Decision* emphasized that all of the "underlying conduct" relevant to proving that pre-2009 contracts were impacted by the conspiracy would have "occurred during" the 2003–2008 putative *MDL I* class period, leaving no doubt that defendants had fair notice of these claims.  *Id.* at *24.  Extension of the *Tolling Decision*'s holding to lingering-effects damages for purchases made pursuant to types of price authorities other than the bilateral, fixed-term model of purchasing rail-freight transportation from defendants was not raised in the motions to dismiss. Such an extension is appropriate only if, like the bilateral and finite contracts evaluated in the *Decision*, proof that the alleged conspiracy caused plaintiffs to pay allegedly supracompetitive fuel surcharges under the identified price authority rests solely on litigation of conduct occurring before December 31, 2008.

Assessment of whether this criterion is satisfied should take into account that plaintiffs were on notice from 2007, when the Surface Transportation Board ("STB") "determined . . . that defendants' practice of imposing rate-based fuel surcharges for regulated rail freight traffic was an unreasonable practice," *id.* at *7 (internal quotation marks omitted); *see also* STB Ex Parte No. 661, ID No. 37341, at 1 (Jan. 25, 2007), and *MDL I* began, advancing the same theory with respect to unregulated rail-freight traffic, that their agreements with defendants might contain

artificially high rate-based fuel surcharges.  To the extent that proof of plaintiffs' post-2008 lingering-effects allegations raised under a price authority other than a bilateral, fixed-term contract would require litigation of why plaintiffs, after being put on notice of the alleged conspiracy, did not, for example, object to an allegedly conspiratorial fuel surcharge term, terminate an agreement without a fixed end date, refuse to renew a conspiracy-period agreement, or decline to purchase rail-freight transportation from defendants under an allegedly tainted open price authority after December 31, 2008, such allegations necessitate litigation of post-2008 conduct that was not at issue in *MDL I* and are time-barred.

The *Tolling Decision*'s application to each of the new lingering-effects theories suggested by plaintiffs during discovery and contested in the parties' briefing of the instant motions is considered in light of these principles.

### 3.    *Application to New Lingering-Effects Theories*

Plaintiffs represented during the parties' conferral process that, in addition to the lingering-effects damages resulting from bilateral, fixed-term contracts entered during the pre-2009 class period identified in the *Tolling Decision*, they may seek lingering-effects damages, and related discovery, based on (1) "pre-2009 contracts and price authorities in effect after 2012"; (2) "open offers of transportation, evergreen contracts, or other price authorities"; and (3) contracts with nondefendant railroads.  Pls.' Lingering-Effects Letter at 2–3; *see also* Pls.' Reply at 23, 28–29, 29 n.12.  They complain that consideration of these categories of potential damages is inappropriate at this stage, where "the question . . . is only whether Plaintiffs' claims are barred by the statute of limitations," Pls.' Reply at 23, relying on the *Tolling Decision*'s observation that "[w]hether plaintiffs can prove that their alleged post-2008 harms in fact resulted from defendants' pre-2008 conduct is an issue for future stages of litigation," *id.* (quoting *Tolling Decision*, 2020 WL 5016922, at \*24); *see also id.* at 29–30.  While the issue of

22

proof still remains for another day, as explained above, resolution of the instant motions and assessment of the appropriate scope of discovery requires some evaluation of whether these additional lingering-effects claims are likely to be tolled under *American Pipe*. This determination affects both defendants' contention, in support of their Motion for Reconsideration, that undue prejudice results from the tolling of *any* lingering-effects damages here, and plaintiffs' claim, in support of their Motion to Compel, that the extensive post-2008 transaction data they seek is in fact relevant to this multidistrict litigation.

Moreover, the *Tolling Decision* cabined its reservation of judgment only as to those post-2008 lingering-effects allegations for which the underlying conduct to be proven at future stages of litigation "occurred during the class period." 2020 WL 5016922, at *24. The *Decision* unambiguously held that claims of continuing harm from the conspiracy that would require proof of conduct after December 31, 2008 were time-barred. *See id.* at *24–27. Thus, plaintiffs' allegations with respect to lingering-effects damages are tolled under *American Pipe*, as applied to the facts of this multidistrict litigation in the *Tolling Decision*, only for bilateral, fixed-term contracts entered into before December 31, 2008 with an end date in 2009 or later, and for post-2008 purchases of rail-freight transportation made pursuant to similarly constrained price authorities for which all of the underlying conduct, including any relevant acts or omissions by plaintiffs, occurred prior to December 31, 2008. Allegations concerning lingering-effects damages are otherwise time-barred. This bright-line distinction provides a basis on which to draw some categorical conclusions at this time about the availability of lingering-effects damages resulting from purchases under price authorities other than the bilateral, fixed-term contracts with post-2008 end dates identified by the *Tolling Decision*.

### a)        Post-2012 Purchases

First, plaintiffs leave open the possibility that they may seek lingering-effects damages for post-2012 purchases of rail-freight transportation made under "pre-2009 contracts and price authorities in effect after 2012." Pls.' Lingering-Effects Letter at 2; *see also* May 6 Hr'g Tr. at 54:1-5. For these lingering-effects allegations to be timely under the *Tolling Decision*'s reasoning, they must allege harms resulting from contracts or other forms of price authorities entered into or in effect before January 1, 2009 with a fixed end date, agreed to at the time of creation, after 2012. Post-2012 claims resulting from purchases made under pre-2009 pricing agreements as to which a plaintiff could have avoided further transactions or mitigated harm after December 31, 2008, including by terminating the agreement or refusing to renew it, necessarily require evidence of post-2008 conduct to establish that plaintiffs paid artificially high fuel surcharges after 2012 because of the alleged 2003–2008 conspiracy. By January 1, 2009, plaintiffs were aware from the STB's ruling and the filing of *MDL I* that their agreements with defendants might include artificially inflated fuel surcharge terms. *See supra* Part III.A.2. Evidence concerning their decision, with that knowledge, to continue purchasing rail-freight transportation under terms set during the conspiracy period, as well as the parties' negotiations after December 31, 2008, would therefore be required to litigate the issue of causation. *See, e.g.*, *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) ("Proximate causation is an essential element that plaintiffs must prove in order to succeed on any of their [antitrust] claims. The purpose of the proximate causation requirement . . . is to avoid speculative recovery by requiring a direct relation between the plaintiff's injury and the defendant's behavior." (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992))); Defs.' Mem. L. Supp. Defs.' Mot. Recons. & Opp'n Pls.' Mot. Compel ("Defs.' Opp'n") at 17, ECF No. 561-1. Defendants further highlight that, for some multiyear agreements, the parties

entered additional, related contracts during the original contract period, May 6 Hr'g Tr. at 67:4–68:11, or "a change in the relationship for the parties, like an amendment to the contract," occurred, *id.* at 68:7-8.  Proof of post-2012 lingering effects from the 2003–2008 conspiracy under such altered agreements would likewise require inquiry into the parties' post-2008 conduct.

As to these more complicated multiyear agreements, under the *Tolling Decision*'s logic, *American Pipe* tolling of lingering effects is unavailable because the expansion of plaintiffs' factual allegations, and the concomitant expansion of the scope of discovery, encompasses conduct not litigated and evidence not sought by the putative class.  *See Tolling Decision*, 2020 WL 5016922, at *24–27.  Given this restriction on tolling, and plaintiffs' representation that most of their agreements with defendants were "one-year term contracts" that, if entered in 2008, would have ended at some point in 2009, Pls.' Mem. at 3, the subset of timely post-2012 lingering-effects allegations is likely to be extremely small, if such allegations exist at all. Nonetheless, in the unlikely event that a plaintiff can show that it suffered continuing harms from purchases made pursuant to a pricing agreement entered before January 1, 2009 with an end date after December 31, 2012, as to which no proof of post-2008 conduct by either side is needed, these post-2012 lingering-effects allegations may be tolled under the *Tolling Decision*.  As plaintiffs "do not . . . ask the Court to order the production of data beyond 2012" in their instant Motion to Compel, Pls.' Mem. at 11 n.12; *see also* May 6 Hr'g Tr. at 54:1-5, no final determination of whether allegations for such damages will ultimately be tolled under *American Pipe* need be reached here.

b)      **Evergreen Contracts and Open Offers of Transportation**

Next, plaintiffs' potential lingering-effects damages for post-2008 purchases of rail-freight transportation pursuant to "open offers of transportation, evergreen contracts, or other

price authorities," Pls.' Lingering-Effects Letter at 2, are mostly time-barred.[6]  As defendants explain, "an evergreen contract is a contract that simply renews each year unless canceled by one of the parties."  May 6 Hr'g Tr. at 64:8-10.  These types of price authorities typically anticipate long-term, repeat shipments.  *See id.*  In contrast, "open offers of transportation" are offers published by railroads on their website, via a circular, or through some other mechanism, setting out the terms under which a prospective customer may purchase rail-freight transportation.  The shipper accepts the open offer by ordering a shipment under its terms.  *See id.* at 65:5-15.  Open offers are frequently used in the context of "spot moves," or situations in which a shipper has a short-term need to "mov[e] freight from point A to point B," but does not "need a formal contract or a long-term contract" because "they just want to address one shipment."  *Id.* at 65:11-15.  The agreement between the parties is thus fully performed upon completion of the single shipment for which the shipper accepted the open offer, and a subsequent purchase by the same shipper under the open offer constitutes a new contract rather than a continuation of the former agreement.

