### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br><br>*Environmental Protection & Improvement Company, LLC v. Union Pacific Railroad Company, et al.*, No. 1:22-cv-02587 (BAH) | MDL Docket No. 2925<br>Misc. No. 20-00008 (BAH) |

### <u>MEMORANDUM OPINION</u>

Over 300 rail freight shippers, who are the plaintiffs in this multidistrict litigation, *In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*MDL II*"), Case No. 20-mc-00008-BAH, MDL No. 2925 (D.D.C.), claim that defendants, the four largest railroads operating in the United States, engaged in a multi-year price-fixing conspiracy to increase the price of rail freight transport through their coordinated efforts to cause an industry trade group to adopt a new cost index that excluded the cost of fuel and then to implement, in lockstep, artificially inflated fuel surcharges, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This claim was originally pressed in another multidistrict litigation pending in this District, *In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*MDL I*"), Case No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C.), in which a putative class of direct purchasers of unregulated rail freight services alleged the same conspiracy, occurring from 2003 to 2008, against the same defendants, *see, e.g., In re Rail Fuel Surcharge Antitrust Litig.* ("*MDL I–D.D.C. 2012 Op.*"), 287 F.R.D. 1, 11–12 (D.D.C. 2012). Certification of that class was

1

ultimately denied, *see In re Rail Freight Fuel Surcharge Antitrust Litig.—MDL No. 1869* ("*MDL I–D.C. Cir. 2019 Op.*"), 934 F.3d 619, 627 (D.C. Cir. 2019), and subsequently, former putative class members in *MDL I* brought individual complaints consolidated into *MDL II*.

Nearly all of these complaints trickled into *MDL II* between 2020 and 2021, but a single lagging case was filed by plaintiff Environmental Protection & Improvement Company, LLC ("EPIC") on July 29, 2022—nearly three years after the D.C. Circuit affirmed the denial of class certification, and more than thirteen years after the conclusion of the alleged conspiracy. *See Env't Prot. & Improvement Company, LLC v. Union Pac. R.R. Co.*, No. 1:22-cv-2587-BAH (D.D.C. filed July 29, 2022). This latest-consolidated case is subject to defendants' pending motion to dismiss, which urges that EPIC's complaint is time-barred under the Clayton Act's statute of limitations because EPIC "has 'slept on its rights' for far too long to avail itself of class action tolling" under *American Pipe & Construction Co. v. Utah* ("*American Pipe*"), 414 U.S. 538 (1974). Defs.' Mot. Dismiss Env't Prot. & Improvement Co.'s Compl. ("Defs.' Mot.") at 8, ECF No. 857 (quoting *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352 (1983)) (cleaned up).[1] For the reasons explained below, defendants' motion to dismiss is denied.

## I.    BACKGROUND

EPIC directly purchased unregulated rail freight transportation—in which rates are set by private contracts rather than rate regulation under federal law—from defendants between 2003 and 2008. Compl. ¶¶ 1–5, ECF No. 1. The defendants named in the complaint, CSX Transportation, Inc. ("CSXT"), Norfolk Southern Railway Company ("Norfolk Southern"), and

---

[1]    Pursuant to the Court's Initial Practice and Procedure Order, parties are required to file documents that pertain to fewer than all cases in *MDL II* in both the master docket, Case No. 20-mc-00008, and the individual case docket to which the documents pertain. *See* Initial Practice and Procedure Order ¶ 2(a), *MDL II*, ECF No. 10. Consequently, defendants' motion to dismiss and reply in support of the motion are filed in the master docket and individual case docket; EPIC's opposition to defendants' motion is filed only in the master docket, in violation of the Court's order. For clarity, the Court will refer only to the briefings filed in the master docket.

Union Pacific Railroad Company ("Union Pacific") are, as already noted, major freight railroads in the United States and together accounted for "the majority of all rail shipments within the United States" between 2003 and 2008.  Compl. ¶ 13.  Those defendants, together with BNSF Railway Company, operate more than 90 percent of all railroad track in the United States, *id.* ¶ 19.[2]  CSXT and Norfolk Southern operate primarily in the eastern United States and Canada, *id.* ¶¶ 6–7, while Union Pacific is concentrated in the western United States, *id.* ¶ 8.  All three railroads connect with partners in other markets to facilitate freight throughout the country.  *See id.* ¶¶ 6–8.

Defendants' instant challenge to the complaint as time-barred substantially relies on the procedural history of *MDL I* and *MDL II*, which is extensively recounted in this Court's earlier Memorandum Opinion denying defendants' motions to dismiss ten other cases consolidated in *MDL II*.  *See* Mem. Op. at 3–13, *MDL II*, ECF No. 358.  Rather than retread the same ground, only the most relevant details of this history to EPIC's case are set out below.

A.     **MDL I**

The first complaint in what would become *MDL I* was filed on May 14, 2007.  *See* Compl., *Dust Pro, Inc. v. CSX Transp., Inc.*, Case No. 2:07-cv-2251-DMC (D.N.J. May 14, 2007), ECF No. 1.  Soon after, in November 2007, the Multidistrict Litigation Panel consolidated thirteen separate class actions, then pending in six districts, that alleged common antitrust violations against defendants for pretrial proceedings in this District.  *See* Transfer Order, *MDL I*, Case No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Nov. 14, 2007), ECF No. 1.

---

[2]     While not named as a defendant in the case subject to the pending motion to dismiss, BNSF Railway Co. is named as a defendant in other cases consolidated in *MDL II*.  *See, e.g.,* Compl., *Gerdau Ameristeel Corp. v. Union Pac. R.R. Co.*, No. 19-cv-03618-BAH (D.D.C. Dec. 3, 2019), ECF No. 1; Compl., *Int'l Paper Co. v. Union Pac. R.R. Co.*, No. 20-cv-00023-BAH (D.D.C. Jan. 6, 2020); Am. Compl., *Anheuser-Busch, LLC v. BNSF Ry. Co.*, No. 20-cv-00523-BAH (D.D.C. June 11, 2020), ECF No. 35.