Under the *Tolling Decision*'s reasoning, as plaintiffs concede, *see* May 6 Hr'g Tr. at 44:13-14, allegations related to offers made and accepted after 2008, including offers presented as evergreen contracts and open offers of transportation, are time-barred.  In contrast, allegations related to agreements entered into by December 31, 2008, as to which the parties' obligations continued after that date, are tolled.  Plaintiffs thus may recover lingering-effects damages for

---

[6]     Plaintiffs stated at the May 6, 2021 motions hearing that they "don't understand what an evergreen contract is and we don't know that we have any," May 6 Hr'g Tr. at 42:4-5, and that they are "not clear on what [an open offer of transportation] is," *id.* at 42:21.  In their March 2, 2021 letter to defendants, however, plaintiffs disputed "Defendants' characterization" of open offers of transportation and evergreen contracts "as not being 'bilateral contracts,'" and "reserve[d] their rights to request any relevant data demonstrate lingering effects . . . whether based on open offers of transportation, evergreen contracts, or other price authorities," Pls' Lingering-Effects Letter at 2, suggesting that plaintiffs have some familiarity with these terms of art and have not disclaimed the possibility of recovering lingering-effects damages under these types of price authorities.

purchases made pursuant to an evergreen contract that was renewed in 2008 until its expiration date one year later, in 2009. In such cases, as explained above, the underlying conduct at issue, of forming the 2008–2009 agreement, occurred entirely during the class period. Lingering-effects damages for purchases made until the one-year term of the evergreen contract ran, at some point in 2009, are tolled.

Allegations of lingering effects resulting from purchases made under an evergreen contract after its annual renewal in 2009 or later present a different case. Though they may include identical terms, the 2009 renewal of the agreement after the conspiracy period is a separate contract from the 2008 initiation or renewal of the agreement finalized during the conspiracy period. Allegations arising under the 2009 or later renewal of an evergreen contract therefore require inquiry into plaintiffs' decision, after December 31, 2008, not to cancel the evergreen agreement after information was publicly available about the alleged conspiracy, any conversations between the parties in relation to that choice, and defendants' motivations for leaving identical terms in place for the 2009–2010 renewal and subsequent annual terms. That conduct is not fairly encompassed by the putative class's claims and would require additional discovery beyond that undertaken in *MDL I*. Allegations for lingering-effects damages under evergreen contracts after the expiration of their 2008 term of renewal are therefore untimely.

A similar distinction controls the availability of lingering-effects damages for allegations of continuing harm resulting from post-2008 purchases of rail-freight transportation under open offers of transportation. Plaintiffs may pursue claims related to their open-offer purchases undertaken prior to January 1, 2009, as to which no litigation of post-2008 conduct is necessary. Lingering-effects allegations related to open-offer purchases after that date, however, are time-barred. As explained above, each purchase of rail-freight transportation under an open offer

forms a new contract.  Thus, any purchase made pursuant to these price authorities after

December 31, 2008 constitutes an offer and acceptance undertaken after the close of the *MDL I*

class period, and related lingering-effects allegations are plainly untimely under the *Tolling*

*Decision*'s bar on litigation of post-2008 contracts.  *See* 2020 WL 5016922, at \*25, \*26–27.

Moreover, linking these purchases, like purchases made under evergreen contracts renewed

during the 2009 calendar year or later, to the alleged conspiracy compels litigation of both

plaintiffs' post-2008 decision to buy rail-freight transportation under a possibly tainted price

authority after being put on notice of defendants' potentially conspiratorial conduct and

defendants' decision not to modify the terms of the open offer.  These factual issues were not

litigated by the putative class in *MDL I* and would call for new evidence.  *American Pipe*

therefore does not toll allegations of lingering effects from purchases under open offers of

transportation after December 31, 2008.

> ### c)  Interline Contracts and Contracts with Nondefendant Railroads

The question of the extent to which plaintiffs may seek lingering-effects damages based

on interline contracts and contracts with nondefendant railroads entered during the conspiracy

period, Pls.' Lingering-Effects Letter at 3; *see* May 6 Hr'g Tr. at 45:5-11, is reserved.[7]  The

nature of the price authorities to which these terms refer, in the context of this dispute, remains

unclear.  Plaintiffs assert that they may seek lingering-effects damages under interline

"contract[s] between a plaintiff and a defendant railroad," May 6 Hr'g Tr. at 45:25–46:1,

meaning that one of the defendants negotiated the contract with a plaintiff, but at least one other

---

[7]        An "interline" is "[a] rail shipment involving two or more linehaul carriers," *R.R. Rules*, *supra*, at 58
(emphasis omitted), which are "rail carrier[s] that collect[] or receive[] revenue . . . for the movement of freight
between two stations that are not located with the switch limits of each other," *id.* at 59 (emphasis omitted).  An
interline contract thus is a contract for a shipment from an originating destination to a final destination, as to which a
railroad other than the originating railroad carries the shipment part of the way.

railroad, either a second defendant or a nondefendant railroad, carried the plaintiffs' goods part of the way to their final destination, *see id.* at 48:15-24.  This category of interline contracts was the focus of their statements at the May 6, 2021 motions hearing, but plaintiffs' March 2, 2021 letter to defendants indicated that "none of the Plaintiffs has reached a decision about whether any might seek damages under a contract with a non-Defendant railroad," and reserved their rights to do so.  Pls.' Lingering-Effects Letter at 3.  Plaintiffs describe these potentially relevant agreements as "contract[s] with a nondefendant railroad that ha[ve] a fuel surcharge that is an interline with a nondefendant railroad and one of the defendants."  May 6 Hr'g Tr. at 49:2-4.

Defendants further complicate this picture.  Their emphasis is on the status of claims and related discovery for lingering-effects damages from "[re]ceived traffic."  *Id.* at 73:3.  As they explain, a contract for interline rail-freight transportation involves an "originating railroad," defined as the railroad that moves the freight from its point of origin, *id.* at 73:4, 73:14-15, and any number of "receiving railroad[s]," *id.* at 73:4, that "receive" the traffic at some point after it leaves its point of origin en route to its final destination.  A receiving railroad may complete the transportation of goods to their final destination or hand them off to another railroad.  The terms of an interline agreement are "mostly set by the originating railroad," while receiving railroads "simply receive the traffic and receive revenues from it."  *Id.* at 73:6-9.  Thus, for interline contracts as to which defendants are receiving railroads, they are unlikely to have set the terms of the agreement, including any relevant fuel surcharge term, and may or may not be parties to it. *See id.* at 73:22-24.  Depending on the particular interline contract, however, the controlling agreement with the shipper may be a either bilateral contract with the originating railroad or a three- or four-way contract to which "all of the interlining railroads," whether originating or receiving, are parties.  *Id.* at 73:18; *see also id.* at 73:17-19.