The putative class plaintiffs filed an initial consolidated class complaint in April 2008. Consolidated Am. Class Action Compl., *MDL I*, ECF No. 91–92.  Defendants unsuccessfully sought to dismiss this complaint as inadequately pled.  *See generally In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*MDL I–D.D.C. 2008 Op.*"), 587 F. Supp. 2d 27 (D.D.C. 2008). Even at this early stage in the litigation, the district court found "ample support for a plausible inference of an agreement made illegal by Section 1 of the Sherman Act," *id.* at 33, backed by "robust factual details," *id.* at 34, "to make plausible [plaintiffs'] theory that defendants' behavior was collusive and anticompetitive," *id.* at 36.  Those same facts were alleged in the eventual operative complaint in *MDL I*.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*MDL I–D.D.C. 2017 Op.*"), 292 F. Supp. 3d 14, 34 (D.D.C. 2017).

The putative class plaintiffs filed the operative class complaint in *MDL I* in February 2010.  Second Consolidated Am. Class Action Compl. ("Class Compl."), *MDL I*, ECF No. 324. The Class Complaint alleges that in early 2003, defendants "conspired to increase their total revenues through the use of standardized, uniform, and supra-competitive fuel surcharges." *MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 13 (first citing Class Compl. ¶ 1; and then citing *MDL I– D.D.C. 2008 Op.*, 587 F. Supp. 2d at 29).  In the wake of the deregulation of the railroad industry, most rail shipments move under unregulated private transportation contracts.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 34 (D.D.C. 2008).  According to the putative class plaintiffs, in this unregulated market, defendants determined that the most effective mechanism to "increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible," rather than through efforts to renegotiate each individual contract or to fix each base rate separately.  Class Compl. ¶ 3.  Thus, they

"conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits." *Id.* ¶ 4.

The impediment to this plan, the putative class alleged, was that "the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index." *Id.* The All Inclusive Index ("AII") is published by the Association of American Railroads ("AAR"), a railroad trade organization dominated by defendants. *Id.* ¶¶ 4, 8. Plaintiffs alleged that the AII (and a related cost index called the Rail Cost Adjustment Factor ("RCAF")) already accounted for variations in fuel costs. *Id.* ¶¶ 4, 55. Thus, any actual increase in fuel costs for the railroads, regardless of size, would be reflected in the increases to base rates calculated under the AII or RCAF. *Id.* ¶ 55. The putative class alleged that defendants conspired to remove fuel as a cost factor by causing the AAR to replace the AII with an unprecedented, new All Inclusive Index Less Fuel ("AIILF"), a cost-escalation index without fuel as a component. *Id.* ¶ 66. The adoption of the AIILF meant that defendants could now apply a separate "fuel surcharge" as a percentage of the total cost of freight transportation. *Id.* ¶ 5. With fuel costs left out of the AIILF, and therefore no longer weighted against other cost factors, defendants were free to raise total freight prices on a near-universal basis by a given percentage through fuel surcharges. *Id.* ¶ 56. Beginning in July 2003, all four railroads proceeded to implement fuel surcharges in lockstep with one another and therefore to raise revenues across the board. *Id.* ¶¶ 1, 4, 8–11, 69–73, 80–82. As a result, defendants allegedly earned supra-competitive profits during the class period. *Id.* ¶¶ 1, 99. These actions, according to the putative class, violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. *Id.* ¶¶ 102–07.

The Class Complaint filed in February 2010 proposed a class consisting of:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period").

*Id.* ¶ 38.  The Class Complaint defined a "rail fuel surcharge" as "a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel," *id.* ¶ 2, but only made specific allegations concerning fuel surcharges "applied as a percentage against the total cost of the freight transportation," *id.* ¶ 5.

A month later, in March 2010, the putative class moved for certification of a class including:

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a standalone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing").

Pls.' Mot. Class Certification ("Class Certification Mot.") at 1, *MDL I*, ECF No. 339.  This proposed class was subsequently certified.  *MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 10, 74.  In finding that the requirements for class certification under Federal Rule of Civil Procedure 23 were met, the district court's analysis focused largely on the only major dispute between the parties: whether plaintiffs met their burden to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *Id.* at 17 (quoting FED. R. CIV. P. 23(b)(3)).  Of particular concern was whether the putative class's expert analysis demonstrated "that impact can be established at trial with evidence common to the class."  *Id.* at 25.  The court "credit[ed] [the expert's] conclusion that impact and damages [were] capable of proof at trial with common evidence."  *Id.* at 28.

On appeal, the U.S. Court of Appeals for the District of Columbia Circuit vacated the

class certification.  *In re Rail Freight Fuel Surcharge Antitrust Litig.—MDL No. 1869* ("*MDL I–

D.C. Cir. 2013 Op.*"), 725 F.3d 244, 255 (D.C. Cir. 2013).  The panel chose to exercise

jurisdiction over defendants' interlocutory appeal largely because of the Supreme Court's

intervening decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  *See MDL I–D.C. Cir.