29

The lingering effects of interline contracts with either defendant or nondefendant railroads entered after 2008 are, of course, time-barred under the *Tolling Decision*.  As to conspiracy-period interline agreements with nondefendant railroads, beyond the immediate issue of the availability of post-2008 lingering-effects damages, no ruling has been reached in either *MDL I* or this multidistrict litigation as to whether the *MDL I* and *MDL II* plaintiffs may recover any damages for pre-2009 interline contracts under which one or more of the defendants was a receiving railroad, but a nondefendant railroad was the originating railroad.  *See* May 6 Hr'g Tr. at 45:20–46:5.[8]  The *Tolling Decision* found allegations in the challenged complaints that nondefendant railroads participated in defendants' conspiracy to be untimely because "*American Pipe* tolling does not apply to entities or individuals not named as defendants by the putative class."  2020 WL 5016922, at *18 (collecting cases).  It held that, "[t]o the extent that any allegations involving . . . alleged non-party co-conspirators are intended to change 'the contours of potential claims' against defendants by increasing the number of claimants to include direct purchasers of unregulated rail freight services from [nondefendant railroads] and the scope of potential damages claims from defendants' customers who also purchased rail freight services

---

[8]     Plaintiffs assert that "the Court held at the hearing on March 26, 2021 that Plaintiffs are not foreclosed from seeking damages under price authorities issued by other railroads and said that limited discovery may be subsequently obtained if a Plaintiff seeks such damages."  Pls.' Reply at 29 n.12 (citing Tr. of Disc. Dispute (Mar. 26, 2021) ("Mar. 26 Hr'g Tr.") at 65–67, ECF No. 557).  No such holding was reached.  The March 26, 2021 hearing concerned a request by defendants, in part, to compel production of information about fuel surcharges paid by plaintiffs to defendants' competitors during the conspiracy period.  *See* Email from Luke von Houwelingen, Defs.' Counsel, to the Court (Mar. 18, 2021, 12:48 PM), at 1–2, ECF No. 556.  In rejecting that request, the Court said: "To the extent that defendants intend to use information about other railroads' fuel surcharges at the damages stage to rebut particular plaintiffs' claims about the degree to which they paid more for shipping than they otherwise would have paid due to the alleged conspiracy, discovery can be reopened as to a refined set of data and contracts relevant to the damages claims of specific plaintiffs at that time."  Mar. 26 Hr'g Tr. at 65:16-23.  While the Court noted that "discovery can be reopened at the damages stage . . . if plaintiffs prevail on liability . . . and are seeking damages on those specific contracts" with nondefendant railroads, *id.* at 66:18-21, the request at issue sought only data from 2000–2008, not the post-2008 data requested in plaintiffs' pending motion, and the availability of damages under nondefendant contracts was not being disputed by the parties.  The Court's statements at the March 26 hearing therefore did not constitute a holding on an issue not raised by the parties in relation to the dispute resolved.

from [nondefendant railroads], such potential claims would be time-barred." *Id.* (quoting *McCarthy*, 562 F.2d at 1275); *see also* May 6 Hr'g Tr. at 45:7-11.  This reasoning would, on its face, appear to deprive allegations related to interline contracts for which nondefendant railroads were the originating railroads of *American Pipe* tolling.  The complexity of this issue, however, warrants resolution at a later date, with the benefit of full briefing.

In any event, resolution of the instant motions does not turn on whether allegations of lingering effects from purchases made under conspiracy-period interline contracts with nondefendant railroads are tolled.  Plaintiffs confirm that they are not currently seeking transaction data after 2009 with respect to these agreements.  Pls.' Lingering-Effects Letter at 3; May 6 Hr'g Tr. at 50:11-18.  As to 2009 data, plaintiffs request only "that same data [on interline contracts with nondefendant railroads] . . . as was produced in *MDL I*."  May 6 Hr'g Tr. at 50:16-17.  Likewise, defendants' parallel offer during the parties' conferral process "to produce 2009 data for all Plaintiffs and affiliated entities" for the same fields produced in *MDL I*, Defs.' Opp'n at 10; *see also* Defs.' Feb. 15 Email at 2, would result in production of the same data on interline contracts with nondefendant railroads for 2009 that was included in the *MDL I* data set for 2000 to 2008.  That data set "include[s] revenues from . . . [re]ceived traffic," May 6 Hr'g Tr. at 73:2-3, that is, information on transactions under interline contracts for which a nondefendant railroad was the originating railroad and at least one defendant was a receiving railroad.  Under either plaintiffs' request or defendants' previous offer, then, 2009 data for nondefendant interline contracts would be produced.  Thus, the appropriateness of producing 2009 transaction data for nondefendant interline contracts is not contested by the parties, and the scope of fact discovery can be refined at this time without determining the status of lingering-effects claims stemming from interline agreements involving nondefendant railroads.

31

* * *

In sum, plaintiffs' allegations of lingering-effects damages resulting from pre-2009 price authorities extending past 2012 are tolled only for purchases made under price authorities entered before January 1, 2009 with a fixed-term end date after December 31, 2012.  To benefit from *American Pipe* tolling, allegations related to these purchases must not implicate post-2008 conduct by either plaintiffs or defendants, including the issue of whether plaintiffs could have ended their purchases under a challenged conspiracy-period price authority before December 31, 2012.  The lingering effects of evergreen contracts are tolled only through the expiration of the 2008–2009 renewal of such contracts at some point in 2009.  Lingering effects after the date of the 2009–2010 annual renewal of any evergreen contract are time-barred.  Likewise, the lingering effects from purchases made under open offers of transportation published before January 1, 2009 are not tolled for purchases made after that date.  Judgment is reserved as to whether plaintiffs may recover damages under interline agreements as to which a nondefendant railroad was a party.  The pending motions are evaluated in light of this analysis, starting with defendants' Motion for Reconsideration.

### B. Reconsideration of Availability of Lingering-Effects Damages Is Not Warranted

Defendants argue that reconsideration of "whether claims of lingering effects damages are time-barred" is warranted, Defs.' Opp'n at 2, based solely on representations made by plaintiffs' counsel at the February 4, 2021 status conference, described *supra* Part I.C, indicating that the putative class in *MDL I* did not pursue claims for lingering-effects damages, *see* Defs.' Opp'n at 11–19; Defs.' Reply at 2–13.  In defendants' view, these statements constitute "new evidence that compels the Court to revisit its lingering effects ruling," Defs.' Opp'n at 15, because they supply proof that defendants "had no fair notice of the claims for post-2008

damages that Plaintiffs now seek to assert," as *American Pipe* tolling requires, *id.* at 16.  As explained below, defendants have neither uncovered "new evidence" that makes reconsideration appropriate nor demonstrated that the *Tolling Decision* incorrectly tolled plaintiffs' lingering-effects claims.

### 1.      *Statements by Plaintiffs' Counsel Are Not "New Evidence"*

Though the availability of new evidence is among the recognized circumstances when justice may require reconsideration, *see supra* Part II.A, the statements made by plaintiffs' counsel at the February 4, 2021 hearing do not qualify as new evidence warranting reconsideration.  "While it is certainly true that newly-*discovered* evidence may be considered on a motion for reconsideration, a party may not rely on facts that could have been alleged in the underlying motion but were not."  *Davis v. Joseph J. Magnolia, Inc.*, 893 F. Supp. 2d 165, 169 (D.D.C. 2012).  Thus, "[e]ven if evidence is 'newly raised,' it is not considered 'new' evidence if it was 'previously available'" to the party seeking reconsideration.  *Olson v. Clinton*, 630 F. Supp. 2d 61, 63 (D.D.C. 2009) (quoting *Schoenbohm v. FCC*, 204 F.3d 243, 250 (D.C. Cir. 2000)).  As noted, defendants have been parties in *MDL I* since its inception in 2007, and therefore possess extensive firsthand knowledge of the particulars of how that case has been litigated.  The premise advanced by defendants that statements made by plaintiffs' counsel at a status conference nearly fifteen years after *MDL I* began provided the first available indication that the plaintiffs in that multidistrict litigation did not pursue lingering-effects damages thus strains credulity.  Defendants explain at length their belief that "the *MDL I* docket [and discovery record] provided more than ample notice to absent class members that there was no claim for damages beyond 2008 in *MDL I*," Defs.' Reply at 5; *see also id.* at 3–7, but conspicuously overlook the apparent corollary to this claim, that the *MDL I* record provided equally detailed and longstanding notice to defendants themselves well before the *Tolling Decision*.  Plaintiffs'

counsel did not provide any information previously inaccessible to defendants at the February 4 status conference; he merely restated aspects of the procedural history in *MDL I* that should have been well-known to all parties.  His statements therefore do not fit the definition of "new evidence" warranting reconsideration.