2013 Op.*, 725 F.3d at 253–54.  *Behrend* clarified the contours of Rule 23's predominance

requirement and made clear that, to satisfy that class prerequisite in an antitrust class action,

plaintiffs must provide evidence of class-wide damages that are directly attributable to their

theory of antitrust impact.  569 U.S. at 35–36.  District courts must consequently closely

examine plaintiffs' evidence of common impact before granting certification, even when doing

so "requires inquiry into the merits of the claim."  *Id.* at 35.  The D.C. Circuit panel read *Behrend*

to indicate that, in an antitrust class action, common questions "cannot predominate where there

exists no reliable means of proving classwide injury in fact."  *MDL I–D.C. Cir. 2013 Op.*, 725

F.3d at 253.  The panel's analysis again focused narrowly on the damages model put forth by the

class's expert and concluded that the district court had failed to "grapple[] with" a small set of

false positives for legacy shippers and overcharges for class members in the model.  *Id.* at 255;

*see also id.* at 253–54.  The panel held that, without a finding by the district court regarding the

"soundness" of the statistical model, the model could not satisfy Rule 23's predominance

requirement.  *Id.* at 255.  The case was remanded for the district court to take a "hard look" at the

damages model in light of *Behrend*.  *Id.*

On remand, the district court denied class certification in October 2017.  *See generally

MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d 14.  While observing that the putative class had

submitted "strong evidence of conspiracy and class-wide injury" in support of its claims, *id.* at

32, the court, as instructed by the Circuit, "conduct[ed] a rigorous analysis" of the issues

"regarding legacy shippers" and overcharges in light of *Behrend*'s clarification of the Rule 23(b)

predominance requirement, *id.* at 39. Despite finding, again, that the putative class satisfied

nearly all of Rule 23's requirements, the court was unable to conclude that the "damages model

[was] a reliable means of assessing class-wide damages," a shortcoming "fatal to plaintiffs'

claim of predominance." *Id.* at 144. The conclusion that "individual issues predominate

regarding injury and damages," *id.*, also meant that plaintiffs failed to meet Rule 23(b)'s

superiority requirement because they could not show that a class action was the "superior"

method of adjudication, *id.* at 145. Class certification was therefore denied. *Id.* The D.C.

Circuit affirmed this ruling on August 16, 2019. *MDL I–D.C. Cir. 2019 Op.*, 934 F.3d at 627.

## B.  MDL II

Once class certification in *MDL I* was denied, some absent putative former class

members began filing individual actions in district courts across the country to pursue the

conspiracy claim advanced by the putative class against defendants. *See, e.g.*, Compl., *Kellogg

Co. v. BNSF Ry. Co.*, No. 19-cv-02969-BAH (D.D.C. Oct. 2, 2019), ECF No. 1; Compl.,

*Coffeyville Res. Nitrogen Fertilizers, LLC v. BNSF Ry. Co.*, No. 4:19-cv-03762 (S.D. Tex. Sept.

30, 2019), ECF No. 1. On February 6, 2020, the Multidistrict Litigation Panel consolidated

twenty-six such cases for pretrial proceedings in this Court in *MDL II*. Transfer Order, *MDL II*,

ECF No. 1. Since then, dozens of cases initiated by former putative class members have been

consolidated into the multidistrict litigation pending before this Court, for a total of 108 cases

currently pending in *MDL II*.

By the first half of 2020, the parties present in *MDL II* began litigating in earnest. The

Court set an initial schedule on May 22, 2020, ordering the *MDL II* defendants to answer or

otherwise respond to all complaints to which they had not already done so by June 5, 2020, and

8

setting an October 1, 2021 deadline for the completion of all fact discovery.  Order (May 22, 2020), *MDL II*, ECF No. 102.  Accordingly, defendants moved to dismiss, in whole or in part, ten complaints, which motions this Court denied on August 25, 2020.  *See* Order (Aug. 25, 2020), *MDL II*, ECF No. 357.  Defendants argued that those complaints alleged novel factual allegations that strayed too far from those alleged by the putative class representatives in *MDL I*, and thus were not entitled to the tolling generally available to former putative class members under *American Pipe*, 414 U.S. 538.  In denying defendants' motions, the Court held that the complaints at issue "state[d] the same legal claim based on substantially the same facts as the *MDL I* class," although "certain novel factual allegations," such as that the conspiratorial conduct continued past 2008, "var[ied] significantly from allegations in *MDL I* [and were] time-barred."  Mem. Op. at 64–65, *MDL II*, ECF No. 358.

The latest case to be consolidated into the multidistrict litigation pending before this Court, in August 2022, is *Environmental Protection & Improvement Co., LLC v. Union Pacific Railroad Co.* (*"EPIC"*), Case No. 22-cv-2587 (BAH)—the same case subject to defendants' pending motion to dismiss.  EPIC commenced this suit on July 29, 2022, alleging a slightly narrower version of the same conspiracy described by the putative class in *MDL I*.  Namely, EPIC alleged that, beginning in 2003 and continuing until 2008, three of the four defendants named in *MDL I*—Union Pacific, CSX, and Norfolk Southern—conspired to increase their profits by artificially raising the price of rail freight services on unregulated rail freight transport traffic in the United States.  *Compare* Class Compl. ¶¶ 3–4, with EPIC's Compl. ¶¶ 1–3.  The three defendants in that action responded with the pending motion to dismiss EPIC's complaint, which motion is now ripe for the Court's review.  *See generally* Defs.' Mot.

When EPIC filed its complaint, and when defendants moved to dismiss, fact discovery was still ongoing in *MDL II*. The Court had extended fact discovery to October 1, 2022, *see* Mem. & Order, *MDL II*, ECF No. 676, and subsequently, to February 1, 2023, *see* Min. Order (Nov. 8, 2022), *MDL II*. Fact discovery is now complete for all cases except *EPIC*. *See* Joint Status Report (April 21, 2023) at 1–2 & n.3, *MDL II*, ECF No. 911. The parties, with the exception of EPIC, are now conducting expert discovery. EPIC and defendants have exchanged some fact discovery—described as "all documents and data produced by [defendants] in MDL I and MDL II," as well as "certain documents" produced by EPIC, *see* Revised Stipulation Regarding Schedule, *EPIC*, ECF No. 22—but agreed to stay the remainder of fact discovery until the resolution of defendants' pending motion to dismiss, *id.*

## II.   APPLICABLE LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*, 45 F.4th 324, 330 (D.C. Cir. 2022). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that also "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. Courts do not "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*,

797 F.3d 11, 19 (D.C. Cir. 2015) (internal citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

When dismissal is sought on statute-of-limitations grounds, the plaintiff's claims must be "conclusively time-barred on the face of the complaint." *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 787 (D.C. Cir. 2019); *see also Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019); *accord Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).