In an effort to avoid this obvious conclusion, defendants attempt to reframe the relevant inquiry as whether the allegedly "new" evidence they proffer was known to the Court at the time of the *Tolling Decision*.  To this end, they suggest plaintiffs made "representations that were at best misleading" with respect to the role of lingering-effects damages in *MDL I* in their briefing on the motions to dismiss and "prevailed" in the *Tolling Decision* "at least in part[] based on" these misrepresentations.  Defs.' Reply at 11.  The dispositive inquiry for Rule 54 purposes is not, however, whether the reviewing court had prior knowledge of the purportedly new information, but instead whether the information was accessible to the moving party prior to the challenged decision.  This standard prevents parties from seeking reconsideration on the basis of evidence that was or should have been in their possession at the time of the interlocutory order because "motions for reconsideration are not vehicles for either reasserting arguments previously raised and rejected by the court or presenting arguments that should have been raised previously with the court."  *Lovely-Coley*, 255 F. Supp. 3d at 9 (citing *Estate of Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 & n.4 (D.D.C. 2011)); *see also Cornish v. United States*, 934 F. Supp. 2d 105, 109 (D.D.C. 2013) ("[A] motion for reconsideration is not an opportunity to relitigate claims previously decided and is not a vehicle for presenting theories or arguments that could have been raised previously." (internal quotation marks and citation omitted)); *North v. U.S. Dep't of Justice*, 17 F. Supp. 3d 1, 5 (D.D.C. 2013) (denying a motion for reconsideration in part because "[t]he fact that Plaintiff could have made these arguments

before but did not is itself a sufficient basis for the Court to reject these arguments"). Defendants were in possession of all information related to the role of lingering-effects damages in *MDL I* long before the *Tolling Decision* was issued and had ample opportunity to submit that evidence and any related arguments to the Court in their briefing on their ten motions to dismiss.

Moreover, even if defendants' suggested standard were the correct one, they in fact brought the "new" information on which they now rely to the Court's attention in their previous briefing.[9] Defendants may now regret that they did not pursue their argument that the putative *MDL I* class did not seek lingering-effects damages more vigorously, but they had every chance to do so. Their claim that this omission was because "[t]he primary focus of the parties' motion to dismiss briefing was the allegations of post-2008 conspiratorial conduct rather than the allegations of post-2008 lingering effects," Defs.' Reply at 12, is belied by the fact that defendants specifically argued in at least two briefs that plaintiffs' lingering-effects allegations were not tolled "under the well-established 'continuing violations' doctrine." Defs.' Reply Supp. Mot. Partial Dismissal, or in the Alternative, Mot. Strike Compls. Pls. Kawasaki & Yang Ming at 10, ECF No. 308; *see also id.* at 10–12; Defs.' Reply Supp. Mot. Dismiss Pls.' Compl. or, in the Alternative, Mot. Strike at 12–14, ECF No. 309. Defendants now recast their opposition to the tolling of lingering-effects damages as an argument rooted in *American Pipe, see* Defs.' Opp'n at 13–19; Defs.' Reply at 2–10, but "[w]hen a party first argues an unavailing theory . . . , and then attempts to argue an alternative or contrary position in a motion for reconsideration, this

---

[9]     *See, e.g.,* Defs.' Mem. Supp. Mot. Dismiss Pls.' Compl. or, in the Alternative, Mot. Strike at 6, ECF No. 196-1 ("Plaintiffs in *MDL I* never asserted any conspiracy or damages for the period before July 1, 2003 or after December 31, 2008."); Defs.' Reply Supp. Mot. Partial Dismissal, or in the Alternative, Mot. Strike Compls. Pls. Kawasaki & Yang Ming at 9–10 ("The putative class never amended their complaint to allege a longer conspiracy, never amended their certification request to include additional purchases beyond 2008, and never pushed to broaden the scope of discovery into post-2008 claims."), 9 n.9 ("Here, the Class Complaint clearly does not assert a claim for post-2008 damages[.]"), 10 n.11, 11, ECF No. 308; Defs.' Reply Supp. Mot. Dismiss Pls.' Compl. or, in the Alternative, Mot. Strike at 8–9 n.8, 10 n.11, 11, ECF No. 309 (similar).

constitutes neither new evidence nor a clear error of law sufficient to support a motion for reconsideration," *Foster v. Sedgwick Claims Mgmt. Servs., Inc.*, 842 F.3d 721, 735 (D.C. Cir. 2016).  Statements made by plaintiffs' counsel at a status conference nearly six months after the *Tolling Decision* was issued do not excuse defendants' failure to advance their current argument at the appropriate time or supply a reason to grant them an opportunity to relitigate the lingering-effects issue.

In addition, the *Tolling Decision* makes plain that the Court was aware at the time of that ruling that the putative *MDL I* class did not pursue post-2008 lingering-effects damages.  The *Decision* enumerates a list of "novel allegations that defendants contend warrant the dismissal or striking, in whole or in part, of ten of the *MDL II* complaints," including the allegation that "defendants' conspiratorial conduct, and its effects, transpired outside of the 2003–2008 period defining the *MDL I* putative class."  2020 WL 5016922, at *17.  It elsewhere contrasts the putative class's claims, asserting a class period of July 1, 2003 to December 31, 2008, with allegations in the challenged complaints that "the alleged conspiracy and its effects continue to the present," *id.* at *7, that plaintiffs "experienced continuing harm from defendants' conspiracy after 2008," and "that the conspiracy 'and/or' its effects lasted until September 30, 2012," *id.* at *9.  In short, defendants' claim that the remarks made at the February 4 status hearing constitute new information sufficient to warrant reconsideration fails to carry their burden, as the moving party, "to show that reconsideration is appropriate."  *Lovely-Coley*, 255 F. Supp. 3d at 9 (internal quotation marks and citation omitted).

### 2.    *The* **Tolling Decision** *Correctly Concluded that Lingering-Effects Damages Are Tolled*

Even if defendants had demonstrated one of the recognized circumstances when justice may require reconsideration, their argument on the merits, that lingering-effects damages for pre-

2009 contracts that extended beyond December 31, 2008 should be time-barred under *American Pipe* because "*MDL I* did not provide Defendants fair notice of claims for lingering effects damages after December 31, 2008," Defs.' Opp'n at 16, fails.  As the *Tolling Decision* explained in detail, *American Pipe* tolls the claims of former putative class members that are "'predicated on the same acts'" as the conduct challenged in the original class action, "such that 'there can be no doubt that the defendants have received sufficient notice of the contours of potential claims.'" 2020 WL 5016922, at *11 (quoting *McCarthy*, 562 F.2d at 1275); *see also supra* Part III.A.  The putative class in *MDL I* alleged a July 1, 2003 to December 31, 2008 class period, asserting that supracompetitive fuel surcharge formulas were inserted in contracts entered during that time.  *Id.* at *3–4.  Unlike allegations concerning supracompetitive fuel surcharge formulas in post-2008 contracts, which do not satisfy the criteria for tolling because they are "factually separate from the 2003–2008 conspiracy pursued by the putative class" and defendants therefore lacked fair notice that such contracts were at issue, allegations related to supracompetitive fuel surcharges paid under contracts entered between 2003 and 2008 were litigated by the putative class in *MDL I* and therefore were fairly encompassed by the putative class's claims, even though they may have resulted in lingering effects damages after the *MDL I* class period ended.  *Id.* at *27.