## III.    DISCUSSION

Defendants challenge EPIC's complaint as time-barred.  Federal antitrust claims "shall be forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.  Unless an exception to the statute of limitations is plausibly pled, a claim for damages under the Clayton Act accrues when the plaintiff is first injured, such that the statute of limitations begins to run "when a defendant commits an act that injures a plaintiff[]."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).  In the case of a continuing violation, however, such as a "price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'"  *Id.* at 189 (quoting 2 P. AREEDA & H. HOVENKAMP, ANTITRUST LAW ¶ 338b, p. 145 (rev. ed. 1995)); *accord Zenith*, 401 U.S. at 338.

EPIC alleges that it paid artificially inflated prices for rail freight services from "at least" July 1, 2003 until "at least" December 31, 2008, *see* Compl. ¶¶ 1, 5; consequently, for plaintiff's claims to be timely, they would have had to be brought by December 31, 2012, at the latest.

Since EPIC's lawsuit was filed nearly a decade later, the timeliness of the complaint rests on whether plaintiff has plausibly pled an exception to the running of the statute of limitations.

The Supreme Court outlined one such exception, applicable to the claims of absent former putative class members such as the plaintiff here, in *American Pipe*. The legal principles guiding the tolling of the statute of limitations under *American Pipe* are discussed first, before turning to examination of the proper application of that doctrine to EPIC's complaint.

### A.   Principles of *American Pipe* Tolling

The timeliness of EPIC's complaint turns on whether the exception to the statute of limitations for former putative class members provided in *American Pipe* applies. The Supreme Court in *American Pipe* held "that the commencement of a class action suspends the applicable statute of limitations" as to all putative class members through the class certification stage. 414 U.S. at 554. The limitations period is "tolled for all members of the putative class until class certification is denied," at which time class members may choose to bring a separate lawsuit or to file a motion to intervene in the former class action. *Crown, Cork & Seal Co. v. Parker* ("*Crown, Cork*"), 462 U.S. 345, 354 (1983); *see also Barryman-Turner v. District of Columbia*, 115 F. Supp. 3d 126, 134 (D.D.C. 2015) ("The statute of limitations ceases to run for the entire period from the day a class action is filed until the class is decertified or the court declines to certify the class . . . .").

The *American Pipe* rule promotes Federal Rule of Civil Procedure 23's goals of "efficiency and economy of litigation" by eliminating the need for putative class members to file protective motions to intervene in the pending class action to preserve their claims, *Am. Pipe*, 414 U.S. at 553, and thus preventing a "needless multiplicity of actions," *Crown, Cork*, 462 U.S. at 351. The rule also serves the function of statutes of limitations, which are "designed to promote justice by preventing surprises through the revival of claims that have been allowed to

12

slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Am. Pipe*, 414 U.S. at 554 (quoting *Order of R.R. Telegraphers v. Ry. Exp. Agency*, 321 U.S. 342, 348–49 (1944)).  These underlying policies of "essential fairness" and "of barring a plaintiff who has slept on his rights," *id.* (internal quotations omitted), are met "when . . . a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment," *id.* at 554–55.  In such circumstances, the defendant timely receives "the essential information necessary to determine both the subject matter and size of the prospective litigation," *id.* at 555, and faces "no potential for unfair surprise," *Crown, Cork*, 462 U.S. at 353.

### B.      Timeliness of EPIC's Complaint

Defendants urge that "EPIC should not enjoy the benefit of *American Pipe* tolling at this late date," Defs.' Mot. at 14–15, because the tolling doctrine is "available only to diligent plaintiffs," Defs.' Reply at 1, *MDL II*, ECF No. 874.  This argument is anchored in the Supreme Court's confirmation of the equitable nature of *American Pipe* tolling in *California Public Employees' Retirement System v. ANZ Secs., Inc.* ("*CalPERS*"), 582 U.S. 497, 509–10 (2017), which defendants argue has "profound consequences for its application," Defs.' Mot. at 14.[3] Generally, when determining the applicability of *American Pipe* tolling, courts focus on the symmetry between the putative class action that encompassed the individual plaintiff and that plaintiff's subsequent claim.  Defendants' novel argument proposes tacking on a new diligence

---

[3]      Until the Supreme Court's 2017 decision, whether *American Pipe* tolling was an equitable or legal doctrine was unsettled. *See Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 108 (2d Cir. 2013) ("[T]he *American Pipe* decision contains conflicting indications of the source of authority for its tolling rule, and the Supreme Court's subsequent statements on the matter—all in dicta—provide little clarity.  The Courts of Appeals are divided on this issue."); *Barryman-Turner*, 115 F. Supp. 3d at 131–32 (describing circuit split over whether tolling doctrine is equitable or legal in nature).

prerequisite that would require "case-specific determinations" as to whether a plaintiff acted within a "reasonable period" after class certification was denied to pursue its claim—a test that plaintiff, by waiting nearly three years after the denial of class certification was affirmed, arguably failed.  Defs.' Mot. at 8, 12.[4]

To address defendants' motion requires disaggregating the two distinct but intertwined questions implicated.  First, defendants challenge whether EPIC is entitled to *American Pipe* tolling at all, arguing that courts have denied equitable tolling to plaintiffs who failed to exhibit sufficient diligence in pursuing their claims, *id.* at 14.  Second, if *American Pipe* tolling applies, the question remains as to the implementation of the tolling doctrine: whether EPIC is entitled to only a reasonable extension of time to file its complaint after the tolling period concludes, or whether EPIC is entitled to the same amount of time remaining under the statute of limitations when the tolling period began.  *See id.* at 15 (citing *Vine v. Republic of Iraq*, 459 F. Supp. 2d 10 (D.D.C. 2006), *rev'd on other grounds by Simon v. Republic of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008), *rev'd by Republic of Iraq v. Beaty*, 556 U.S. 848 (2009), which applied *American Pipe* tolling, but held that the "deadline is tolled only 'by a reasonable period after the tolling circumstance [is] mended,'" *Vine*, 459 F. Supp. 2d at 24 (quoting *Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993)); Reply at 6–7 (urging that *Barryman-Turner*, 115 F. Supp. 3d at 133, was wrong to hold that *American Pipe* extends the statute of limitations "categorical[ly] and