Defendants contend that this reasoning was erroneous because, even though the putative *MDL I* class litigated the very contracts for which the *Tolling Decision* found lingering-effects damages to be time-barred, *MDL I* did not provide specific "fair notice" of post-2008 damages claims.  Defs.' Opp'n at 16–19; Defs.' Reply at 2–13.  In making this argument, they distort the applicable law.  Defendants insist that *American Pipe* tolling does not apply to claims for lingering-effects damages "because these claims were not pursued in *MDL I*."  Defs.' Reply at 2.  As the *Tolling Decision* emphasized, however, "claims raised by former putative class members

need not be identical to those alleged by the putative class to be tolled."  2020 WL 5016922, at

*28 (citing *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985)).  Rather,

"tolling . . . is appropriate so long as 'the defendant has received fair notice' through the former

class action 'of the number and generic identity of the potential [plaintiffs] and their substantive

claims.'"  *Id.* at *11 (alteration in original) (quoting *McCarthy*, 562 F.2d at 1274).  Courts

determine whether this notice requirement is satisfied by "assess[ing] whether defendants'

'liability' in the former class action and the present individual action 'is predicated on the same

acts,'" *id.* (quoting *McCarthy*, 562 F.2d at 1275), not whether defendants were aware of the exact

form plaintiffs' remedy might take if they prevail at the liability stage.  The *MDL I* class sought

damages resulting from their payment of allegedly supracompetitive rate-based fuel surcharges

because of defendants' 2003–2008 conspiracy.  Viewed in light of the black-letter antitrust

principle that plaintiffs "[i]n the context of a continuing conspiracy" may "recover not only those

damages which [they] ha[v]e suffered at the date of accrual, but also those which [they] will

suffer in the future" from the initial conspiratorial conduct, *Zenith Radio Corp.*, 401 U.S. at 338–

39, the putative class's claims provided more than sufficient notice to defendants of the

substantive claims at issue here, of economic harm resulting directly from the alleged 2003–2008

conspiracy.

 Defendants repeatedly quote the Supreme Court's admonition that tolled claims should

"'concern the same evidence, memories, and witnesses as the subject matter of the original class

suit,'" Defs.' Opp'n at 13 (quoting *Crown*, 462 U.S. at 354–55 (Powell, J., concurring)); *see also*

Defs.' Reply at 1, 2, 8, 9, pointing to plaintiffs' requests for extensive new transaction data in

their pending Motion to Compel as proof that tolling lingering-effects damages does not satisfy

this requirement and therefore prejudices defendants, *see* Defs.' Opp'n at 16–19; Defs.' Reply at 7–10.  This emphasis is misplaced for two reasons.

First, in arguing that plaintiffs' lingering-effects allegations prejudice defendants, defendants rely heavily on plaintiffs' representations during the conferral process that they may seek discovery and, eventually, damages for purchases made after 2012, purchases made under evergreen contracts or open offers, and purchases made under contracts with nondefendant railroads.  *See* Defs.' Opp'n at 16–17; Defs.' Reply at 9–10.  These new allegations, in defendants' view, would require extensive and burdensome new discovery into post-2008 conduct, showing that they were not litigated by the putative *MDL I* class.  As explained *supra* Part III.A.3, however, the majority of these novel claims of post-2008 lingering effects fall outside the scope of the lingering-effects allegations tolled under the *Tolling Decision*, and so any discovery related exclusively to proof of these claims is not relevant to this multidistrict litigation and falls outside the scope of discoverable information under Rule 26.  The burden or prejudice to defendants that might result from substantiating these time-barred claims is therefore inapposite to assessing the accuracy of the *Tolling Decision*'s lingering-effects holding.  As to the discovery necessary to prove plaintiffs' timely lingering-effects allegations, defendants have already accepted the burden of producing 2009 transaction data for all plaintiffs and affiliated entities both during the parties' conferral process and in their briefing of the instant Motion to Compel, *see* Defs.' Opp'n at 20–22; *infra* Part III.C, mitigating any burden this discovery may impose on defendants.  Any post-2009 transaction data that may eventually be required will be limited in scope to the discovery necessary to substantiate the extremely limited set of post-2009 lingering-effects allegations that are tolled, and will therefore create only minimal burdens.  Altogether, defendants' obligation to produce discovery in relation to the very cabined category

of timely lingering-effects allegations falls far short of the prejudice needed to foreclose *American Pipe* tolling.

Second, the contours of the "same evidence" requirement emphasized by defendants are tied to the *American Pipe* doctrine's focus on the "substantive claims" raised by plaintiffs. *McCarthy*, 562 F.2d at 1275.  This limitation on tolling is thus best understood as a requirement that the underlying conduct at issue in both the former class action and former putative class members' individual actions, not the specific relief sought by plaintiffs, be susceptible to proof by the same evidence.  *See Tolling Decision*, 2020 WL 5016922, at *28.  Defendants do not dispute that, as the *Tolling Decision* noted, they "have now spent over a decade litigating these exact allegations [that they engaged in a 2003–2008 conspiracy to impose supracompetitive rate-based fuel surcharges] in *MDL I*" and that proof of "these overlapping allegations" of their conspiratorial conduct from 2003–2008 "involve[s] the 'same evidence, memories, and witnesses' as the putative class action."  *Id.* (quoting *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring)).  The lingering effects actually tolled by the *Tolling Decision*, for purchases made after 2008 under bilateral, fixed-term contracts or other similarly restricted price authorities entered into before December 31, 2008, do not implicate discovery into any additional conduct. *See supra* Part III.A.  Rather, defendants' liability for the continuing-effects claims they challenge are based on the allegation, pursued by the putative *MDL I* class, that defendants set artificially high rate-based fuel surcharges during the conspiracy and therefore will be proven or disproven on this same body of evidence.  Given this fact, plaintiffs rightly point out that the 2009–2012 transaction data related to these purchases they seek as "new evidence" is not intended "to prove the fact of their injury," a consideration that would weigh against *American Pipe* tolling, but rather "to quantify the amount of their damages."  Pls.' Reply at 18.  Their

request for limited post-2008 transaction data for this exclusively remedial purpose does not show that lingering-effects damages resulting from defendants' alleged conspiratorial conduct from 2003–2008 were improperly tolled.

In sum, the limited lingering-effects allegations tolled by the *Tolling Decision* were correctly found to fall within the scope of *American Pipe*'s exception to the running of the statute of limitations because they are "predicated on the same acts" and will be proven by the same evidence as the claims advanced by the putative class in *MDL I*.  None of this analysis breaks new ground, because defendants seek to relitigate issues already twice decided in an attempt to compel a conclusion more to their liking.  *See Tolling Decision*, 2020 WL 5016922, at *24–27; *NYK Recons. Decision*, 2020 WL 6198487, at *2–3.  Defendants' renewed opposition to plaintiffs' lingering-effects allegations remains, as it was at the time of the *Tolling Decision*, "a barely-concealed attempt to limit their potential liability for plaintiffs' post-2008 damages claims for the alleged continuing effects of defendants' conspiracy at the outset of this litigation." *Tolling Decision*, 2020 WL 5016922, at *24 (internal quotation marks omitted).

Defendants' Motion for Reconsideration is denied and lingering-effects damages are tolled within the parameters set forth *supra* Part III.A.  Plaintiffs' Motion to Compel the production of information to substantiate their timely lingering-effects allegations is considered next.

## C.     Defendants Are Required to Produce Only 2009 Transaction Data

Plaintiffs, relying on the *Tolling Decision*'s tolling of limited lingering-effects damages, move for an order compelling production of information they describe as "evidence to prove those damages," Pls.' Mem. at 4, namely: (1) the same fields of transaction data included in the *MDL I* data set for all plaintiffs, including data located by searching for entity names and spellings provided by plaintiffs, and (2) transaction data for 2010–2012 for plaintiffs who

41

identify a price authority entered into or in effect on or before December 31, 2008 that they

reasonably believe continued beyond 2009, with production of such data to be made "within 30

days of presentment of the price authority," Pls.' Mot. at 1. They further ask that defendants be

required, by June 1, 2021, to complete production of all price authorities entered into or in effect

on or before December 31, 2008 applicable to any plaintiff. Pls.' Mot. at 1; Pls.' Mem. at 5, 14–

15; Pls.' Reply at 24 n.9. As explained below, in light of the *Tolling Decision*'s substantial

limitations on the availability of lingering-effects damages and the significant burden of

plaintiffs' request for 2010–2012 transaction data, defendants will be compelled to produce only

2009 transaction data for all plaintiffs and affiliated entities. The application of Rule 26's

relevancy and proportionality requirements to the information of which plaintiffs seek to compel

production follows review of the interaction between the procedural history of this multidistrict

litigation and the Rule 26 factors.