---

[4]     Generally, the *American Pipe* tolling period extends from the filing of a proposed class action only until certification is denied by the district court.  *See Collins v. Village of Palatine*, 875 F.3d 839, 843–44 (7th Cir. 2017) (collecting cases).  In *MDL I*, however, defendants agreed to "exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification, and (ii) the date that the Court of Appeals issues its merits-panel decision on Plaintiffs' appeal, for actions that are filed after the date in clause (ii)." *See* Stipulation and Second Order on Plaintiffs' Motion for a Stay of Proceedings and to Toll the Statute of Limitations at 3, *MDL I*, ECF No. 856.  The parties agree that this stipulation applies to EPIC's complaint, such that any *American Pipe* tolling period ended when the D.C. Circuit affirmed the denial of class certification on August 16, 2019, rather than in October 2017, when the district court denied certification.  *See* Defs.' Reply at 11; Pls.' Opp'n to Defs.' Mot. Dismiss ("Pl.'s Opp'n") at 10, *MDL II*, ECF No. 865.

mechanical[ly]" rather than only for a reasonable period).  Confusingly, while defendants frame their briefings almost entirely in terms of the first question, plaintiff frames its opposition exclusively in terms of the second.  *Compare* Defs.' Mot. *with* Pl.'s Opp'n to Defs.' Mot. Dismiss ("Pl.'s Opp'n"), *MDL II*, ECF No. 865.[5]  Both are necessary to the analysis and addressed in turn.

### 1.  *Applicability of* American Pipe *Tolling*

As the Supreme Court held in *American Pipe* and *Crown, Cork*, the filing of a class action tolls the statute of limitations for the benefit of putative class members who, upon the denial of class certification, seek to either intervene in the original suit or to file individual lawsuits.  For a litigant to gain the benefit of *American Pipe* tolling, it generally must satisfy five prerequisites:

> (1) someone must have filed a purported class action; (2) the class action complaint must include the plaintiff within its asserted class; (3) the plaintiff must possess a claim that was timely when the putative class action suit was filed; (4) the plaintiff must possess a claim that the prior class action asserted; and (5) the plaintiff must press that claim against an individual whom the purported class action named as a defendant.

3 WILLIAM B. RUBENSTEIN, NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 9:56 (6th ed.); *accord Crown, Cork*, 462 U.S. at 350 ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class . . . .'" (quoting *American Pipe*, 414 U.S. at 554)); *Aly v.*

---

[5]      The parties conflate the two inquiries, perhaps because in application the difference is not always apparent. If the reasonableness of EPIC's delay in filing its complaint must be taken into account—whether at the threshold determination of whether any tolling applies, or in determining the length of any post-tolling extension under *American Pipe*—then EPIC's complaint is time-barred either way.  *See generally* Pl.'s Opp'n (not disputing and effectively conceding that EPIC filed suit outside a reasonable period after the class litigation concluded).  The two questions must be disaggregated as consecutive considerations, however.  The problem with plaintiff's argument is that, by arguing that *American Pipe* is applied "in a mechanical manner that simply calculates the days remaining in the statute of limitations period," Pl.'s Opp'n at 6, EPIC fails to address the threshold question of whether *American Pipe* applies *at all.*  If the answer to that question is no, then EPIC's arguments about the length of the extension *American Pipe* allows are irrelevant.  *Cf. Smith v. Davis*, 953 F.3d 582, 598 (9th Cir. 2020) (en banc) (rejecting a litigant's argument that he was entitled to equitable tolling to excuse his delay in filing a habeas corpus petition based on the fact that equitable tolling "pauses, or suspends, a statute of limitations," holding that this rule "sheds no light on the underlying question of which litigants are eligible for such extended limitations deadlines").

*Valeant Pharms. Int'l, Inc.*, 1 F.4th 168, 175 (3d Cir. 2021) ("*American Pipe* makes clear that the filing of a class action is the operative event that tolls the limitations period. . . . The Court has not held that anything further . . . is required to benefit from tolling."); Mem. Op., *MDL II*, ECF No. 358 (examining whether other *MDL II* plaintiffs' complaints benefitted from *American Pipe* tolling by comparing the nature of their claims with the class complaint). Defendants do not contend plaintiff failed to satisfy any of these five requirements, but solely point to equitable principles as requiring plaintiff to have also acted diligently. *See generally* Defs.' Mot.

Defendants are correct that *American Pipe* tolling is a doctrine arising from the principles of equity. Indeed, *CalPERS* and *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), plainly held that "the source of the tolling rule applied in *American Pipe* is the judicial power to promote equity," *CalPERS*, 582 U.S. at 509. The Supreme Court's *American Pipe* jurisprudence "reveals a rule based on traditional equitable powers, designed to modify a statutory time bar where its rigid application would create injustice." *Id.* at 510. As a result, the *CalPERS* court held that clear legislative enactments such as statutes of repose can "supersede[] the courts' residual authority and foreclose[] the extension of the statutory period based on equitable principles." *Id.* at 508. *Accord China Agritech*, 138 S. Ct. at 1809 (calling the rule "*American Pipe*'s equitable-tolling exception to statutes of limitations").