### 1. *Relevance of Procedural History and* **American Pipe** *Tolling*

As the standards for plaintiffs to demonstrate relevancy and proportionality under Rule

26 make clear, *see supra* Part II.B, evaluation of any discovery dispute under Rule 26 is highly

context-specific. Thus, as previously described at the March 26, 2021 hearing, *see* Mar. 26 Hr'g

Tr. at 51:13–55:6, several considerations specific to the procedural posture and extensive history

of this multidistrict litigation guide application of the Rule 26 factors to requests for discovery

raised by any party.

First, as explained *supra* Part I.A, this multidistrict litigation is the second multidistrict

litigation pending in this District, alleging that defendants engaged in a 2003–2008 price-fixing

conspiracy to impose inflated rate-based fuel surcharges. Many of these same parties have been

litigating plaintiffs' claims in *MDL I* for well over a decade, and have already undertaken

extensive fact and expert discovery on identical or substantially similar issues. Additional

discovery requested by any party in *MDL II* that has already been produced in *MDL I* is duplicative and unduly burdensome.  It therefore falls outside the scope of allowable discovery under Rule 26 and will not be permitted.  *See* Fed. R. Civ. P. 26(b)(2)(C) ("[T]he court must limit the frequency or extent of discovery . . . if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."); *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 307 (7th Cir. 2020) (noting that "duplicative discovery" was "properly denied" by the lower court); *BuzzFeed, Inc.*, 318 F. Supp. 3d at 358.

Second, consistent with this procedural history, when the JPML created *MDL II*, after the 2019 denial of class certification in *MDL I*, plaintiffs represented to the Panel that "all the fact discovery as to Defendants ha[d] been done" in *MDL I*, JPML Hr'g Tr. at 11:15-16, and that, as a result, any new fact discovery would be case-specific and substantially limited to individualized damages discovery.  Plaintiffs thus anticipated, and accordingly informed both the JPML and the Court, that only some additional transaction data particular to specific parties would be required. *See supra* Part I.B.  These statements suggest that discovery as to defendants' liability, which is not case-specific, was completed in *MDL I*, and that any allowable new discovery should presumably be limited to the issue of plaintiffs' damages claims.  Moreover, the scope of additional discovery outlined by plaintiffs aligns with the principles of *American Pipe* tolling. *See supra* Part I.A, Part III.A.  To the extent that new discovery is required to establish defendants' liability, rather than to quantify plaintiffs' damages, the need for that discovery strongly suggests that the *MDL II* plaintiffs seek to litigate conduct that was not at issue in *MDL I* and lacks a sufficient factual nexus with the claims pursued by the putative class in that case. Consequently, the related allegations are likely time-barred.

Finally, assessment of any request for additional discovery is colored by the background fact that the *MDL II* plaintiffs' claims would have been untimely in their entirety if class certification in *MDL I* had not been denied.  *See supra* Part I.A.  Although the statute of limitations has been tolled for the majority of the *MDL II* plaintiffs' claims, the policies underlying statutes of limitations and *American Pipe*'s exception to the running of the statute of limitations, outlined *supra* Part III.A.2, inform evaluation of discovery disputes.  As relevant to the resolution of such disputes, it bears repeating that, to promote the goals of statutes of limitations, *American Pipe* tolling is available only in individual actions concerning "the same evidence, memories, and witnesses as the subject matter of the original class suit."  *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring).  When these requirements are satisfied, a defendant is "on notice as to the content of the claims against it and the set of potential plaintiffs who might assert those claims," and the purposes of the statute of limitations are thus met even though the claims are facially untimely.  *Calif. Pub. Emps.' Ret. Sys.*, 137 S. Ct. at 2053.  At the same time, this restriction on the availability of tolling weighs heavily against allowing additional discovery in individual actions that was not produced in the original class suit, even if the additional discovery is sought in relation to tolled claims.

Against the backdrop of these three considerations contextualizing fact discovery in *MDL II*, requests from either side for additional discovery not produced in *MDL I* must overcome a very high hurdle of relevancy, probativeness of claims and defenses, and proportionality, in light of the extensive discovery already produced in *MDL I* and the presumption that an otherwise-untimely individual action that stands on the shoulders of a former class action through *American Pipe* tolling will rely on the "same evidence" as the original suit.  This framework guides application of the Rule 26 factors to the requests set forth in plaintiffs' Motion to Compel.

2.      *Agreed-Upon Production of 2009 Transaction Data for All Plaintiffs Is Relevant and Proportional*

First, plaintiffs ask that defendants be compelled to "produce the same fields of transaction data for 2009 that they produced in [*MDL I*] for all Plaintiffs [and affiliated entities], and to search the data for entity names and spellings provided by Plaintiffs." Pls.' Mot. at 1.[10] In their view, this data is relevant "because many price authorities that were entered into or issued at the end of the conspiracy period in 2008 would have continued in effect into 2009." Pls.' Mem. at 8. Thus, transaction data for 2009 "will enable Plaintiffs to determine whether there were any lingering effects of Defendants' conspiracy" in that year and, in turn, to both establish their damages for purchases made in 2009 and determine which plaintiffs "can identify a price authority entered or in effect during the conspiracy period that continued in effect after 2009." *Id.* Plaintiffs further contend that their request for the blanket production of 2009 transaction data is proportional because the burden of collecting data for all plaintiffs and affiliated entities is lower than the burden imposed on both sides by an alternative approach, originally suggested by defendants, under which data is produced only for plaintiffs who can demonstrate that an applicable conspiracy-period price authority continued into 2009. *Id.* at 11; *see also* Pls.' Reply at 28. In addition, plaintiffs "believe that many of the price authorities did not continue beyond 2009," such that the 2009 data will be sufficient to fully establish lingering-effects damages for most plaintiffs. Pls.' Mem. at 11. Defendants claim that "the vast majority of Plaintiffs have not alleged they suffered lingering effects damages beyond 2008 and post-2008 data for those Plaintiffs is therefore irrelevant," but otherwise do not contest any of this analysis.

---

[10]     Plaintiffs argue that searches for entity names and spellings proposed by plaintiffs are necessary "to ensure that the search covers the names of entities recently identified by Plaintiffs in Interrogatory responses and the different spellings of Plaintiffs' names found in the MDL I data." Pls.' Mem. at 10–11 n.11. Defendants do not object to that component of plaintiffs' request for 2009 transaction data. *See* May 6 Hr'g Tr. at 61:5–63:2.

Defs.' Opp'n at 25; *see also id.* at 20–28.  They in fact remain willing "to produce 2009 transactional data for all Plaintiffs and affiliated entities" named in plaintiffs' interrogatory responses, *id.* at 1; *see also id.* at 20–22; May 6 Hr'g Tr. at 61:5–63:2, as they previously offered during the parties' most recent conferral process, *see supra* Part I.C.

The 2009 transaction data sought by plaintiffs is both relevant and proportional, as the parties' consensus around production of this information confirms.  As explained *supra* Part III.A, plaintiffs may pursue claims for lingering-effects damages related to conspiracy-period price authorities that continued past December 31, 2008 for which no litigation of post-2008 conduct is required.  Plaintiffs represent that most of their agreements with defendants were "one-year term contracts" that, if entered in 2008, would have ended at some point in 2009.  Pls.' Mem. at 3; Pls.' Reply at 34.  The 2009 transaction data is clearly relevant to establishing lingering-effects damages from these price authorities, and, as plaintiffs submit, to identifying the price authorities, if any, pursuant to which plaintiffs might seek post-2009 lingering-effects damages despite the restrictions set forth *supra* Part III.A.3.  *See, e.g.*, *Eagle Railcar Servs.- Roscoe v. NGL Crude Logistics, LLC*, No. 1:16-CV-0153-BL, 2018 WL 2317696, at *18 (N.D. Tex. May 22, 2018) ("Discovery about recoverable damages stemming from asserted claims is undoubtedly relevant and thus discoverable so long as the requested discovery is proportional."); *In re Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, Civ. A. No. 15-cv-1712, 2018 WL 2184391, at *1 (E.D. Pa. May 10, 2018) ("An important part of an antitrust case is the Plaintiffs' burden of proving the 'fact of injury'—that the illegal conduct resulted in damages, and providing discovery relevant on the amount of damages claimed.").