That courts must apply the nebulous test of whether each plaintiff who would otherwise benefit from *American Pipe* tolling "had slept on [its] rights," as defendants urge, *see* Defs.' Mot. at 14 (quoting *Desmesmin v. Boston*, Case No. 19-cv-12170 (WGY), 2020 WL 2079389, at *4 (D. Mass. Apr. 30, 2020)), does not follow from the tolling doctrine's equitable nature, however. The policies underlying statutes of limitations—of ensuring "essential fairness to defendants and of barring a plaintiff who has slept on his rights," *American Pipe*, 414 U.S. at 554

16

(internal quotations omitted)—are encompassed in the design of the *American Pipe* tolling rule itself, without requiring courts to conduct an individualized inquiry as to each plaintiff's diligence.  As the Supreme Court explained in *China Agritech*:

> Ordinarily, to benefit from equitable tolling, plaintiffs must demonstrate that they have been diligent in pursuit of their claims. . . . Even *American Pipe,* which did not analyze 'criteria of the formal doctrine of equitable tolling in any direct manner,' observed that tolling was permissible in the circumstances because plaintiffs who later intervened to pursue individual claims had not slept on their rights.  Those plaintiffs reasonably relied on the class representative, who sued timely, to protect their interests in their individual claims.

138 S. Ct. at 1808 (quoting *CalPERS*, 582 U.S. at 510) (citations omitted).

Defendants mischaracterize this quoted passage, urging that the *China Agritech* court reasoned that the *American Pipe* plaintiffs had not slept on their rights because they "filed their own motions all but immediately after class certification was denied."  Defs.' Reply at 4–5.  Not so.  In concluding that *American Pipe* tolling was "permissible," *China Agritech* focused entirely on the fact that plaintiffs in this context reasonably relied on their class representative to protect their interests during the tolling period—not the speed by which the plaintiffs filed individual suits once that putative class representative's role had concluded.  138 S. Ct. at 1808.  In other words, the *American Pipe* doctrine reflects a categorical determination that all potential class members who wait to file individual lawsuits until after the denial of class certification—even if doing so results in filing lawsuits beyond the applicable statute of limitations—are not careless in belatedly pursuing their claims.

Essentially, defendants incorrectly assume that because *American Pipe* tolling is an equitable doctrine, the requirements of the more generally-applied equitable tolling doctrine must be imported into the former's analysis.  Courts have long applied what the Supreme Court has called "the formal doctrine of equitable tolling," *CalPERS,* 582 U.S. at 510, in diverse contexts to "'relieve hardships which, from time to time, arise from a hard and fast adherence' to more

absolute legal rules, which, if strictly applied, threaten the 'evils of archaic rigidity,'" *Holland v. Florida*, 560 U.S. 631, 650 (2010) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 248 (1944), *overruled on other grounds by Standard Oil Co. v. United States*, 429 U.S. 17, 18 & n.2 (1976)); *accord Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990) ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."). As the Supreme Court stated in *China Agritech*, and has already been noted, "[o]rdinarily, to benefit from equitable tolling, plaintiffs must demonstrate that they have been diligent in pursuit of their claims." 138 S. Ct. at 1808. More specifically, litigants have been required to establish two elements to be entitled to equitable tolling of a statute of limitations: "(1) that [they] ha[ve] been pursuing [their] rights diligently, and (2) that some extraordinary circumstance stood in [their] way and prevented timely filing." *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland*, 560 U.S. at 649). Defendants urge that this diligence requirement applies to plaintiff's delay in filing its individual complaint after class certification was denied.

Defendants gloss over the fact that, even if an individualized analysis of plaintiff's diligence were conducted according to the doctrine of equitable tolling, the law is unsettled. Several courts of appeals have held that for a litigant to satisfy the first element required for equitable tolling, "he must show that he has been reasonably diligent in pursuing his rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in federal court." *Smith v. Davis*, 953 F.3d 582, 598–99 (9th Cir. 2020) (en banc). *Accord Jackson v. Davis*, 933 F.3d 408, 411 (5th Cir.

2019) ("What a petitioner did both before and after the extraordinary circumstances that prevented him from timely filing may indicate whether he was diligent overall."). That view is not unanimous, however: the Second Circuit has held that a litigant need only demonstrate his diligence "*throughout the period he seeks to toll*" in order to benefit for equitable tolling, *Harper v. Ecole*, 648 F.3d 132, 139 (2d Cir. 2011) (emphasis in original) (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007)), and, thus, there is no requirement of a "further showing of diligence through filing," *id.*; *accord Checo v. Shinseki*, 748 F.3d 1373, 1379 (Fed. Cir. 2014) (following *Harper*). The D.C. Circuit has not entered this fray, leaving unsettled whether formal equitable tolling's diligence factor would even apply to the period after the denial of class certification if it were extended to the *American Pipe* context.

Even assuming that plaintiff would need to demonstrate diligence in the period after the denial of class certification to be eligible for formal equitable tolling, the same requirement is not true for *American Pipe* tolling. Albeit a species of equitable tolling, *American Pipe* tolling is not subject to "the criteria of the formal doctrine of equitable tolling." *CalPERS*, 582 U.S. at 510. After all, in the context of non-*American Pipe* equitable tolling, the Supreme Court has strictly construed both elements of the test as necessary and distinct, "rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other." M*enominee Indian Tribe*, 577 U.S. at 256. This equitable tolling test cannot logically be incorporated into the *American Pipe* analysis, because the *American Pipe* tolling doctrine does not require an "extraordinary circumstance" to have "prevented timely filing." *Holland*, 560 U.S. at 649. Instead, *American Pipe* tolling recognizes that, absent such a tolling rule, members of a potential class action "would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable," breeding "needless duplication of motions."

414 U.S. at 553–54.  *American Pipe* tolling is not designed to accommodate an *obstacle* to timely filing, but rather to "insure effectuation of the purposes of litigative efficiency and economy" that Federal Rule of Civil Procedure 23 "was designed to serve," *id.* at 556.  *See also China Agritech*, 138 S. Ct. at 1806 ("*American Pipe* tolls the limitation period for individual claims because economy of litigation favors delaying those claims until after a class-certification denial.").