For similar reasons, production of the 2009 transaction data for all plaintiffs and affiliated entities is proportional.  This data was not produced in *MDL I*, *see supra* Part I.C, and therefore

is neither cumulative nor duplicative.  Although plaintiffs ought to have much of the data sought in their possession, they represent that their records are lacking due to "the passage of time," Pls.' Mem. at 1, such that defendants' records are the most convenient and least burdensome source of this information.  The remaining Rule 26(b) factors likewise favor production.  *See* Fed. R. Civ. P. 26(b); *BuzzFeed Inc.*, 318 F. Supp. 3d at 358; *supra* Part II.B.  Consideration of damages is, of course, somewhat premature at this stage of litigation, before defendants' liability for the alleged conspiracy has been established, and is secondary in importance to that ultimate issue.  In addition, relative to the overall amount in controversy in this multidistrict litigation, lingering effects are likely only a small portion of the recovery plaintiffs seek.  Lingering-effects damages for 2009 purchases, however, represent the bulk of the tolled post-2008 damages claims for which plaintiffs may seek recovery, *see supra* Part III.A, and, according to plaintiffs, the 2009 transaction data will fully capture most plaintiffs' lingering-effects damages, *see* May 6 Hr'g Tr. at 29:2-5; Pls.' Reply at 34.  The requested information will therefore help to establish the majority of plaintiffs' claims in this category, and is in fact critical to plaintiffs' ability to do so.  Moreover, that defendants have access to their records related to all plaintiffs for 2009 and have already undertaken significant efforts to collect and produce this same data for 2000–2008 suggests that they have both greater access to the relative information and the resources in place to process it.

Crucially, defendants do not object to the potential burden of conducting searches to identify all transaction data associated with any plaintiffs and any affiliated entity.  Though less burdensome alternatives for defendants are available and might be feasible—for example, the production of transaction data for all shippers with any searches to be conducted by plaintiffs on their own—defendants have expressed a preference for the seemingly more onerous proposal to

them of limiting production to plaintiff-specific data.  *See* Defs.' Opp'n at 20–22; May 6 Hr'g

Tr. at 60:21–63:2.  They will be required to make good on this offer, and are ordered to promptly

produce 2009 transaction data for the same fields produced in *MDL I* for all plaintiffs and

affiliated entities identified by plaintiffs in their responses to defendants' interrogatories, and to

search the data for entity names and spellings provided by plaintiffs.

### 3.     *Production of 2010–2012 Transaction Data Is Not Proportional at This Stage of Litigation*

Plaintiffs next seek "[transaction] data from 2010 to 2012 for Plaintiffs who identify a

price authority entered into or in effect on or before December 31, 2008 that they reasonably

believe continued beyond 2009."  Pls.' Mot. at 1.  They contend that "[d]ata for 2010–2012 is

just as relevant and just as proportionate for Plaintiffs with conspiracy period contracts that

continued after 2009," Pls.' Reply at 25, as the 2009 transaction data defendants offered to

produce and that "Defendants identify no particular burdens of producing this information that

would outweigh its importance to the case, nor do they identify any other factor . . . that would

suggest this request is anything but proportionate and reasonable," *id.* at 25–26; *see also id.* at

25–30, 33–36.  Defendants, for their part, note that, for most plaintiffs, "Plaintiffs admit that

there is no reason to believe they would need any data beyond the 2009 data offered by

Defendants," Defs.' Opp'n at 25, and therefore no factual nexus between most 2010–2012

transaction data and the claims alleged by the putative *MDL I* class exists, such that the requested

information is irrelevant.  On the basis of this assumption, defendants argue that "requiring

[them] to produce irrelevant data . . . relating to contracts or other price authorities that could not

support . . . a [lingering-effects] claim[] creates an enormous and expensive burden on

Defendants."  *Id.* at 26.  Thus, in their view, the requested transaction data falls outside the scope

of discoverable information under Rule 26 because it is disproportionate.  *See id.* at 25–28.

Defendants' relevancy argument sweeps too broadly.  The *Tolling Decision* leaves open the possibility, however unlikely, that some plaintiffs may be able to demonstrate that they suffered lingering effects after 2009 from a price authority, which was entered into or took effect during the alleged 2003–2008 conspiracy, such that their lingering-effects allegations would be tolled.  *See supra* Part III.A.3.  Though, as defendants claim, plaintiffs repeatedly emphasize that most of their lingering-effects damages claims will be confined to 2009, *see* Pls.' Mem. at 2–3, 8–9; Pls.' Reply at 34–35; May 6 Hr'g Tr. at 29:2-5, to the extent that any plaintiff can successfully show that purchases made under a conspiracy-period price authority extended past 2009 and do not necessitate litigation of post-2008 conduct, lingering-effects damages for 2010–2012 may be available.  For the extremely limited number of plaintiffs who can make this threshold showing that their post-2009 lingering-effects allegations satisfy the requirements of *American Pipe*, 2010–2012 transaction data would therefore be relevant to establishing their damages.  Moreover, plaintiffs' request for 2010–2012 transaction data, seeking such information only for plaintiffs who can "identify a price authority entered into or in effect on or before December 31, 2008 that they reasonably believe continued beyond 2009," Pls.' Mot. at 1, is appropriately tailored to require production only of relevant information.

Nonetheless, plaintiffs' request is not proportional.  In arguing that the Rule 26(b) factors tilt in their favor, plaintiffs contend that discovery of 2010–2012 transaction data "goes to a central issue in cases with billions of dollars in damages on the line."  Pls.' Reply at 26.  Their characterization overstates the importance of lingering-effects damages, and particularly of post-2009 lingering-effects damages, in the context of this multidistrict litigation as a whole.  The central issue in the case is whether defendants in fact engaged in a price-fixing conspiracy from 2003–2008 to artificially increase the cost of rail-freight transportation through the imposition of

49

rate-based fuel surcharges.  The requested information is not at all connected to this essential question of defendants' liability, which has yet to be decided in either *MDL I* or *MDL II*.  The 2010–2012 transaction data may be important to the issue of establishing certain plaintiffs' full damages, but only if plaintiffs successfully carry their burden of proof at summary judgment or trial will their damages need to be quantified.  The requested 2010–2012 transaction data does not even relate to the core of plaintiffs' potential recovery, their damages for alleged harms incurred during the 2003–2008 conspiracy period.  Further indicating the peripheral nature of this issue, plaintiffs themselves state that only a small minority of their number might be able to pursue claims for post-2009 lingering-effects damages.  *See* Pls.' Mem. at 11–12; May 6 Hr'g Tr. at 29:2-5.  The importance of plaintiffs' 2010–2012 lingering-effects allegations to *MDL II* overall is minimal, at best.  Relatedly, potential recovery from these claims will necessarily constitute a relatively small portion of the total amount in controversy.

Unsurprisingly, in light of the foregoing analysis, the burden of plaintiffs' request for 2010–2012 transaction data outweighs its likely benefit.  The data sought is not duplicative, but in the context of *MDL II*, the fact that this information was not produced in *MDL I*, in combination with the attenuated relationship between plaintiffs' central allegations and the post-2009 lingering-effects allegations the data is meant to substantiate, indicates that the benefit of compelling production is relatively low, at least at the liability stage.  Plaintiffs protest that allowing defendants to withhold 2010–2012 transaction data is tantamount to allowing them "to evade liability for lingering effects damages after 2009, even though . . . legitimate post-2009 damages may exist."  Pls.' Reply. at 28.  This risk is mitigated by defendants' obligation to produce both 2009 transaction data and, as discussed below, applicable conspiracy-period price authorities.  As plaintiffs concede, they can use these two sources of information to identify both

the conspiracy-period price authorities that they believe continued past 2009 and the plaintiffs

who they believe purchased rail-freight transportation under the price authorities.  *See* Pls.'

Reply at 33–34; May 6 Hr'g Tr. at 38:7-12.  These inferences will allow plaintiffs to evaluate

now, at the liability stage, which of them has a reasonable basis on which to assert post-2009

lingering-effects damages claims.  Before defendants' responsibility for plaintiffs' alleged

economic harms is established at summary judgment or trial, the additional benefit offered by

production of 2010–2012 transaction data to quantify plaintiffs' potential post-2009 damages is

of little utility.