Perhaps recognizing the incongruence of the "formal" equitable tolling doctrine's second element with the *American Pipe* rule, defendants urge only the applicability of the first element, "that [plaintiff] has been pursuing [its] rights diligently," but this is merely an attempt to cherry-pick a rule that is simply not applicable in the context of *American Pipe* tolling.  *Menominee Indian Tribe*, 577 U.S. at 255 (quoting *Holland*, 560 U.S. at 649).  *See* Defs.' Mot. at 8, 12–15; Defs.' Reply at 3–6.  *Accord CalPERS*, 582 U.S. at 510 (concluding that *American Pipe* sets out an equitable tolling rule, even though "the *American Pipe* Court did not consider the criteria of the formal doctrine of equitable tolling in any direct manner," and "did not analyze, for example, whether the plaintiffs pursued their rights with special care; whether some extraordinary circumstance prevented them from intervening earlier; or whether the defendant engaged in misconduct").  Indeed, neither of the two post-*CalPERS* cases cited by defendants held that individual plaintiffs are not entitled to *American Pipe* tolling if they were insufficiently diligent in filing a complaint after the denial of a class certification.  *See* Defs.' Mot. at 14; Defs.' Reply at 5–6.  For example, in *Desmesmin v. Boston*, Case No. 19-cv-12170 (WGY), 2020 WL 2079389, at *4 (D. Mass. Apr. 30, 2020), the court assumed that the individual plaintiff was entitled to *American Pipe* tolling and then focused on the proper end-point of the *American Pipe* tolling period where the district court had only denied class certification without prejudice before

proceeding to a trial on the merits.  Only about five years later did the district court deny with prejudice a renewed class certification motion.  In Desmesmin's separate action, the court held that plaintiff had been wrong to "slumber" until after the final, years-later decision on the class certification, because plaintiff "had no objectively reasonable justification to rely upon the [putative class action plaintiffs] to vindicate his rights after the motion for class certification was denied in 2014 and those plaintiffs tarried for five years before renewing the motion."  2020 WL 2079389, at *4.  There, based on the unusual procedural order of the case, the statute of limitations clock had resumed ticking five years earlier than the court's final denial of class certification, and so the court's note that "*American Pipe* tolling generally applies only where the latecomers have 'not slept on their rights,'" arose in the context of a filing even beyond the extension in the statute of limitations permitted by *American Pipe*.  *Id.* (quoting *China Agritech*, 138 S. Ct. at 1808).  Meanwhile, in *Testa v. Becker*, an individual plaintiff sought to extend *American Pipe* tolling to participant ERISA actions, which the court rejected as a "radical argument."  910 F.3d 677, 684 (2d Cir. 2018).  The court's passing dicta that "even if equitable tolling did apply, Testa would almost certainly not qualify for it" because he was not "diligent in pursuit of [his] claims" is not persuasive for lacking any explanation or controlling weight, *id.* at 684 (quoting *China Agritech*, 138 S. Ct. at 1808).

Defendants urge that their proposed narrowing of *American Pipe* is in line with recent decisions that have limited the scope of the doctrine.  *See* Defs.' Reply at 7–8 (citing *China Agritech*, 138 S. Ct. at 1811 and *Weitzner v. Sanofi Pasteur, Inc.,* 909 F.3d 604, 612 (3d Cir. 2018)).  These limitations on class-action tolling, however, are consistent with its original purposes.  In ruling that successive class action complaints cannot benefit from *American Pipe* tolling, the Supreme Court explained that Rule 23 "evinces a preference for preclusion of

untimely successive class actions by instructing that class certification should be resolved early on," and that permitting late-filed class action complaints would violate this policy. *China Agritech*, 138 S. Ct. at 1802; *see also id.* at 1809 (noting that permitting tolling for successive class actions could limitlessly toll the statute of limitations). In *Weitzner*, which held that named plaintiffs in a putative class action cannot later avail themselves of the tolling doctrine, the Third Circuit explained that *American Pipe* is designed to protect the interests of unnamed class members who, under Rule 23, are entitled to act as mere "passive beneficiar[ies]"—a rationale that does not encompass named plaintiffs. *Weitzner*, 909 F.3d at 611 (quoting *Am. Pipe*, 414 U.S. at 552). Defendants' proposed new limitation on class-action tolling, by contrast, runs counter to the "highly sensitive [] need for certainty of a bright-line rule" evinced by the Supreme Court in *American Pipe*. *Bridges v. Department of Maryland State Police*, 441 F.3d 197, 212 (4th Cir. 2006). "Because statutes of limitations provide notice to all parties—to plaintiffs as to a clear date by which to commence an action and to defendants as to a date after which they can rely that stale claims cannot be presented," defendants' vague rule would "destroy[]" the needed "clarity of a statute of limitations . . . contrary to the clear intent of *American Pipe* and *Crown, Cork & Seal*." *Id.* at 213. As a result, defendants' diligence prerequisite would "encourage the duplicative 'just in case' litigation that *American Pipe* seeks to prevent." *Valeant Pharms.*, 1 F.4th at 177.

Consequently, EPIC, as a member of the putative class in *MDL I* now raising the same claims against a subset of the same defendants, is entitled to the benefit of *American Pipe* tolling.

### 2. *Effect of* American Pipe *Tolling on the Statute of Limitations*

Having determined that EPIC was entitled to *American Pipe* tolling, a second question arises: how much time did EPIC have to file its complaint after the tolling period concluded? Courts have framed this question in terms of following either a "stop-clock approach," urged by

plaintiff, in which "the days during a tolled period simply are not counted against the limitations period," or, as defendants urge, a more "case-specific approach" of evaluating whether a litigant pursued its claims with diligence. *Smith*, 953 F.3d at 589 (internal quotations omitted). *Accord Barryman-Turner*, 115 F. Supp. 3d at 132 (comparing the "case-by-case" and "categorical" approaches to *American Pipe*'s application).