On the other side of the equation, defendants assert that "the discovery stemming from

Plaintiffs' lingering effects allegations would be significant," necessitating "additional related

productions, expert reports and depositions, and likely fact depositions as well, all of which

would likely take months to complete."  Defs.' Opp'n at 18; *see also id.* at 26.  They further

contend that, if they are required to produce 2009 transaction data for all plaintiffs, they should

not "also be required to engage with Plaintiffs in a contract-by-contract analysis of whether

Plaintiffs[] can have additional data from 2010 to 2012—and possibly beyond."  *Id.* at 21.  The

burden to defendants of producing 2009 transaction data for all plaintiffs, though appropriately

imposed under Rule 26, is substantial.  They correctly anticipate the expansion of both fact and

expert discovery, as well as additional obligations on their part to carry out further searches on

their data to facilitate production.  Granting plaintiffs' request for still more plaintiff-specific

transaction data outside the conspiracy period would only exacerbate the burden, in exchange for

slight gains.

Indeed, plaintiffs previously condemned the process they now suggest for the production

of post-2009 transaction data, under which plaintiffs would proffer an applicable conspiracy-

period price authority that they believe continued in effect after 2009, as "enormously burdensome," Disc. Dispute Email at 2, "unworkable and inefficient," and likely to lead to numerous "small disputes at this discovery stage over the proper categorization of Defendants' price authorities," *id.* at 3.  Plaintiffs now argue that undertaking this procedure with the benefit of complete production of price authorities will "avoid the inevitable squabbling and time-consuming inefficiency" surrounding the issue of "whether a particular price authority that could give rise to lingering effects damages."  Pls.' Reply at 35.  As previously explained, however, a number of unresolved questions about the timeliness of post-2009 lingering-effects damages claims remain.  *See supra* Part III.A.3.  Though plaintiffs' model may restrict the squabbling and inefficiency to a narrower set of price authorities, the risk of time-consuming and burdensome disputes stemming from the implementation of this proposal is substantial.  These considerations clearly show that the burden of plaintiffs' request for 2010–2012 transaction data outweigh the benefits.

The remaining Rule 26(b) factors weigh in plaintiffs' favor.  As to the parties' relative access to relevant information and resources, and the availability of the requested information from another source, including plaintiffs' own files, plaintiffs claim that "they do not have access to Defendants' data and that their own data (if they still have it) is not a substitute for Defendants' data" in terms of its completeness.  Pls.' Reply at 26–27.  Similarly, as to the importance of the discovery in resolving the issue of lingering-effects damages, the parties do not dispute that 2010–2012 transaction data would be necessary to quantify any timely 2010–2012 lingering-effects damages.  These factors, however, are not sufficient to overcome either the minimal relevance and importance of the requested information or the significant burdens of production, particularly in light of the heightened showing of relevancy and proportionality

necessary in this multidistrict litigation to compel the production of discovery that was not

produced in *MDL I*. *See supra* Part III.C.1. Should plaintiffs prevail at the liability stage, the

relevance of post-2009 transaction data will increase, as will the centrality of 2010–2012

lingering-effects allegations to the outstanding issue of quantifying their damages. Accordingly,

if the parties reach the damages stage, discovery may be reopened on a limited basis to allow

plaintiffs to seek information to substantiate their claims for post-2009 lingering-effects

damages.

In short, the limited relevance of the requested post-2009 data to only a tiny subset of a

handful of plaintiffs' claims, the fact that these claims are divorced from the central issue of

defendants' liability, the burden to defendants of collecting and producing the requested

information, and the possibility of reopening discovery as to 2010–2012 lingering-effects

allegations if plaintiffs prove their claims and this multidistrict litigation advances to the

damages stage all counsel against compelling the production of 2010–2012 transaction data at

this time. The requested information, though potentially relevant, is disproportionate to the

needs of the litigation at this stage. Defendants therefore will not be required to produce any

2010–2012 transaction data.

### 4. *Defendants Will Not Be Compelled to Produce Price Authorities by June 1, 2021*

Finally, plaintiffs "seek an order requiring Defendants to substantially complete the

production of [conspiracy-period] price authorities" by June 1, 2021. Pls.' Mem. at 14; *see also*

Pls.' Mot. at 1; Pls.' Reply at 24 n.9. They contend that this expedited production order is

warranted "because Plaintiffs need the price authorities" to establish that they bought rail-freight

transportation from defendants after 2009 pursuant to a conspiracy-period price authority

"under . . . [their] proposal for [the compelled production of] data after 2009." Pls.' Mem. at 14.

In opposing this request, defendants emphasize that they "have spent the last several months searching for and producing approximately 2,800,000 pages of contracts and rate authorities to Plaintiffs, on top of the millions of pages of documents Defendants previously produced in *MDL I*, which Defendants have provided to Plaintiffs at their request." Defs.' Opp'n at 27. They do not, however, contest their obligation under Rule 26 to produce the applicable conspiracy-period price authorities. *See* May 6 Hr'g Tr. at 74:16–84:7.

At the May 6, 2021 motions hearing, defendants described the productions of conspiracy-period price authorities they have so far made to plaintiffs and their anticipated timeline to complete production.[11] Norfolk Southern Railway indicated that it had produced all contracts and price authorities for all shippers from 2001–2008, May 6 Hr'g Tr. at 58:2-11, 58:15-21, 75:2-5, and "supplement[ed]" that production "with additional hard copy documents" totaling "over 100,000 pages," *id.* at 59:18-20. It expected to make its last supplemental production on May 6, 2021. *Id.* at 59:20-22. BNSF Railway stated that it was, as of May 6, "substantially complete in producing [its] contracts." *Id.* at 75:16-17. CSX Transportation said that its "contracts and price authority production" would likely be complete "within a week or so" of the May 6 hearing. *Id.* at 76:20-23. All three of these defendants noted that additional productions might be necessary due to difficulties locating interline price authorities with nondefendant railroads, steel mill contracts, and documents related to recently added plaintiffs, but stated that,

---

[11] Plaintiffs explain at length their belief that "Defendants have delayed producing the price authorities Plaintiffs need." Pls.' Mem. at 15; *see also id.* at 2, 14–16; Pls.' Reply at 30–33; Jaffe Decl. ¶¶ 13–19. They emphasize in particular defendant Union Pacific Railroad's failure to produce any contracts or price authorities until April 7, 2021, and question Union Pacific's representations that it lacked a central pricing database that would have facilitated speedier production. *See* Pls.' Reply at 32–33; Decl. of Daniel M. Jaffe Supp. Pls.' Mem. P. & A. Opp'n Defs.' Mot. Recons. & Reply Supp. Mot. Compel Produc. Post-2008 Transaction Data & Price Authorities ¶¶ 7–18, ECF No. 612-2; May 6 Hr'g Tr. at 54:16–55:22, 87:11–88:6. Defendants, unsurprisingly, challenge this characterization of their efforts to date. *See* Defs.' Opp'n at 26–28; May 6 Hr'g Tr. at 74:16–84:7. In light of defendants' statements at the May 6, 2021 hearing that their productions of price authorities will be substantially complete by June 30, 2021 at the latest, *see* May 6 Hr'g Tr. at 82:24-25, 83:3-21, 83:23–84:7, this dispute need not be resolved.

even with these possible outliers, their productions could be completed by June 1, 2021.  *See id.* at 75:17–76:13, 76:20-23, 83:8-21, 83:23–84:7.  Union Pacific Railroad's production of contracts and price authorities significantly lags behind its codefendants, but the company still intends to complete its productions by June 30, 2021.  *Id.* at 82:24-25.  In light of these representations, defendants will not be compelled to complete production of price authorities by June 1, 2021.  They are nonetheless expected to make every good-faith effort to produce all applicable price authorities to plaintiffs promptly, consistent with their representations to the Court.

## IV.    CONCLUSION

For the foregoing reasons, defendants' Motion for Reconsideration is denied and plaintiffs' Motion to Compel is granted in part and denied in part.  Defendants are required to produce the same fields of transaction data for 2009 that they produced in *MDL I* for all plaintiffs and the affiliated entities plaintiffs identified in their answers to defendants' interrogatories, and to search the data for entity names and spellings provided by plaintiffs.  Defendants will not, however, be compelled to produce any transaction data for 2010–2012 at this time, nor to complete the production of price authorities applicable to plaintiffs by June 1, 2021, in light of defendants' representations at the May 6, 2021 hearing that they will complete such production in the coming weeks.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 12, 2021

_____
BERYL A. HOWELL
Chief Judge