The most glaring problem with defendants' argument is that the proposed approach runs counter to the body of Supreme Court jurisprudence creating and interpreting *American Pipe* tolling. The Supreme Court has repeatedly indicated that former members of a putative class have an extension equivalent to "the time the class suit was pending," *China Agritech*, 138 S. Ct. at 1809, to pursue the claims on their own. To begin, in *American Pipe*, where the class action lawsuit was brought with only eleven days yet to run in the period set by the statute of limitations, the Supreme Court held that "the intervenors thus had 11 days after the entry of the order denying them participation in the suit as class members in which to move for permission to intervene"—treating the statute of limitations like a temporarily suspended stopwatch. 414 U.S. at 561. Defendants place great weight on "the *American Pipe* plaintiffs' diligence in filing their motions barely one week after denial of certification," Defs.' Reply at 4, but in later Supreme Court cases, plaintiffs benefitting from *American Pipe* have not always been so quick to file. In *Crown, Cork*, the Supreme Court noted in passing that the putative member of a class action suit "retained a full 90 days"—the applicable statute of limitations period there—"in which to bring suit after class certification was denied." 462 U.S. at 354. The Supreme Court's approach has not wavered upon declaring the tolling rule an equitable one; most recently, the Court noted that "[t]he time to file individual actions once a class action ends is finite, extended only by the time the class suit was pending," *China Agritech*, 138 S. Ct. at 1809. In other words, *American Pipe*

tolling temporarily "stop[s] the limitations clock." *Artis v. District of Columbia*, 138 S. Ct. 594, 602 (2018).  The statute of limitations then "starts running again when the tolling period ends, picking up where it left off." *Id.* at 601.

Defendants cite the district court opinion *Vine v. Republic of Iraq*, which held that, for plaintiffs whose claims were tolled by *American Pipe*, "the deadline is tolled only 'by a reasonable period after the tolling circumstance [is] mended.'" *Vine*, 459 F. Supp. 2d at 24 (quoting *Phillips*, 984 F.2d at 492).  Defendants are correct that the decision was reversed by the D.C. Circuit on other grounds, because the appeals court determined that the statutory jurisdictional provision upon which the plaintiffs relied contained a limitations period that controlled the analysis, requiring the court to "includ[e]" any equitable tolling period "in calculating [the] limitation period," and thus, plaintiffs' complaints were timely.  *Simon*, 529 F.3d at 1194–95 (quoting 28 U.S.C. § 1605(f) (2007)).  At the same time, however, the D.C. Circuit noted that the *Phillips* case, on which *Vine* relied, was undermined by both "intra-circuit" and "inter-circuit inconsistency."  *Id.* at 1195 (identifying, without resolving, this "home-grown conflict").  Indeed, the D.C. Circuit has alternatively declared that, on the one hand, "tolling does not bring about an automatic extension of the statute of limitations by the length of the tolling period," but rather "gives the plaintiff extra time *only* if he needs it," *Phillips*, 984 F.2d at 492 (emphasis in original), and on the other hand, that the "[p]rinciples of equitable tolling usually dictate that . . . the time remaining on the clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped," *United States v. Saro*, 252 F.3d 449, 454 (D.C. Cir. 2001) (quoting *United States v. Ibarra*, 502 U.S. 1, 4 n.2 (1991)).  Properly contextualized, *Vine* is hardly persuasive, particularly in light of the Supreme Court's consistent stop-clock approach to *American Pipe* tolling, and this Court follows *Barryman-*

24

*Turner* in concluding that "[u]nder *American Pipe*, the filing of a class action thus functions as a pause button for the claims of all purported class members."  115 F. Supp. 3d at 134.

Accordingly, because plaintiff's claims were filed within four years of August 16, 2019, the conclusion of the tolling period, its claims are not barred by the statute of limitations.[6]

Finally, defendants' complaint that this result would "allow[] EPIC to create its own [discovery] track, frustrat[ing] the entire purpose of an MDL,"  Defs.' Mot. at 17, is overblown. Plaintiff only seeks "targeted discovery aimed at obtaining the documents previously produced in this case as well as financial information relating to EPIC's purchases of rail services."  Pl.'s Opp'n at 11.  The parties have indicated that, in the intervening period since defendants moved to dismiss this case, they have engaged in limited discovery and otherwise intend to complete discovery upon resolution of the pending motion.  *See* Revised Stipulation Regarding Schedule, *EPIC*, ECF No. 22.  Courts overseeing multidistrict litigation commonly organize separate tracks for discovery, and the discovery for *EPIC* can proceed expeditiously by taking advantage of the completed fact discovery in the earlier cases in *MDL II*.  *See* DAVID F. HERR, MULTIDISTRICT LITIGATION MANUAL II § 1407 (May 2023).

## IV.    CONCLUSION

EPIC's complaint is not time-barred.  The limitations period was tolled, as provided by *American Pipe,* because plaintiff is a former putative class member of earlier class proceedings in *MDL I* and its claims fall within the scope of the class sought to be certified in *MDL I*.  Thus, defendants received adequate notice of the subject matter, such that they were aware of the need

---

[6]    Having found that *American Pipe* tolling applies here to suspend the running of the statute of limitations as to plaintiff's claims, EPIC's  supplemental argument need not be addressed that because defendants "expressly stipulated and agreed to 'exclude from future statutes of limitations *calculations*' the time prior to the D.C. Circuit Court of Appeals ruling on class certification," the stop-clock approach must control.  *See* Pl.'s Opp'n at 10 (emphasis in original).

to preserve relevant evidence, and continued litigation of those allegations at this late date poses no unfair surprise.  The tolling suspended the running of EPIC's statute of limitations for the duration of the tolling period, resulting in EPIC having the same amount of time remaining under the statute of limitations that it did at the commencement of *MDL I.*

Accordingly, defendants' motion for the dismissal of EPIC's complaint is DENIED, and its request for a stay of discovery pending a ruling on this motion is DENIED AS MOOT.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: June 21, 2023


_____
BERYL A. HOWELL
U.S. District Judge